**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| JUDY VUONG, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 4:22-cv-01823 |
| | ) | |
| U.S. DEPARTMENT OF VETERANS | ) | |
| AFFAIRS | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DENIS MCDONOUGH, | ) | |
| In his official capacity as Secretary of | ) | |
| Department of Veterans Affairs, | ) | JURY DEMANDED |
| Defendants. | ) | |
| | ) | |

**SECOND AMENDED COMPLAINT**

**TO THE HONORABLE UNITED STATES DISTRICT COURT:**

Plaintiff JUDY VUONG, in the above numbered and entitled case, complains of

DENIS MCDONOUGH, SECRETARY, DEPARTMENT OF VETERANS AFFAIRS (VA) and

the UNITED STATES DEPARTMENT OF VETERANS AFFAIRS. (Hereafter, "Defendants",

"VA" , "MEDVAMC" and/or "Agency"), Defendants in the above numbered and entitled case,

and for cause(s) of action would respectfully show unto the Court and jury as follows:

**I. PARTIES**

1.        Plaintiff, JUDY VUONG an Asian Female, is a citizen of the United States,

was employed as a Supervisory Health Systems Specialist (GS-0671-13) and then as a Program

Analyst (GS-0343-13) for the Health Administrative Service (HAS) of the Department of Veterans

Affairs at the Agency's Michael E. DeBakey VA Medical Center in Houston, TX ("MEDVAMC")

during the time-period wherein the present of cause of action accrued. JUDY VUONG has been employed by the DEPARTMENT OF VETERANS AFFAIRS from September 2008 to present. JUDY VUONG is a federal employee within the meaning of Section701(f) and Section 717(a) of Title VII, 42 U.S.C. Sec. 2000e(f) and 16(a) and at all relevant times was a federal employee.

2.      Defendant DENIS MCDONOUGH is the SECRETARY OF THE DEPARTMENT OF VETERANS AFFAIRS, which is an agency of the United States government. Secretary DENIS MCDONOUGH is therefore a proper party to be named and served on Plaintiff's various EEO complaints. Secretary DENIS MCDONOUGH is a nominal party only and is not believed to have any personal knowledge of the events at issue. The actual discriminatory actors in this case are all employees of the VA. Defendant does business at the United States Department of Veterans Affairs 810 Vermont Avenue, NW Washington DC 20420. Defendant DENIS MCDONOUGH is sued in his official capacity as SECRETARY OF THE DEPARTMENT OF VETERANS AFFAIRS, and as such, is amenable to suit as provided in Section701(f) and Section 717(a) of Title VII, 42 U.S.C. Sec. 2000e(f) and 16(a) and may be served by serving Secretary, DENIS MCDONOUGH.

3.      Defendant U.S. DEPARTMENT OF VETERANS AFFAIRS ("VA") is a federal Agency who, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000c, is a properly named party for claims arising under Title VII.

## II. JURISDICTION

4.      This action arises under Title VII of the Civil Rights Act of 1964, Section 701 et. seq., as amended, 42 U.S.C.A. 2000e, et. seq., 29 C.F.R. 1614 *et. seq*., and 28 U.S.C. Section 1346.

5.      All of the necessary administrative prerequisites have been met prior to filing the instant action, as Plaintiff has filed timely complaints of race discrimination, color discrimination, sex discrimination and retaliation with her federal employer, the Department of Veterans Affairs, and brings her claims more than 180 days after she filed her formal complaints.

6.      The Southern District of Texas is where the actions complained of in the present case took place and where the employment records relevant to the unlawful practices are kept.

7.      The jurisdiction of the Court is invoked pursuant to 28 US.C. § 1343(a)(4) and 42 U.S.C. § 2000E-5 (2012).

### III. VENUE

8.      Venue is appropriate in this District pursuant to 28 U.S.C. §1391, 42 U.S.C. 2000e-5(f)(3), because the Defendant resides in this judicial district, and a substantial part of the events giving rise to this action took place within this judicial district.

### IV. FACTS

9.      Plaintiff Judy Vuong was a Supervisory Health Systems Specialist (GS-0671-13) and then a Program Analyst (GS-0343-13) for the Department of Veterans Affairs at the Agency's Michael E. DeBakey VA Medical Center in Houston, TX ("MEDVAMC" or "Agency"), during the time-period that is the subject matter of the present litigation.

10.      Upon becoming the Associate Director in April 2014, Mr. Christopher R. Sandles (African American/Black Male), hereafter "Mr. Sandles", immediately discriminated, harassed, and then retaliated against Plaintiff. Mr. Sandles intentionally created a hostile and stressful environment where his "cronies", most of whom are Black/African American or White/Caucasian, perpetuated the intentional harassment of Plaintiff. These hostile actions by Mr. Sandles were

motivated by Plaintiff's race, color, sex and in retaliation for her protected EEO activities. Plaintiff is an Asian female.

11.     From on or about April 1, 2014 to on or about July 26, 2017, Agency management officials, including but not limited to Christopher R. Sandles, Associate Medical Center Director, Curtis Bergeron (Black/African American Male), Supervisory Health Systems Specialist to Prime Care, and Carolyn F. Baldwin (White/Caucasian Female) badgered, harassed and humiliated Plaintiff on almost a daily basis, motivated by and/or because of Plaintiff's race, color, sex and in retaliation for her prior protected EEO activity. This continuous hostile work environment included but not limited to setting Plaintiff up for failure; excessively monitoring Plaintiff; talking down to Plaintiff; mocking Plaintiff's education; giving Plaintiff demeaning work duties; trying to turn Plaintiff's coworkers against her; attempting to create strife between Plaintiff and her subordinate employees; intentionally giving Plaintiff inconsistent instructions; sending Plaintiff harassing emails; humiliating Plaintiff in front of her coworkers, intentionally ignoring Plaintiff's work related inquiries; defaming Plaintiff; repeatedly questioning Plaintiff's intelligence; excluding and isolating Plaintiff from her coworkers. The incidents comprising this hostile work environment are identified in very specific detail in Exhibit 3, Exhibit 4, Exhibit 5 and Exhibit 6 attached to Plaintiff's First Amended Complaint and also identified in the facts section of this Second Amended Complaint. (Dkt. #22).

12.     In addition to the hostile work environment described above, the Agency subjected Plaintiff to several discrete adverse actions from on or about April 1, 2014 to on or about July 26, 2017, including but not limited to the Agency denying Plaintiff higher ratings on her performance appraisals; Mr. Sandles' failure to submit Plaintiff's performance appraisals which resulted in her

not receiving several incentive awards; Mr. Sandles not allowing Plaintiff to participate in the National Workgroup; Mr. Sandles issuing Judy a "2016 Supervisory Notice of ECF Performance Concerns"; on or about July 22, 2016, Plaintiff was not selected for the Staff Assistant position to the Deputy Medical Center Director; Mr. Sandles intentionally delayed his approval of Plaintiff's nomination for membership to VISN 16 Professional Standards Board; denying Plaintiff the opportunity to serve as acting Chief of HAS on multiple occasions; denying Plaintiff career enhancing opportunities on multiple occasions; on or about October 28, 2016 Plaintiff was notified that she was not selected for the position of Medical Administration Officer under Vacancy ID 1789406; on or about May 30, 2017, Plaintiff was not selected for the Health Systems Specialist position under the Office of the Deputy Medical Center Director; on or about June 20, 2017, Plaintiff was not selected for the Health Systems Specialist position under the Clinical Practice Office; Agency's denial of Plaintiffs "detail" opportunities; deliberately isolating Plaintiff physically, emotionally, and not promoting Plaintiff. These discrete adverse acts were motivated by and/or because of Plaintiff's race, color and sex, as well as being in retaliation for Plaintiff's opposition to such unlawful conduct. These discrete acts of discrimination and retaliation are identified in very specific detail in Exhibit 3, Exhibit 4, Exhibit 5 and Exhibit 6 attached to Plaintiff's First Amended Complaint and also identified in the facts section of this Second Amended Complaint. (Dkt. #22).

13.     On or about April 1, 2014, Plaintiff requested that Mr. Sandles be her mentor upon coming on board to MEDVAMC. Mr. Sandles declined.   Yet, Mr. Sandles favored and mentored other staff who are outside of his oversight, such as Mr. Chris Ferguson and Ms. Sonja White (Black/African American Female).   This was very demeaning and insulting to Plaintiff as Mr.

Sandles refused to provide any support or mentorship to Plaintiff but did provide support to her coworkers that were outside of protected classes.

14.     On or about April 8, 2014, Mr. Sandles inquired about Plaintiff's personal life based on what he had "heard." Plaintiff requested that Mr. Sandles keep her personal life private, and he agreed.   However, Mr. Sandles violated this agreement and shared Plaintiff's personal life with her colleagues and subordinates without her permission. Telecare staff become aware of Plaintiff's personal life because Mr. Sandles shared this private information with them. Plaintiff had not shared this personal information with her direct staff.

15.     Plaintiff requested to be added to the Executive Council e-mail group on several occasions but was not added by the owner, Victoria Wells (White/Caucasian Female).   Upon further discussion with Mr. Sandles on April 8, 2014, he stated, "You should be added to the Executive Council e-mail group, and I'll see to it that you will be added."   Yet, Plaintiff was never added to the Executive Council e-mail group.   Plaintiff was later informed that she allegedly did not qualify to be added to the Executive Council e-mail group because she did not encumber a "GS-14" position.    Yet, there were other GS-13 staff who attended these meetings. For example, Carolyn F. Baldwin (Hereafter "Ms. Baldwin", White/Caucasian Female), former Assistant Chief of Health Administration Service ("HAS"), was the equivalent grade as Plaintiff (GS-13) and was added to the Executive Council e-mail group without any issues.   Ms. Baldwin was kept up to date with the activities of the facilities, whereas Plaintiff was deliberately excluded from receiving any executive information.

16.     On or about April 8, 2014, Mr. Sandles was informed that Plaintiff was not issued an FY14 Performance Appraisal as the former Associate Director, Francisco Vasquez (Hispanic

Male), transferred to a different facility when Plaintiff came on board.   Plaintiff provided Mr. Sandles several notifications.   However, Mr. Sandles failed to issue Plaintiff's Fiscal Year 2014 (FY14) Performance Appraisal despite several reminders.

17.     Mr. Sandles failure to submit Plaintiff's FY14 Performance Appraisal, resulted in the loss of Plaintiff's incentive award. This happened for several performance appraisal cycles wherein Plaintiff did not receive an incentive award even though she was entitled to these awards. Each time Plaintiff did not receive an incentive award resulted in monetary loss to her.

18.     On or about June 4, 2014, Mr. Sandles informed Plaintiff that a realignment of Telecare Pharmacy staff to Outpatient Pharmacy would occur.   Mr. Sandles moved the Telecare Pharmacy staff under Outpatient Pharmacy, which reported questionable data among other problematic practices.   Outpatient Pharmacy continued to fail its measures with Pharmacy supervision but none of the managers were issued a 2016 Supervisory Notice of (Executive Career Field) ECF Performance Concerns.   Instead, Cheryl Douglas (Black/African American Female) was selected and promoted to GS-15 Chief of Pharmacy in September 2015.

19.     On or about August 6, 2014, Plaintiff completed a mediation with the Telecare Leadership "team members" upon the instructions of Mr. Sandles even though Plaintiff had informed him that she was not comfortable.   Additionally, Plaintiff informed Mr. Sandles of a "hostile work environment" that Ms. Edtrina Moss (Black/African American Female) created and cultivated.   Mr. Sandles brushed off her concerns, stating, "These are not indicative of the definition of a hostile environment and are more appropriately addressed with performance actions, coaching, and in this case improving infrastructure."   Mr. Sandles alleged that Plaintiff

was the issue even though she was holding staff accountable since they were allowed to violate laws and regulations under past management officials.

20.     During various bi-weekly meetings, Plaintiff informed Mr. Sandles that Ms. Moss, former Nurse Manager, created and instilled a hostile work environment. Ms. Moss made false allegations that Plaintiff instructed staff to hang up on a patient. Marilyn Shaffer (Asian Female), Telecare registered nurse, even stated to Plaintiff that "Ms. Moss is out to cut your throat." Plaintiff submitted a disciplinary action request for Ms. Moss's disruptive and threatening conduct. However, no action was taken against Ms. Moss. Mr. Sandles continued to allow a hostile work environment to thrive.

21.     On or about August 5, 2014, Mr. Sandles conducted a town hall meeting with the Telecare Nurses.   The staff nurses expressed and confirmed that Nurse Manager, Ms. Moss created and instilled a hostile work environment. Prior this town hall meeting, Plaintiff had advised Mr. Sandles of Ms. Moss's hostile behavior, but Mr. Sandles did not believe Plaintiff despite several notifications.    Instead, it was reported during this meeting that Mr. Sandles asked, "What about Judy?" rather than focusing on the complaints regarding Ms. Moss that were brought to his attention. Staff responded that Plaintiff was not the issue but that it was Ms. Moss.

22.     On or about August 25, 2014, Mr. Sandles informed Plaintiff that he had concerns about a "hostile work environment" that staff expressed to him that Ms. Moss created and instilled during the town hall meetings.   However, Mr. Sandles did not believe Plaintiff when she had previously brought these concerns to his attention during their bi-weekly meetings. Mr. Sandles decided to take action only after Plaintiff's subordinate staff corroborated her concerns regarding Ms. Moss.

8

23.     On or about September 26, 2014, Plaintiff informed Mr. Sandles of a hostile work environment connected with Marlecia Price (Black/African American Female), former Medical Support Assistant (MSA) Supervisor.    Plaintiff further informed Mr. Sandles that her relationship with Ms. Price was not productive and was not salvageable.    Despite Plaintiff's concerns and discomfort, Mr. Sandles continued to have Ms. Price under Plaintiff's oversight. Yet, Mr. Sandles moved other staff, outside of Plaintiff protected class, when they caused discomfort to other management staff but not for Plaintiff.

24.     On or about September 26, 2014, Mr. Sandles stated, "Judy, last minute Annual Leave requests are not well received by me.    This should be avoided in the future or risk being denied."   Mr. Sandles threatened to mark Plaintiff as Absent Without Leave (AWOL).   Mr. Sandles threatened to AWOL Plaintiff without further determining why she requested Annual Leave on such short notice.

25.     On or about October 2014, Mr. Sandles reviewed Plaintiff's selection for the Medical Support Assistant (MSA) Supervisor, rather than allow Plaintiff to exercise supervisory oversight.    Mr. Sandles made the statement, "I don't know why Judy selected you" to Timothy Jackson, former MSA Supervisor.   This was statement was made in the presence of Nurse Manager, Ms. Denise Davis, (Black/African American Female) during a meeting in December 2014.   This commentary not only undermined Plaintiff's authority but also discredited her supervisory judgment.

26.     On or about November 6, 2014, Plaintiff made a request to change her schedule temporarily since she was attending law school part-time.    Mr. Sandles was aware of Plaintiff's personal commitments outside of work. At the VA, Plaintiff oversaw the operations of a 24-hour/7-

day-a-week Call Center, which had several different works shifts available for rotation. However, Mr. Sandles denied Plaintiff's request even though it was temporary and related to a practicum in conjunction with another federal agency on November 13, 2014.

27.     On or about November 13, 2014, Mr. Sandles stated Plaintiff's schedule change request was for "personal needs" even though this practicum experience would be with the United States Attorney's Office and would thus contribute to the needs of the Federal Government.     Mr. Sandles further stated that he would need to "clarify with HR."    Mr. Sandles deliberately failed to respond to Plaintiff's request in a timely manner, thereby forcing her to rescind her schedule change request despite the fact that she had initiated this request at least 7 days in advance and provided Mr. Sandles with a friendly reminder. It should be noted that several staff employees under Mr. Sandles' oversight, including but not limited to Mark Muhammad (Black/African American Male), former Human Resources Officer, have changed their schedules to pursue educational endeavors unrelated to the Federal Government.     Staff, outside of Plaintiff's protected class, were allowed to change their work schedules without having to exhaust their Annual Leave, even though only one tour-of-duty is available within their respective services. Other staff, outside of Plaintiff's protected class, were also able to "flex" their tours-of-duty, such as Alisa Cooper (Black/African American Female), Chief of Fiscal Service, and were allowed to come in as they please.

28.     During bi-weekly meetings, Ms. Davis and Plaintiff notified Mr. Sandles that Leah Palmer (White/Caucasian Female), Assistant Nurse Manager, was disruptive during a transition period where the Nurse Manager position was vacant. However, Mr. Sandles met with Ms. Palmer without re-directing her back to her chain-of-command.    Ms. Palmer had filed an EEO complaint

against Telecare management on or about March 4, 2015.   Shortly thereafter, Ms. Palmer was "hired" for a position under Research with Mr. Sandles' help on or about May 17, 2015. It should be noted that the position Ms. Palmer was selected for was not posted on www.usajobsjobs.gov for interested applicants to compete.

29.     Mr. Sandles did not allow Plaintiff to independently hire the Nurse Manager who would be under her direct supervision in September 2014.   On or about February 3, 2015, Mr. Sandles closely reviewed Plaintiff's selection for the vacant Nurse Manager position since he did not "trust" Plaintiff's selection.

30.     On or about February 23, 2015, Mr. Sandles provided Plaintiff instructions to terminate Sandra Strassner (White/Caucasian Female), who had interim reasonable accommodations with Non-VA Care under the supervision of Ms. Edritna Moss.   Plaintiff questioned why Ms. Strassner was being terminated since she was no longer under Plaintiff's service and was performing her duties under Non-VA Care since February 3, 2015.   Mr. Sandles responded that she was a "re-employed annuitant", and her employment was "at-will."   This created stressful circumstances as Plaintiff was instructed to remove a federal employee without receiving any valid reasons as to why she was being terminated.

31.     On or about February 25, 2015, Mr. Sandles embarrassed Plaintiff in front of her fellow colleagues during an Associate Director bi-weekly meeting.   Mr. Sandles stated that Telecare had been in a "hell storm" and threatened that Plaintiff was in the "hot seat" during this meeting with other managers.   However, Plaintiff had been reporting progress to Mr. Sandles on a consistent basis regarding the failure to meet Utilization Review Accreditation Commission (URAC) measures.   Adam Walmus (Medical Center Director, White/Caucasian Male) was not

notified of said progress despite Plaintiff's constant updates to Mr. Sandles.   The service was failing to meet URAC measures and was falsifying data to receive accreditation prior to Plaintiff coming on board.   However, upon Plaintiff's encumbrance of the Chief position, Plaintiff reported accurate data and attempted to rectify issues moving forward but was penalized by Mr. Sandles for doing so.

32.    Mr. Walmus, retired Medical Center Director, instructed Plaintiff to complete site-visits at the Community-Based Outpatient Clinics (CBOCs).   Upon completion of the site-visits on or about March 19, 2015, results were provided to Executive Leadership.   In response to Plaintiff's results, Mr. Sandles stated, "Judy, any updates to the Director are to be routed to me, and I'll provide them."   Mr. Sandles restricted Plaintiff from expressing her concerns regarding untruthful practices and/or prohibited Plaintiff from bringing her concerns to the attention of the chain-of-command. Yet, Mr. Sandles enabled Plaintiff's staff, who were mostly Black/African American, to meet with and e-mail senior leadership directly.   However, Plaintiff was restricted from addressing the Medical Center Director directly even though Mr. Walmus requested updates from her directly. Mr. Sandles continued to intentionally undermine Plaintiff's authority and ability to perform her job functions to set her up for failure.

33.    Upon returning from medical leave on or about March 23, 2015, Ms. Tegan (Gay) Chambliss (Black/African American Female) informed Plaintiff that Plaintiff was to issue a termination letter to Ms. Strassner per Mr. Sandles instructions. This made Plaintiff very uncomfortable as she did not initiate the request nor was she aware of what had transpired that resulted in the decision to terminate Ms. Strassner. However, Plaintiff was still expected to deliver

the proposed removal action against Ms. Strassner after Plaintiff returned from her scheduled medical leave.

34.     On or about March 26, 2015, Mr. Sandles embarrassed Plaintiff yet again in front of Care Line Executives when he stated on a microphone in front of all Executives present, "Judy, this meeting is only for Executives."     However, Mr. Sandles had initially invited Plaintiff to come to the meeting to discuss scheduling concerns. Mr. Sandles invited Plaintiff to the meeting for the sole purpose of intentionally humiliating her in front of upper management.

35.     On or about April 9, 2015, Mr. Sandles provided Plaintiff with instructions to cease Silent Monitoring upon his agreement with the American Federation of Government Employees (AFGE) even though this practice had been a URAC accreditation requirement for quite some time.     Mr. Sandles excluded Plaintiff from the discussion with AFGE even though it affected her workload.     Plaintiff informed Mr. Sandles of the history related to Silent Monitoring.     However, during an Automatic Call Distribution Strategic Management Board (ACD SMB) meeting on or about July 28, 2015, Kelly Irving (Black/African American Female), Associate Director of Patient Care Services, questioned why there was a change to Silent Monitoring as it had been in practice for quite some time even when it was under her oversight.     Mr. Sandles blamed the changes on Plaintiff and stated, "Judy can explain" in front of Plaintiff's colleagues.

36.     On or about April 9, 2015, Mr. Sandles embarrassed Plaintiff in front of her colleagues.     Mr. Sandles stated that a patient had accused Maurice Stringfellow (African American Male), Telecare Medical Support Assistant, of theft of a cell phone.     Mr. Sandles stated mockingly, "You need to check up on that."     Upon further investigation, it was a found to be a misunderstanding as Mr. Stringfellow had kept the lost cell phone for safekeeping to return to the

patient. However, Plaintiff reported to Mr. Sandles that Mr. Stringfellow had falsified his Over

Time (OT) in Rehabilitation Service.   But no action was taken by Mr. Sandles against Mr.

Stringfellow even though Mr. Sringfellow had committed timecard and government fraud.   Yet,

Plaintiff was "verbally counseled" for being on medical leave even though she had supporting

medical documentation and provided instructions to upload and submit contract information while

she was out on unexpected medical leave on or about March 23, 2016.

  37. Plaintiff requested Annual Leave for 1.5 hours from 2:30 p.m. to 4:00 p.m. on or

about April 5, 2015.   Mr. Sandles denied this request even though Plaintiff had planned coverage

for 1.5 hours, made this request in advance, and had sufficient annual leave to make this request.

Plaintiff inquired whether the policy of notifying Mr. Sandles regarding her leave requests had

changed but she did not receive a response from Mr. Sandles to her inquiry.

  38. On or about April 21, 2015, Mr. Sandles received an e-mail from Jo Ann

Malarchick (White/Caucasian Female), former Telecare registered nurse, who was disgruntled

with changes and read it to Ms. Davis and Plaintiff during a bi-weekly meeting.   However, Mr.

Sandles did not send the e-mail to them for their rebuttal.   Instead, Mr. Sandles took Ms.

Malarchick's complaint at face value and did not provide Plaintiff with the fair opportunity to

respond. Ms. Sandles continued to intentionally discriminate against Plaintiff by undermining her

authority and purview of responsibilities associated with her VA job functions.

  39. While Plaintiff was on leave, Mr. Sandles attended a meeting that Plaintiff

facilitated along with Prime Care on April 23, 2015.   During this meeting, Mr. Sandles discussed

Plaintiff's personal life.   Mr. Sandles informed Mr. Curtis Bergeron (Black/African American

Male), Health Systems Specialist to Prime Care, that Plaintiff was in law school despite her making repeated requests to keep her personal life private.

40.     During a meeting on April 24, 2015, Plaintiff informed Mr. Sandles of direct observations and questionable practices presented during the Medical Support Assistant (MSA) Training that Ms. Marlecia Price (Black/African American Female) was tasked to complete.    This meeting included Mr. Sandles, Ms. Denise Davis, Ms. Price, and Marilyn Davis (Black/African American Female).    Mr. Sandles stated, "How many MSAs did you send to this training?" Plaintiff responded, "One."    Mr. Sandles then questioned, "Then how do you know this? You're taking it off one MSA's response?"    However, Plaintiff had attended the training first-hand, as she had noted in the original e-mail addressing Plaintiff's concerns to Mr. Sandles.

41.     On or about May 11, 2015, Plaintiff requested a change to her schedule and requested Leave Without Pay (LWOP) in order to complete Plaintiff's Doctor of Jurisprudence (J.D.) degree.    Instead, Mr. Sandles approved an arrangement whereby Plaintiff would exhaust her Annual Leave to complete her classes. However, other staff under Mr. Sandles' oversight, such as Mark Muhammad (Black/African American Male), were not required to exhaust their leave. Plaintiff exhausted 180+ hours of Annual Leave but many other employees outside of her protected class were not required to exhaust their Annual Leave to pursue their educational endeavors unrelated to the mission of the Federal Government.

42.     On or about June 2015, it was reported that Ms. Keisha Allen (Black/African American Female) made threats toward the lives of her managers (Ms. Davis and Plaintiff). During the fact-finding regarding this matter, Michael King (Black/African American Male,

External Vice President of AFGE) stated to Plaintiff, "Are you incompetent?" and walked out of the fact-finding.

43.     Shortly thereafter, Mr. Sandles called Plaintiff on July 15, 2015, to determine what had occurred as he had "heard" what had gone on from the AFGE and inferred that Plaintiff was the issue. Mr. Sandles did not provide Plaintiff with a fair and proper opportunity to respond to these allegations. Plaintiff informed Mr. Sandles of the unprofessional conduct Mr. King exhibited, and that Ms. (Gay) Chambliss (Black/African American Female) could attest to his disruptive behavior when Plaintiff attempted to move forward with the fact-finding. Prior to the start of the meeting, Ms. Chambliss shared with Plaintiff that she respected Plaintiff and that Plaintiff stood up for what was right.   Ms. Chambliss confided that she does not like it when "people abused their authority" and had "power trips" especially against "women of color."   Ms. Chambliss was referring to her observations of Mr. Sandles in his interactions with Plaintiff.

44.     Shortly thereafter, Mr. Sandles removed Plaintiff from the fact-finding and assigned it to Percy Riley (Black/African American Male). However, Ms. Allen was not re-assigned from the service while the fact-finding was conducted.   Instead of disciplining staff, Mr. Sandles provided instructions for mediation to occur.   Mr. Sandles continued to endanger Plaintiff's life when she had already informed him that she was concerned of workplace violence by Ms. Allen.

45.     On or about June 17, 2015, Mr. Sandles did not respond to a disrespectful and threatening e-mail from Keisha Allen (Black/African American Female), former Telecare registered nurse, sent to Plaintiff and included him.   Ms. Allen stated, "Ms. Vuong, I am going to ask you in the *nicest* possible way, not to take it upon yourself to sign in for all staff who attend

16

meeting." Mr. Sandles did not intervene, nor did he inform the Ms. Allen to stop her disrespectful conduct towards Plaintiff.   Instead, Mr. Sandles continued to allow for this disruptive behavior towards Plaintiff to go unaddressed.

46.     Mr. Sandles was aware of Plaintiff's part-time work schedule for the month of June 2015.   On or about June 18, 2015, a scheduling concern was escalated to Mr. Sandles in which Plaintiff questioned the Medical Care Line (MCL) of the accuracy of the alleged "scheduling error."   The Medical Care Line (MCL) was unable to provide a valid response as to what it considered a "scheduling error."   However, the meeting was scheduled to deliberately exclude Plaintiff's presence and/or representation from Telecare. Mr. Sandles stated, "This is not for e-mail."   It was apparent that Mr. Sandles wanted to "game" the system to indicate that patients had timely access to care even though they did not and "warned" Plaintiff this was to be discussed "orally" to ensure that wrongdoing would not be tracked in writing should an investigation arise. Thereafter, Mr. Sandles sent an e-mail instructing changes that appointments less than 30 days were to be transferred directly to MCL instead of Telecare to schedule the appointments into VistA, the legacy electronic health records system.   Mr. Sandles effectively approved an arrangement where data would not be accurately captured – and thus reflect positively for this service, if not the facility despite Plaintiff's concerns.

47.     On or about July 15, 2015, Plaintiff was appointed as the Chairperson for the Medical Support Assistant Professional Standards Board (MSA PSB). Plaintiff informed Mr. Sandles that the Inpatient MSAs would not meet the qualifications for a GS-6 since Plaintiff reviewed qualifications as the Chair of the MSA Board in the presence of Clifton Jackson (Black/African American Male), Labor Management (LMR) Specialist.   Mr. Sandles was upset

17

when Plaintiff informed him of this and he stated, "Holy Sh*t!"   Mr. Sandles cursed and yelled at Plaintiff. Then, on April 4, 2016, Plaintiff was removed as the sole Chair and was demoted to being Co-Chair.

48.    Plaintiff informed Mr. Sandles that Mr. Jeffrey Young stated that Plaintiff had a "target on your back" from the AFGE and that "it was not a way to live" upon her meeting with Jeffrey Young (White/Caucasian Male) ), former Chief of Labor Management Relations (LMR), Alisa Cooper (Black/African American Female), Chief of Fiscal Service, and Darren Breaux (Black/African American Male), LMR Specialist, on July 29, 2015.   Plaintiff received the veiled threat that Plaintiff was not doing things the "VA way."   However, Mr. Sandles did not address this threat even though Plaintiff brought this to his direct attention.

49.    Plaintiff entered her leave into VistA platform in advance for August 2015, which included both Annual and Sick Leave requests.   Shortly after returning to work on August 12, 2015, Plaintiff received an e-mail from the Staff Assistant, Ms. Chambliss, that there was a "change in process."   This "change" was made and directed toward Plaintiff since she was on leave for greater than a week and was approved for both Annual and Sick Leave prior to this announcement.

50.    On or about August 17, 2015, during an Automatic Call Distribution Strategic Management Board (ACD SMB) meeting, a service had commented that calls were being transferred to their service.   Mr. Sandles stated, "Are you sure it wasn't Telecare?" Again, Mr. Sandles tried to use Plaintiff as a scapegoat.

51.    On or about August 18, 2015, Mr. Sandles sent Plaintiff an e-mail displaying her leave pattern from February 2015 until August 2015.   However, Mr. Sandles had previously

approved the exhaustion of Plaintiff's Annual Leave and Leave Without Pay arrangements for this time period.   Mr. Sandles claimed that Plaintiff was necessary to the operations of the service but allowed Plaintiff to change her schedule and then later issued her a 2016 Supervisory Notice of ECF Performance Concerns.

52.     On or about July 2015, Mr. Sandles did not move forward with the Summary Review Board action that was proposed for a disruptive probationary employee named Cora Duhon (Black/African American Female), a former Telecare registered nurse.   Mr. Sandles was informed that this employee created a "hostile work environment" with her disruptive behavior. However, Mr. Sandles supported and moved forward with the Summary Review Board for an employee under one of his other services, VA Care Coordination.   This proposed action of termination for that employee went through on August 18, 2015.   Instead, when it came to Ms. Cora, Mr. Sandles stated he wanted to "speak with her [Cora]."   This was yet another instance in which Mr. Sandles continued his pattern of questioning Plaintiff's qualifications and competency as a manager.

53.     On or about August 19, 2015, Mr. Sandles was scheduled to meet with the Telecare management team in Conference Room in Telecare (Building 122, Rm 110).   Ms. Davis, Mr. Jackson, Ms. Clay-Jordan, and Plaintiff waited for Mr. Sandles for quite some time, but he did not report to the meeting room.   Mr. Sandles was called from the Conference Room to ensure that he was not lost.   Plaintiff stated that they had been waiting for him in the Conference Room.   Mr. Sandles shouted, "I am pissed off.   You made me walk in the heat for the past 15 minutes." Plaintiff inquired which room he went to, and he stated it was the Conference Room.   However,

the team was in the Conference Room waiting for him for approximately fifteen minutes.   On several occasions, Mr. Sandles had confused Room 114 with Room 110 in Building 122.

54.     Also on August 19, 2015, Mr. Sandles instructed Plaintiff to write an apology to the AFGE and that it was "non-negotiable" to "drop a ULP (Unfair Labor Practice) complaint." However, Mr. Sandles did not share the ULP complaint for Plaintiff to review and respond accordingly.   It was Mr. Jackson that had a previous direct interaction with AFGE on this matter, not Plaintiff.   Mr. Sandles then threatened Plaintiff with the comment, "You don't want your name showing up [on the Internet."   Mr. Sandles further threatened to divide Telecare.   Mr. Sandles stated, "I'm debating whether I want to split up Telecare."

55.     On or about August 27, 2015, in fear of continued retaliation, harassment, and discrimination that would affect both Plaintiff's professional and personal endeavors, Plaintiff stated on her Moral Character and Fitness application for the Texas Bar exam that Mr. Sandles may provide unfair and inaccurate information.   Plaintiff notified the Committee of Plaintiff's concerns along with the submission of Plaintiff's application.   This was distressing and upsetting to Plaintiff as concerns with her professional life had crossed over to Plaintiff's personal life.

56.     On or about August 28, 2015, Mr. Sandles agreed to the temporary placement of a disruptive employee, Alex Richard (Black/African American Male), Pharmacist, from Inpatient Pharmacy to Telecare.   This employee had threatened the life of the former Pharmacy Inpatient Manager, who had resigned from the facility after this troubling incident.   It was also reported that this employee had exhibited suicidal and depressed ideations and threatened workplace violence, thereby resulting in his temporary placement in Telecare.   However, this general information was not disclosed to Plaintiff and her teams even though their lives were in direct

20

danger.   Mr. Sandles did not take Plaintiff's concerns seriously until Reports of Contacts from anonymous sources expressed their concerns about this disruptive employee.

57.     On or about August 29, 2015, Plaintiff applied for the Health Care Leadership Development Program. Mr. Sandles had encouraged his Chiefs under him to apply for said program. However, when Plaintiff applied to the program Mr. Sandles wrote inappropriate comments on the application. Mr. Sandles wrote that Plaintiff would not be able to "handle the program" since she was "attending law school." As a result of these inappropriate comments, Plaintiff was disqualified from advancing to the next round of the program.

58.     Mr. Sandles instructed that no bargaining unit staff were to attend Prime Care cross-training meetings in August 2015.   However, Mr. Sandles discussed management preparations in front of Ms. Clay-Jordan (Black/African American Female), Administrative Officer who had bargaining unit status, and even assigned her the task of reviewing the rooms.   This created the perception that Plaintiff purposely excluded Ms. Clay-Jordan from these meetings, despite Mr. Sandles' direct instructions.   Mr. Sandles purposely set up Plaintiff to have meritless complaints filed against her.

59.     On or about September 3, 2015, Mr. Sandles pressured Ms. Davis and Plaintiff to hire candidates quickly in the presence of Karen Reynard (Black/African American Female), Staffing Specialist, and Maggie Rountree (Black/African American Female), Nurse Recruitment Specialist, during a Telecare Staffing meeting.   During this meeting, Plaintiff explained to Mr. Sandles that candidates were selected based on the hiring grid.   Plaintiff further explained that candidates who were not selected were screened and did not qualify.   Mr. Sandles requested to review the hiring grid and to micromanage Plaintiff's work.   Upon further discussion, they were

instructed to hire the rejected candidates. As a result of this undue pressure, these candidates were hired and continued to be problematic employees within Telecare.   Mr. Sandles continued to undermine Plaintiff's authority by constantly and excessively micromanaging Plaintiff, even though she could independently make decisions as the Chief.

60.     On or about September 10, 2015, Plaintiff informed staff of a few announcements, including cross-training for the Telecare-Prime Care rotations.   Previously, on September 1, 2015, Mr. Sandles provided Ms. Davis and Plaintiff with approval to move forward with this project and spoke about his vision.   During this meeting, Plaintiff informed him that AFGE should be notified.   Mr. Sandles stated, "We will deal with AFGE at a later time." Ms. Davis was present and witnessed Mr. Sandles' statement.   However, Mr. Sandles then blamed Plaintiff for moving forward with his orders on October 2, 2015. Mr. Sandles would use Plaintiff as a "pawn" to further his interest in other areas he oversaw.   This tactic was not only demeaning but also very stressful and hostile to Plaintiff.

61.     On or about September 23, 2015, there was a concern regarding the issuance of Authorized Absence (AA) to employees who went on job interviews.   Mr. Sandles questioned Ms. Davis and Plaintiff on what the previous procedure was for employees who went on interviews.   Mr. Sandles was informed that staff used their Annual Leave.   Despite this explanation, Mr. Sandles instructed Ms. Davis and Plaintiff to approve AA for interviews, even though it was for individual personal gains and Office of Personnel Management (OPM) regulations commended otherwise.

62.     On or about September 28, 2015, Mr. Sandles wrongly accused Plaintiff of retaliating against employees with the direct instructions, "Judy, ensure we are not retaliating

against employees for other on-going issues." However, Plaintiff was not retaliating against any employees and was ensuring same guidelines were applied to all staff.   Plaintiff also received a disturbing e-mail from Kathy Salazar (Hispanic Female), Human Resources Officer, on the behalf of an employee who sent a "threatening" e-mail to Plaintiff since Plaintiff refused to provide him with an unfair advantage for employment within Telecare.   Ms. Salazar intervened on behalf of this employee and provided him with preferential treatment.

63.     On or about September 24, 2015, Mr. Sandles instructed Plaintiff to speak with Ms. Clay-Jordan, Administrative Officer, regarding her "disjointed" presentation and her bargaining-unit status.   Plaintiff discussed these concerns with Ms. Clay-Jordan on September 28, 2015, who informed Plaintiff that "they told me this last year."   However, Mr. Sandles did not inform Plaintiff that he and/or his delegates had already spoken to Ms. Clay-Jordan about this issue. Mr. Sandles continued to intentionally place Plaintiff in uncomfortable situations and was aware of the negative consequences this would cause her.

64.     Ms. Chambliss had previously approved Plaintiff of an Annual Leave request on October 2, 2015.   Yet, there was a change in policy when it came to Plaintiff's leave requests.   Ms. Chambliss stated that she was "not authorized" to approve Plaintiff's Annual Leave request although she had previously approved Plaintiff's Annual Leave request in October 2015.   Mr. Sandles discussed and provided Mr. Chambliss with specific instructions when it came to Plaintiff's leave requests.

65.     On or about October 5, 2015, Mr. Sandles approved for Ms. Moss to take a computer and printer along with her during her transition, even though Plaintiff, as the Chief of

Telecare, did not have a printer in her office. The removal of this equipment did not allow Plaintiff to complete actions in an efficient and effective manner.

66.     On or about October 2015, Mr. Sandles did not take any disciplinary action against Ms. Moss but instead promoted her as the Program Manager of the Care Coordination Office where she oversaw Bed Control, Transfer Center, Diagnostic Referral Center, and Non-VA Care.   Ms. Moss was rewarded for her egregious conduct and was re-assigned to a position equivalent to Plaintiff's position, despite creating and instilling a hostile work environment. Ms. Moss continued to receive the same (managerial) pay and boasted about falsifying data.

67.     During a Strategic Management Board (SMB) meeting on or about October 27, 2015, Jeremiah Jackson (Black/African American Male) reported that an employee was moved from his area while a fact-finding was being conducted.   Yet, problematic employees still remained within Telecare, but other employees were moved to other services during fact-findings.

68.     On or about October 27, 2015, Plaintiff notified Mr. Sandles regarding an incident in which a problematic employee, Akosua Danquah (Black/African American female), attempted to assault Plaintiff on federal grounds.   There were several witnesses to this incident including Ms. Davis, Nurse Manager, and Rey Galvan (Hispanic Male), Medical Support Assistant.   Mr. Sandles did not ask Plaintiff about the incident and/or about her well-being. Instead, Mr. Sandles provided instructions that this disruptive employee continue to be under Plaintiff's oversight and her work area.   This disruptive employee remained under Plaintiff's chain-of-command for quite some time. Also, on or about November 4, 2015, Plaintiff informed Mr. Sandles that she did not feel comfortable speaking with Ms. Danquah alone as her direct supervisor. Mr. Sandles brushed off Plaintiff's concerns and stated she could request Union representation.

69.     On or about October 30, 2015, Mr. Sandles issued Plaintiff her FY15 Performance Appraisal in the presence of a third-party, Ms. Chambliss, Staff Assistant to the Associate Director. This was inappropriate as this discussion between a supervisor and employee should not have occurred in the presence of another employee.   Mr. Sandles deliberately included several inappropriate comments in Plaintiff's appraisal, to intentionally sabotage her future goals and future job prospects, as recent performance appraisals may be requested with federal job applications. Mr. Sandles pressured Plaintiff to sign the document without further review.

70.     Several inappropriate comments were included in Plaintiff's FY15 Performance Appraisal, which Plaintiff rebutted on November 6, 2015. Mr. Sandles further discussed Plaintiff's FY15 Performance Appraisal with her on November 12, 2015. Plaintiff informed Mr. Sandles that the comments were inappropriate and were not in the correct timeframe.   Plaintiff further explained that Telecare was a difficult service consisting of employees who had been transferred, reasonably accommodated and/or had bargained other questionable work arrangements.   Plaintiff provided a reminder that Telecare was considered the "dumping grounds" as Plaintiff had informed Mr. Sandles when he first came on board in April 2014. In response, Mr. Sandles threatened Plaintiff, "If I were unreasonable, I could have included the MSA Supervisor, but I didn't."   Mr. Sandles overlooked Plaintiff's valid concerns and further stated, "Everyone has difficult employees."   Mr. Sandles further stated that he had written a "benign memo" for Mr. Walmus to review and stated he would send Plaintiff a copy of the e-mail.   However, Mr. Sandles never sent Plaintiff a copy of the e-mail.

71.     Mr. Sandles continued to e-mail Plaintiff about her meeting with Mr. Walmus, retired Medical Center Director.   Mr. Sandles stated and inferred, "If you'd like for him to make

25

a decision without a meeting, you can let me know."   Mr. Sandles tried to pressure Plaintiff to

drop Plaintiff's challenge to her Plaintiff's FY15 Performance Appraisal.   It took 6+ months into

Fiscal Year (FY) 2016 to receive a response regarding Plaintiff's multiple rebuttals of her FY15

Performance Appraisal.   Additionally, Plaintiff had concerns with her FY15 Mid-Year Review

and did not sign it, as Mr. Sandles did not discuss his alleged concerns with Plaintiff face-to-face.

72.     On or about May 23, 2016, Plaintiff submitted a rebuttal to Mr. Sandles to escalate

for higher-level review even though he threatened that it was the last revision he would make.

Plaintiff contested her FY15 Performance Appraisal rating on several different occasions.   It was

not until Plaintiff requested that Mr. Sandles escalate Plaintiff's request to Veterans Integrated

Service Network (VISN) and/or Department of Veterans Affairs Central Office (VACO) were the

inappropriate comments finally removed from her performance appraisal.   During a meeting on

May 17, 2016, Mr. Sandles inquired why Plaintiff wanted the comments removed.   Plaintiff

informed Mr. Sandles what he already knew.   Mr. Sandles knew it was inappropriate and

confirmed that it would harm Plaintiff's future job prospects as she had stated in several

memorandums.

73.     During a bi-weekly meeting on or about November 2, 2015, Mr. Sandles inferred

that Plaintiff was "the problem" when a disruptive employee (Akosua Danquah, Black/African

American female), attempted to assault her in the presence of Ms. Chambliss, Staff Assistant to

the Associate Director.   Plaintiff defended her character and reputation, stating to Mr. Sandles

that she was "a professional and had been working with him for 1.5+ years" and that he is aware

of her "character and integrity."   Again, Mr. Sandles did not inquire as to what had occurred on

Plaintiff's account and took the disruptive employee's account as truth over Plaintiff's without any

further investigation. Mr. Sandles finally revealed that the problematic employee came to his office after the incident along with her fellow colleagues.   Mr. Sandles also admitted he had heard the recording where the employee attempted to assault Plaintiff.   Mr. Sandles was informed that the AFGE had instructed its clients to record Plaintiff (illegally) but allowed this to occur and to be included in the evidence file. Mr. Sandles later stated he would conduct a fact-finding.   Mr. Sandles conducted the fact-finding in a cursory manner to alleviate the concerns of the AFGE, instead of in accordance with the principles of OPM labor management relations.   Mr. Sandles "swept this under the rug" and hid Plaintiff's assault from the attention of regional and national headquarters, where an issue brief was not created to report these concerns that a disruptive employee committed attempted assault against a manager.   This demonstrated Mr. Sandles lack of support for Plaintiff, particularly where she had the traumatic experience where she was nearly physically assaulted by Ms. Danquah.   Police Services also cited Ms. Danquah for being "disruptive" shortly thereafter for this "incident."

74.   Mr. Sandles instructed Plaintiff to set up town hall meetings on November 2, 2015, and November 3, 2015.   Mr. Sandles stated that he would like to include the American Federation of Government Employees in the town hall meetings.   However, this had not been the arrangement with previous town hall meetings where management staff are not included in town hall meetings.   These "town hall meetings" were a guise for "fishing expeditions" where Mr. Sandles' intent was to remove the Plaintiff from her position.   It was reported during this meeting that Mr. Sandles questioned employees, "Does Ms. Vuong and Ms. Davis create a hostile work environment?"   It was yet another attempt to move Plaintiff, which failed. It was further reported

that Mr. Sandles stated to staff that Ms. Davis and Plaintiff would be "removed" from their management positions.

75. Mr. Sandles directed that a meeting occurs with the AFGE and Telecare management to improve upon a collaborative relationship. This meeting occurred on or about November 3, 2015, and included the following members: Mr. Sandles, Ms. Irving, Ms. Davis, Doris Barnes (Black/African American Female), and Daphne Jackson (Black/African American Female). During this meeting, Mr. Sandles questioned Plaintiff's competence, "Is this your first time managing?" Plaintiff responded, "No." Then Mr. Sandles continued to insult Plaintiff in front of her subordinate and AFGE representatives, "Where were you a manager?" Plaintiff responded, "Durham, North Carolina." However, Mr. Sandles was aware of Plaintiff's background history, as she had already previously informed him of her prior work experience at other different VA medical centers. Mr. Sandles undermined Plaintiff's reputation as well as her authority at this meeting. As a result of Mr. Sandles' constant damage to Plaintiff's reputation, AFGE and Plaintiff's subordinates continued to disrespect her.

76. On or about November 5, 2015, Mr. Sandles stated that he received information from AFGE Steward, Pryncess Jenkins (Black/African American Female), and falsely accused Plaintiff of listening to a phone call inappropriately between Ms. Jenkins and Lorraine Gaines (White/Caucasian Female), a bargaining unit employee. Mr. Sandles attempted to take disciplinary action against Plaintiff for this false accusation even though he did not provide Plaintiff with a fair and proper opportunity to respond to this false allegation.

77. On or about November 12, 2015, Mr. Sandles continued to make defamatory remarks about Plaintiff to her subordinates. These subordinates of Plaintiff informed her of his

degrading remarks.   These demeaning remarks include but are not limited to false allegations of Plaintiff's ineffectiveness and incompetence as a manager. Mr. Sandles made it a point to continue to intentionally harm Plaintiff's reputation.

78.     On or about November 12, 2015, Mr. Sandles intervened when AFGE Representative, Mr. King, made the false allegation that the removal of Charge RN duties from an employee impacts their proficiencies.   Mr. Sandles did not allow supervisory authority to occur where Plaintiff could respond directly to this false allegation.   Instead, Mr. Sandles continued to "meddle" in Plaintiff's day-to-day operations and created chaos.

79.     On or about November 12, 2015, Mr. Sandles met with Ms. Davis and Plaintiff. During this meeting, he informed them of the results of the town hall meeting.   Mr. Sandles claimed that he asked MSA staff whether it was a hostile work environment and only four Medical Support Assistant (MSA) staff responded affirmatively.   However, Mr. Sandles did not question the credibility of the problematic staff who alleged it was a "hostile work environment." Mr. Sandles failed to inform them that he asked the following leading question, "Does Ms. Vuong and Ms. Davis create a hostile work environment?"   This was an attempt to try to pinpoint the past indiscretions of prior management on Ms. Davis and Plaintiff.   During this same meeting, Ms. Davis and Plaintiff proposed that the phone tree be changed to better meet the needs of patients. Mr. Sandles stated that he would not approve any changes.   However, Mr. Sandles accepted these same changes without question when Curtis Bergeron (Black/African American Male) proposed them on or about November 12, 2015.

80.     On or about November 12, 2015, Mr. Sandles intervened on the behalf of the AFGE when he requested to review a Telecare Standard Operating Procedure (SOP).   Mr. Sandles

29

stated, "This is concerning Judy. Several things here appear to be inappropriate for a charge nurse to be responsible for."   However, this was the same policy that had been in place prior to Plaintiff coming on board.   There were no changes to this policy.   Again, Mr. Sandles intentionally undermined Plaintiff's supervisory authority.

81.   When Plaintiff requested to participate in the National Workgroup on or about November 25, 2015, Mr. Sandles assumed that Plaintiff was not qualified to participate despite the pretense of supporting her with reaching her personal and professional goals.

82.   On or about November 24, 2015, Plaintiff received a call from Doris Barnes (Black/African American Female) who requested a status regarding the re-assignment Ms. Danquah, who attempted to assault Plaintiff.   Plaintiff was not aware of the status request as Mr. Sandles had conducted negotiations with AFGE.   Plaintiff was not aware that the disciplinary action had been "reduced" to a "re-assignment," which was a slap on the wrist for the harm Ms. Danquah caused.   The disciplinary action of removal had been recommended for Ms. Danquah's reckless actions.

83.   On or about December 1, 2015, Ms. Davis and Plaintiff informed Mr. Sandles that Mr. Anthony Radcliffe Myers (Black/African American Male), Acting Interim Assistant Nurse Manager, would be selected as the Assistant Nurse Manager (ANM).   Mr. Sandles initially supported the selection.   However, Mr. Sandles changed his decision upon his discussion with AFGE and e-mailed Plaintiff, "I'd like the position re-announced formally."   Plaintiff informed Mr. Sandles that there were concerns as to why the position should be reposted and informed him that the Agency was engaging in prohibited personnel practices under claims of retaliation and obstruction of competition. Mr. Sandles requested to discuss this matter "offline" with Plaintiff,

as he usually did when he wanted to avoid the documentation of questionable, if not illegal, practices. Plaintiff informed Ms. Sandles that she would complete his instructions but that there were several staff members, who were present during the Job Fair held on October 31, 2015, whose direct observations conflicted with what Mr. Sandles stated during Plaintiff's "offline" discussion. It should be noted that Mr. Sandles was not present during the Job Fair held on October 31, 2015.

84.    On or about December 7, 2015, a meeting was set up between Telecare management and AFGE to discuss results of the Facilitations that were set up for RN staff. During this meeting, Mr. Sandles agreed with the inappropriate recommendations of the AFGE. Mr. Sandles agreed to AFGE's recommendation that Telecare management "fraternize" with staff. Mr. Sandles suggested that the AFGE determine which management trainings that Ms. Davis and Plaintiff would take, which is inappropriate as AFGE does not have the authority or scope to recommend what trainings management should take. Plaintiff expressed her concerns; however, Mr. Sandles did not respond to her concerns.

85.    Mr. Clifton Jackson (Black/African American Male) contacted Plaintiff and shared the content of an Unfair Labor Practice (ULP) complaint that was filed regarding a FY15 Performance Appraisal rating of Ms. Clay-Jordan (Black/African American Female), who was under Plaintiff's direct oversight.   Plaintiff provided the requested information to Mr. Jackson, on December 21, 2015.   However, Mr. Sandles did not share this ULP with Plaintiff even though she had provided him with notice that the employee would most likely contest her rating on November 16, 2015. Mr. Sandles informed Plaintiff that thereafter he was going to review the employee's claim because of "lateness," even though Plaintiff had submitted FY15 Performance Appraisal reviews for all staff in a timely manner.

86.     On or about December 22, 2015, Plaintiff received an urgent request from Labor Management Relations (LMR) stating that Charge RN data was needed as AFGE had requested this data.   Plaintiff notified Mr. Sandles that she did not understand the rationale as to why the Charge RN data was being provided to the AFGE since criteria for the data request had not been met.   Plaintiff did not understand why Mr. Sandles chose to disregard the guidance of LMR. Mr. Sandles made agreements with AFGE without informing Ms. Davis or Plaintiff.   Mr. Sandles asked Daphne Jackson (Black/African American Female) in a private e-mail thread that did not include Ms. Davis or Plaintiff on December 28, 2015, "Did you receive what you needed?"   Mr. Sandles deliberately excluded them from this correspondence even though their workload would be affected.

87.     Mr. Sandles met with Plaintiff on or about December 29, 2015, and informed her that he was "offended" by her response regarding her concern as to why Charge RN data was being provided to AFGE.   Plaintiff questioned why this data was being requested at the time, particularly since it had been an on-going practice that staff did not have issues with.   Plaintiff further informed Mr. Sandles that the staff had voted that the Charge RN stay consistent.

88.     On or about December 28, 2015, Mr. Sandles, Ms. Irving, Ms. Doris Barnes (AFGE President) and Plaintiff met to discuss the Telecare-Prime Care project.   During this meeting, Mr. Sandles acted inappropriately and discussed Plaintiff's assault case in which she was the victim. This issue was unrelated to the topic at hand and was discussed with Ms. Barnes in Plaintiff's presence.   Mr. Sandles provided confidential details including what action was proposed and the status of the action.   Mr. Sandles also stated to Ms. Barnes that Plaintiff was informed that if there continued to be issues, he would "take a look at management" and proceeded to inform her that he

32

told Plaintiff about his experiences as the Staff Assistant at Greater West Los Angeles.   Mr. Sandles once again threatened Plaintiff in the presence of AFGE.   Mr. Sandles intentionally created and fostered a hostile work environment between Plaintiff and the AFGE.   Mr. Sandles instructed Plaintiff to move forward with actions but blamed the same actions on Plaintiff in AFGE's presence.

89.     During a bi-weekly meeting with Ms. Davis and Plaintiff on or about December 1, 2015, Plaintiff provided Mr. Sandles with updates on personnel issues.   Mr. Sandles was informed of the toxic environment an employee, who has been moved several times, Ms. Keisha Allen (Black/African American Female), was creating. Mr. Sandles stated, "Someone has to take a lashing." Mr. Sandles later denied that he made this statement and stated that Plaintiff "misheard", even though Ms. Davis witnessed this unprofessional statement. Mr. Sandles further stated that Ms. Davis and Plaintiff were responsible for the culture of the service.   Plaintiff responded that she had previously informed Mr. Sandles that Telecare was considered the "dumping grounds."   Mr. Sandles then provided a veiled threat with the example of "Elijah Barnes", who he boasted he had terminated.

90.     On several occasions, Mr. Sandles made inappropriate remarks during his meetings with Ms. Davis and Plaintiff.   On one occasion during the discussion of the Telecare Record Management Plus (TRM+) contract, Mr. Sandles stated to Ms. Davis and Plaintiff, "You need to cut the umbilical cord."   Mr. Sandles laughed as if it was funny while Ms. Davis and Plaintiff were shocked by his inappropriate, misogynistic, and sexist remarks.   These improper remarks came from a male superior who does not have any respect, understanding, or experience with the female reproductive system.

33

91.     On or about December 31, 2015, Plaintiff stopped by Mr. Sandles' office to inform him that her medical provider placed her on medical leave.   However, Mr. Sandles was not present in his office.   Mr. Sandles was on leave and did not inform Plaintiff that he was on leave. Plaintiff e-mailed medical documentation to Mr. Sandles and requested that her request be kept private.   Plaintiff also provided instructions that Ms. Davis would serve in Plaintiff's absence.

92.     On or about January 6, 2016, Mr. Sandles appointed Mr. Bergeron (Black/African American Male), who was the Supervisory Health Systems Specialist to Prime Care, to serve as the Acting Chief of Telecare despite Plaintiff's instructions that Ms. Davis be handed off Plaintiff's duties.   Mr. Bergeron was under the direct chain-of-command of the Chief of Staff, not that of the Associate Director, Mr. Sandles.   Yet, Mr. Sandles abused his powers and intertwined the different chains-of-commands to his advantage to allow Mr. Bergeron to wreak havoc.

93.     On or about January 8, 2016, Mr. Sandles provided instructions for Ms. Carolyn Baldwin (White/Caucasian Female) and Plaintiff to meet regarding the Health Administration Service (HAS) merger that was to occur in April or May 2016.   However, the merger did not occur at that time and the effective date changed to October 1, 2016.   Ms. Baldwin did not receive a notice regarding her failure to meet this FY16 Critical Element of her performance appraisal but was instead promoted to the Chief of Health Administration Service (HAS). Ms. Baldwin also commented on whether Plaintiff would be at MEDVAMC "indefinitely."   However, Plaintiff made no such commentary regarding her absence or return.   Ms. Baldwin was a direct report to Mr. Sandles, who he recruited and directly hired himself.   It was reported that Mr. Sandles and Ms. Baldwin had an "inappropriate relationship."

94.     During Plaintiff's meeting with Mr. Sandles on or about February 1, 2016, Mr. Sandles congratulated Plaintiff on finishing her Juris Doctor degree.   However, Plaintiff had not shared any personal information with Mr. Sandles regarding the completion of her JD degree. Mr. Sandles further stated that Plaintiff had run out of annual leave.   Mr. Sandles then further insinuated that if Plaintiff was stressed with school and that had she needed time, that she could have further discussed that with him.   Mr. Sandles assumed that Plaintiff's unexpected medical leave was related to school and strongly inferred that she had taken time off related to school since Plaintiff had run out of annual leave.   Mr. Sandles continued to pressure Plaintiff to disclose her medical condition.   However, Plaintiff did not disclose her medical condition to Mr. Sandles as it was a personal and private matter.

95.     Plaintiff went on unexpected medical leave again from on or about February 15, 2016, until February 26, 2016.   Mr. Sandles provided instructions that Plaintiff notify him directly of her medical leave request even though he had received Plaintiff's documentation.   Mr. Sandles questioned the authenticity of Plaintiff's medical documentation and then attempted to reach out to her medical provider to knowingly and wrongfully access her protected health information.

96.     On or about January 8, 2016, Mr. Sandles completely disregarded Plaintiff's instructions regarding Ms. Davis serving as the Acting Chief in Plaintiff's absence.   Instead, Mr. Sandles appointed Mr. Bergeron as the Acting Chief in Plaintiff's absence.   Mr. Bergeron was the former Supervisory Health Systems Specialist and had issues with staff in Prime Care.   Mr. Sandles and Mr. Bergeron have a close relationship.   Mr. Bergeron is known to be the "dirty

enforcer" of Mr. Sandles' "dirty deeds."    It should be noted that Mr. Bergeron, Mr. King, and Mr. Sandles have a close relationship outside of work.

97.    Mr. Bergeron attempted to enter Plaintiff's office under the pretense of seeking a response to an Office of Workers' Compensation Program (OWCP) claim and Plaintiff's blue personnel folder upon Mr. Sandles' instructions.    Mr. Bergeron also informed Plaintiff that that he was provided with the master key to enter her office and admitted he had entered her office but stopped after realizing he was unable to retrieve the items on or about February 4, 2016.    Mr. Bergeron only confessed this to the Plaintiff since a fellow employee witnessed that Mr. Bergeron tried to enter Plaintiff's office.

98.    Plaintiff advised Mr. Sandles that a personnel action should be taken against Marlecia Price (Black/African American Female) on several occasions.    Ms. Price had filed a meritless Office of Workers' Compensation Program (OWCP) claim that was rejected and had exhausted her leave.    However, Mr. Sandles refused to heed Plaintiff's advice and instead took Ms. Price under his wing and protected her from disciplinary action.

99.    On or about February 16, 2016, Mr. Sandles re-assigned Ms. Price to Patient Access Center (PAC) under his oversight. Ms. Price was promoted to the Education Facility Trainer under his direct oversight despite her performance and conduct concerns.    Mr. Sandles would later express his disappointment with the Medical Support Assistant (MSA) training that Ms. Price was tasked to conduct.    Yet, no disciplinary action was taken toward Ms. Price.    Instead, Ms. Price remained employed and continued to waste government resources and funding.

100.    On or about February 29, 2016, Mr. Sandles informed Plaintiff that he was "disappointed" with her "office cleaning" and had taken unauthorized pictures of her office.

36

101.    On or about March 1, 2016, Plaintiff informed Mr. Sandles that her office was previously cleaned and that she was busy and overwhelmed since she did not have any administrative support and there were no subordinate supervisors in place.   Plaintiff further questioned why her office was selectively opened as there was no misconduct that warranted entering her office while she was on extended leave.    Plaintiff also informed Mr. Sandles that she did not have her personnel folder as he constantly accused her of having or losing her personnel folder that was in his possession.   Plaintiff also informed Mr. Sandles that this was not the first time that her office had been entered.   As a result of abuse of authority and unauthorized access to Plaintiff's office, she discarded foods and drinks in the event that they were tampered with in her absence.   Mr. Sandles responded that it was for Environment of Care (EOC) Rounds. However, no other rounds were made in locked administrative offices as the EOC Report indicated.

102.    Several witnesses informed Plaintiff that Mr. Sandles led the EOC directly to Plaintiff's office as the first stop of the rounds, even though Plaintiff's office was in the middle of Building 122.   Mr. Sandles also took unauthorized pictures of Plaintiff's office.   No other administrative offices were inspected at the time Plaintiff's was.   Abuse of authority and unauthorized access to Plaintiff's office occurred while she was out of the office and on unexpected medical leave. However, the Environment of Care Report did not include any findings for Plaintiff's office. Of course, this did not stop Mr. Sandles from continuing to "fish" for issues where there were none and attempted to write Plaintiff up, instead of fulfilling the Department of Veterans Affairs' mission.

103.    While Plaintiff was out on unexpected medical leave from on or about March 7, 2016, to until March 18, 2016, Mr. Sandles contacted Ms. Davis to request that she complete a fact-finding related to Ms. Lizette Moni (Hispanic Female).    Mr. Sandles questioned Ms. Davis' and Plaintiff's competency when making selections.    Mr. Sandles questioned Ms. Davis as to whether she and Plaintiff had conducted reference checks on this employee and whether they were aware that her prior facility had attempted to take disciplinary action against her.    Ms. Davis notified Mr. Sandles that they were not aware, nor would they have been aware since references are proposed by the candidate.

104.    On or about March 8, 2016, Mr. Sandles further stated that he had concerns "with the unexpected yet cyclical nature of" Plaintiff's leave usage. Mr. Sandles "recommended" that Plaintiff invoke the Family Medical Leave Act (FMLA) in an attempt to force Plaintiff to disclose her medical condition.    Plaintiff had sufficient a Sick Leave balance of 100.0+ hours and was not required to disclose her medical condition.    Furthermore, Mr. Sandles was aware of FMLA requirements and continued to harass Plaintiff about her medical condition.    Mr. Sandles withheld Plaintiff's leave request until he received Plaintiff's medical documentation even though he was aware that Plaintiff had taken unexpected medical leave in two prior instances.    Mr. Sandles did not have the authority to invoke the type of leave Plaintiff would use since it was her leave that she earned and had the right to take leave.    Yet, Mr. Sandles abused his power and invoked the use of Plaintiff's Sick Leave without Plaintiff's permission or request.    However, Plaintiff had both Sick Leave and Annual Leave available.    Mr. Sandles deliberately invoked the use of Plaintiff's Sick Leave so that her leave would be exhausted under this category and he could deny leave under the Annual Leave category as it was "discretionary."

105.    Plaintiff was penalized and "verbally counseled" on or about March 23, 2016, even though Plaintiff did not meet with Mr. Sandles face-to-face nor was it verbal.   However, when Mr. Bergeron requested assistance with the Telecare Record Management Plus (TRM+) contract, Mr. Sandles stepped aside from the American College of Healthcare Executives (ACHE) Conference to assist him on the week of March 17, 2016.   Plaintiff informed Mr. Sandles that she was not aware of the 45-day turnaround time for contract submission.   Mr. Sandles responded and stated that it was not an "excuse."

106.    Plaintiff informed Mr. Sandles that she did not have a secretary or an Administrative Officer who had supervisory duties, despite overseeing 77.0 Full Time Employee Equivalent (FTEE) in April 2014.   Mr. Sandles still provided Plaintiff no support despite being aware of staffing shortages.   Yet, other services have multiple layers of supervision while Plaintiff's service did not. Mr. Bergeron, former Supervisory Health System Specialist to Prime Care, had several layers of supervision within his service. Yet, Plaintiff was tasked to carry out several assignments for the facility with limited manpower and resources.

107.    Mr. Sandles called Plaintiff's staff "degenerates" and "uneducated" during Townhall meetings.   Mr. Sandles stated that Telecare was "entry-level" and was meant to be "a stepping stone" job to pay for their "hood homes" during these meetings.   Mr. Sandles was unprofessional and stated, "I don't know what the hell an Associate Director does."

108. Mr. Sandles called Ms. Clay-Jordan (Black/African American Female) Administrative Officer, to attend a supervisory meeting.   However, Mr. Sandles was aware that Ms. Clay-Jordan did not have any supervisory authority as Labor Management Relations (LMR)

had clarified this in his and Plaintiff's presence.    Plaintiff had to excuse the employee from the meeting as it was not appropriate for Ms. Clay-Jordan's attendance.

109.    Mr. Bergeron commented to Plaintiff's staff, during Townhall meetings he conducted, that Plaintiff "may or may not come back."   Mr. Bergeron was serving in Plaintiff's absence, even though he reported to the Chief of Staff.   Mr. Bergeron and Plaintiff are in different Executive Lines of supervision, yet Mr. Bergeron was afforded the opportunity to act in Plaintiff's position in her absence.

110.    On or about March 23, 2016, Mr. Sandles informed Plaintiff that her Position Description (GS-343-13) would be changing after he had already instructed Mr. Bergeron to make changes to it and that Plaintiff's personnel folder was found.    Plaintiff questioned Mr. Sandles as to why this change was being made to her position when no other changes occurred when Telecare Pharmacy staff transitioned to Outpatient Pharmacy.     Mr. Sandles failed to provide Plaintiff with any regulations or references as she requested.    Plaintiff reminded Mr. Sandles that she had informed him on several occasions that she did not have her personnel folder, yet Plaintiff's office was entered on several occasions without her permission.    Mr. Sandles did not respond to Plaintiff's comment. Plaintiff questioned Mr. Sandles as to how her livelihood would be affected and whether this was an attempt to bolster the Chief of Health Administration to a higher grade.   Mr. Sandles informed Plaintiff that the Position Description for the Chief of Health Administration Service had not yet been written.    Mr. Sandles was waiting on the re-submission of Plaintiff's Position Description to bolster the Chief of Health Administration Service (HAS) to a GS-14/GS-15 for the pre-selection of Ms. Baldwin.   This position was written for the pre-selected candidate, Ms. Baldwin, which was not in the best interest of the Agency and a Prohibited

Personnel Practice. Plaintiff requested the references related to the potential effect that these changes may have on Plaintiff's grade. Mr. Sandles ignored Plaintiff's valid concerns and did not provide a response.

111.    On or about March 28, 2016, Mr. Sandles announced that Mr. Bergeron was a new addition to the Office of the Associate Director.   However, Mr. Bergeron was one of the employees who was named in the Office of Inspector General (OIG) Report in July 2016.    Instead of receiving disciplinary action, Mr. Bergeron was moved to the Office of the Associate Director where his grade and pay remained intact and unaffected despite his egregious actions identified in the OIG report. Mr. Bergeron encumbered this position shortly after there were "issues" identified within Prime Care, where all Prime Care Leadership stepped down and/or were re-assigned from their positions.    No action was taken against staff who encumbered these Prime Care Leadership positions despite gross mismanagement and waste of government funds. Mr. Sandles continued to reward Plaintiff's coworkers, outside of her protected class, for their bad behavior.

112.    On or about April 10, 2016, Mr. Sandles falsely accused Telecare of scheduling new patients incorrectly.

113.    On or about April 11, 2016, Plaintiff informed Mr. Sandles that his accusations were not correct and reminded him that she informed him of the MSA training concerns on April 23, 2015.   Plaintiff informed Mr. Sandles that Telecare was in support of providing appropriate and accurate scheduling guidance to fulfill the needs of Health Administration Service (HAS) with the participation of current Telecare MSA staff.

114.    On or about April 14, 2016, Mr. Sandles responded that the Medical Support Assistant (MSA) Academy "didn't exist."    On this same day, Plaintiff informed Mr. Sandles that

Telecare Medical Support Assistant (MSA) staff would assist with the Academy where possible and provided him with a friendly reminder that the MSA Academy did exist, and that Secretary McDonald sent an e-mail regarding the efforts that Michael E. DeBakey Veterans Affairs Medical Center (MEDVAMC) had taken to improve access since he claimed otherwise.   Plaintiff further informed Mr. Sandles that his secretary could review his calendar to help refresh his memory as well and attached several corresponding e-mails. Mr. Sandles continued to attack Plaintiff's character, professionalism, and competence on a regular basis by inferring that Plaintiff lied.

115.   On or about April 10, 2016, Mr. Sandles forwarded Plaintiff an e-mail thread between him and Michael Heath (Black/African American Male), Acting Labor Management Relations (LMR) Chief.   Mr. Sandles informed Plaintiff that he was the proposing manager for a disciplinary action against a Telecare employee, Ms. Moni.

116.   On or about April 14, 2016, Mr. Sandles welcomed Ms. Baldwin back from her medical leave during a Bi-Weekly Chief meeting.   During this meeting, Mr. Sandles directed the agenda of the meeting toward being about the Plaintiff.   One of the topics of this discussion was related to an Executive Leadership Conference that Mr. Sandles had attended.   Mr. Sandles stated that we needed to "check our gut" regarding whether this was the "right fit for us" and "to give it some thought as to "why we're in it."   These comments were all directed toward Plaintiff and were subtle yet direct remarks questioning whether Plaintiff belonged at the MEDVAMC.

117.   At approximately 9:30 a.m. on or about May 13, 2016, Plaintiff received a call from Mr. Sandles falsely accusing her that she was "resistant" to assisting Ms. Baldwin with the Medical Support Assistant (MSA) Academy.   Plaintiff defended her character and informed Mr. Sandles that she was not resistant but had brought concerns to Ms. Baldwin's attention, which included

staff reporting that they were not trained and that they were released early from the training. Plaintiff further informed Mr. Sandles that she was willing to assist Ms. Baldwin where possible. Shortly thereafter, Plaintiff received an e-mail from Mr. Sandles stating that they (Plaintiff and Ms. Baldwin) were to "work together."   Mr. Sandles inferred that Plaintiff had trouble collaborating with Ms. Baldwin. However, Plaintiff was and continued to be a team player. Ms. Carolyn Baldwin (White/Caucasian Female) received favorable treatment from Mr. Sandles due to their inappropriate relationship.

118.   On or about May 9, 2016, Marielle Weston (Black/African American Female), Telecare employee, requested to meet regarding her performance rating with the next management official in the chain-of-command, which was the Associate Director, after having met with both her first line and second-line supervisors and the Acting Chief. On or about June 1, 2016, Mr. Sandles revised the rating of Ms. Weston against the advice of Ms. Davis and Plaintiff.   Mr. Sandles continued to reinforce the misrepresentation that Plaintiff was an incompetent manager when he reversed Plaintiff's decisions as a second-line supervisor without reviewing the laws and regulations related to his actions in order to meet the illegitimate demands of favored employees outside of Plaintiff's protected categories and the AFGE.

119.   On or about May 16, 2016, Plaintiff received instructions from Mr. Sandles' Secretary that any future concerns or questions should be directed toward his Staff Assistant, Mr. Bergeron.   However, Mr. Bergeron was not aware of these instructions upon Plaintiff's contact.

120.   On or about May 19, 2016, Mr. Sandles forwarded Plaintiff an e-mail regarding the update of her Position Description, which Plaintiff was notified had been submitted to the VISN Classification Unit.   Mr. Sandles mocked Plaintiff, "Judy, we'll place a copy in your 5-part

43

folder.   I'm so glad this worked out☺!"   Mr. Sandles was aware that Plaintiff was deeply concerned about the revisions as it could affect her future promotion potential and salary but submitted it to the VISN Classification Unit without notifying Plaintiff first.

121.   On or about May 19, 2016, Plaintiff contacted Mr. Sandles since her leave was docked for 1.5 hours from 2:30 p.m. to 4:00 p.m. even though her request was disapproved.   Mr. Sandles attempted to blame the deliberate error he made on Ms. Andrea Morgenstern, retired Secretary.   However, Mr. Sandles did not sign off on the corrections that Ms. Morgenstern had made previously when Plaintiff contacted her regarding this error.   Mr. Sandles closely monitored Plaintiff's leave requests but did not do so with his other subordinate staff, outside of Plaintiff's protected categories. Mr. Sandles deliberately denied Plaintiff's leave request to cause her irreparable personal injury and harm.

122.   Plaintiff requested clarity regarding who Plaintiff was to report to if she was being realigned to Health Administration Service (HAS) at the time.   Mr. Sandles responded on or about May 25, 2016, that Plaintiff was to report to him for daily reporting purposes and performance evaluations until September 30, 2016.   However, Mr. Sandles continued to provide conflicting information as to who Plaintiff should report to and then scolded her when she did or did not contact him based upon his confusing instructions.

123.   Mr. Sandles was able to change Plaintiff's leave requests on her behalf without her knowledge and approval in a timely manner but then purposefully delayed the return of a timecard correction where Plaintiff was denied leave.   This could have potentially resulted in Plaintiff being shorted leave she had earned and/or Plaintiff owing the federal government backpay for taking more leave than she had on the rolls.

124.    Mr. Bergeron received Compensatory Time (CT) for staying past his tour-of-duty, but Plaintiff did not.   Mr. Bergeron had a "flex" tour and disappeared from work as he pleased without having his leave deducted.

125.    On or about May 26, 2016, Mr. Sandles informed Plaintiff that he had met with Ms. Clay-Jordan, and that he needed some clarification.   Mr. Sandles took the inaccurate account of the employee as truth yet again without providing Plaintiff with the opportunity to respond. Plaintiff requested that Mr. Sandles help her understand why her character, reputation, and professionalism and competence as a manager continued to be questioned without proper opportunity for response. Mr. Sandles responded that he would schedule a meeting with Plaintiff to further discuss her concerns.

126.    On or about May 31, 2016, Plaintiff received an e-mail indicating that Sean Ryan (White/Caucasian Male) was serving as the Acting Associate Director since Mr. Sandles was serving as the Acting Medical Center Director.   Plaintiff was confused as to who she was to report to based upon Mr. Sandles' previous instructions.

127.    On or about June 2, 2016, Plaintiff informed Mr. Sandles that she was interested in a detail opportunity.   Plaintiff sought out this opportunity from the Assistant Deputy Under Secretary for Health for Workforce Services since Mr. Sandles nor Education Service Line had shared this information with her.   Mr. Sandles oversaw the Education Service Line. Mr. Sandles responded, "I'd encourage you to apply."

128.    On or about June 3, 2016, Plaintiff kindly reminded Mr. Sandles that an endorsement was required for a career development opportunity.   Mr. Sandles responded that he had sent Plaintiff's endorsement in another e-mail. Plaintiff inquired as to why Mr. Sandles did

not write any comments on Plaintiff's endorsement, particularly since she had worked for him the past 2+ years.   Yet, Mr. Sandles was more than capable of writing inappropriate comments on Plaintiff's performance appraisal. Mr. Sandles responded that it was "optional" even though he was aware that it was a time-sensitive application and was a competitive process.   Mr. Sandles knowingly blocked Plaintiff's opportunity for upward mobility. Mr. Sandles deliberately chose not to provide any positive feedback to ensure that Plaintiff's opportunities would be limited.

129.   On or about June 2, 2016, Plaintiff met with Mr. Sandles who inquired about changes with the issuance of nurse functional statements and proficiency ratings.   Mr. Sandles also asked that Plaintiff inquire about what he had "heard" about Ms. Davis applying for other jobs.   Mr. Sandles alleged that Ms. Davis made these changes on her own, even though Plaintiff had informed Mr. Sandles on several occasions that this was an error that they had just recently become aware of and would not make the same mistake moving forward.   Plaintiff inquired whether disciplinary action should be taken against Ms. Davis.

130.   On June 3, 2016, Plaintiff inquired whether the intention of the Telecare-Prime Care rotations was to be "temporary" or "permanent."   Mr. Sandles stated it was a decision at Plaintiff's level to make.

131.   On or about June 6, 2016, Plaintiff informed Mr. Sandles that it would be temporary and further informed him that there appear to be "internal issues."   Plaintiff further informed him that key Prime Care leadership positions were vacant, etc. which further indicates and reflects that there are "deeper issues that require culture change." However, Mr. Sandles did not allow Plaintiff to execute this decision because he required that Plaintiff report on this on-going project, on a constant basis, at the expense of not meeting Plaintiff's own performance measures.

46

132.     On or about June 6, 2016, Mr. Bergeron, Staff Assistant to the Associate Director, informed Plaintiff that the Telecare Assistant Nurse Manager (ANM) position was no longer approved to recruit.    In response, Plaintiff sent an e-mail to provide clarification that said position was an "integral role."

133.     On or about June 7, 2016, Mr. Bergeron followed up with an e-mail to inform Plaintiff that the Telecare Assistant Nurse Manager (ANM) position "will not be refilled at this time." Plaintiff requested further clarification as to why this was the case. Plaintiff questioned why Ms. Davis and Plaintiff were excluded from meeting when this decision was made.    Plaintiff further questioned why this applied to just Plaintiff's service and what actions were taken against Human Resources (HR) for failing to recruit in a timely manner despite several requests, and who would cover in the absence of the Nurse Manager.    Plaintiff further informed Mr. Sandles that this appeared to be a "retaliatory effort" by Executive Leadership and AFGE against staff who may or may not have been vocal during the Townhall meetings in November 2015.

134.     On or about June 8, 2016, Mr. Sandles responded with inaccurate rationale as to why the Assistant Nurse Manager position was disapproved. Plaintiff informed Mr. Sandles that her concerns were not addressed.    Plaintiff further informed him that the claims that the Assistant Nurse Manager worked the same tour-of-duty as the Nurse Manager and the Charge Nurse were inaccurate.   Plaintiff further informed him that this proposed arrangement would create more confusion as well as provide potential grounds for additional meritless EEO/AFGE grievances. Plaintiff further questioned why these changes were being made at that time, particularly when the Medical Director position was vacant and AFGE elections were coming up.    Plaintiff did not receive a response.

135.     On or about June 16, 2016, Plaintiff's Compensatory Time (CT) from March 24, 2016, and April 6, 2016, was finally approved.    Mr. Sandles was aware of these requests since Plaintiff had worked on the Telecare Record Management Plus (TRM+) contract and the Quarterly Drill Exercise on these respective dates.    This was at least the sixth pay period where Plaintiff did not receive CT earned.    Mr. Sandles had previously approved Plaintiff's requests but he now attempted to reverse his previous approvals, which would result in Plaintiff not receiving any time in lieu of Over Time (OT) for working beyond her tour-of-duty.    However, Mr. Sandles was able to approve CT and/or OT for colleagues outside of Plaintiff's protected classes without any issue.

136.     On or about June 15, 2016, Plaintiff received an e-mail from Mr. Sandles who provided instructions to Victoria Wells (White/Caucasian Female), Staff Assistant to the Medical Center Director, to set up a meeting with Telecare and Medical Care Line (MCL) and Executive Leadership. Plaintiff informed Mr. Sandles that it was her assumption that this meeting was in relation to the Telecare-Prime Care rotations, particularly since the entire Executive Leadership was invited.

137.     On or about June 17, 2016, Mr. Sandles responded that the meeting identified above was in relation to the volume of calls that were being transferred from Telecare to the services. Mr. Sandles further stated, "There seems to be an impression that the telecare staff have been misinformed about CID (Clinically Indicated Date) which has created this increase.    This could include both the central and decentralized phone staff.    The leadership team is coming to ensure we can make decisions whether MD, RN or Admin during this discussion."

138.     On or about June 20, 2016, Plaintiff informed Mr. Sandles that she was not certain what may or may not have been discussed and she clarified that Telecare was not misinformed and

that it was complying with the Directive and instructions as provided by VACO.   Plaintiff further informed Mr. Sandles that "blind scheduling" and other questionable practices may or may not have been shared with him during the discussion.   Plaintiff informed Mr. Sandles that written instructions be provided if "Executive Leadership elects to deviate from the Directive to improve 'patient perception.'" Mr. Sandles demanded and scheduled the meeting but was not present during the meeting on June 20, 2016.   Clarity was provided in relation to concerns that were brought forth by Ms. Lindsay (Harper) Crain (White/Caucasian Female), former Deputy Executive of Medical Care Line.   Plaintiff wrote the minutes and updated Executive Leadership and stakeholders of the discussion on June 23, 2016.   Several questionable practices were brought forth during this meeting.   Yet, Executive Leadership continued to move forward without addressing these valid concerns that could impact patient care.   Patient perception had not improved for the past three years and as a result, these questionable changes were being made at Plaintiff's expense.

139.   On or about June 16, 2016, Darren Breaux (Black/African American Male), Labor Management Relations (LMR) Specialist, informed Plaintiff that Human Resources (HR) Leadership reminded him to speak with her about "intermeddling" in AFGE affairs. Plaintiff informed Mr. Breaux that false and meritless claims were brought to his attention, and it appears that allegations were now being made because Plaintiff questioned the integrity and practicality of why certain changes were being made at that time under the oversight of Mr. Sandles.   Plaintiff asked Mr. Breaux to please let HR and/or Executive Leadership know that she did not have the time or energy to infringe upon matters unrelated to her position and/or violate [the] Master Agreement.

140.    On or about June 17, 2016, Mr. Sandles and Ms. Rachel (Adams) Hills (Black/African American Female), Systems Redesign Coordinator, completed a GEMBA walk within Telecare.    This was the second time Mr. Sandles completed a walk within Plaintiff's area within the past two years he had encumbered an Executive Leadership position. Ms. Hills informed Plaintiff that Mr. Sandles continued to "complain about a barbecue smell" during his GEMBA walk. Mr. Sandles then questioned Plaintiff about a facility policy that he had previously inquired about.    Mr. Sandles inferred that Plaintiff's staff were non-compliant with procedures. Mr. Sandles also questioned Plaintiff about the food policy in work areas.    Plaintiff informed Mr. Sandles that this was a past practice and reminded him of the unique circumstances within Telecare. Mr. Sandles continued to provide feedback on clinical processes when he did not have any clinical authority.

141.    On or about June 17, 2016, Ms. Davis and Plaintiff received a documentation request related to Ms. Strassner, Case Number: 103255.    Plaintiff also received a notice regarding an "Investigation of EEO Complaint, Sandra Strassner, 2003-0580-2015103255."

142.    Plaintiff had a pre-interview with EEO Investigator Ms. Tanya Walkin regarding Ms. Strassner on June 22, 2016.    During this pre-interview, Plaintiff answered inquiries regarding the EEO claims Ms. Strassner alleged. Plaintiff informed Ms. Walkin that Mr. Sandles provided her with direct instructions to terminate Ms. Strassner.

143.    On or about June 20, 2016, Lara Horvith (White/Caucasian Female), Facility Planner, informed Plaintiff of the following, "I have heard that Telecare is moving to building 100 and that there will be additional staff hired as well."

144.     On or about June 27, 2016, Plaintiff informed Ms. Horvith that she was not certain of what she heard or may [not] have heard.    This was the first time Plaintiff became aware that Telecare was being moved. Again, Mr. Sandles withheld information that impacted Plaintiff.

145.     On or about June 28, 2016, Telecare management received notification from Lynette Dorsey (Black/African American Female) to remove the Assistant Nurse On Duty (ANOD) mail group.    Staff were notified to exclude the ANOD mail group accordingly.

146.     On or about June 29, 2016, Plaintiff received a complaint from Sean Ryan (White/Caucasian Male) that Telecare did not notify ANODs of any incidents that occurred the night of June 28, 2016.    It was alleged that Ms. Davis and Plaintiff failed to manage their subordinates.

147.     On or about June 30, 2016, Plaintiff received a Microsoft Lync message from Ms. Chambliss to pick up a memorandum related to Ms. Lizette Moni (Hispanic Female). A memorandum was pre-drafted to include Plaintiff's name and signature.    Plaintiff was unduly pressured and forced to sign a disciplinary action request that she did not request, nor did she initiate. Per Mr. Sandles' instruction, Plaintiff was forced to terminate Ms. Moni despite Plaintiff's concerns.    This was yet another female employee who Mr. Sandles' directed Plaintiff to terminate without any real grounds for disciplinary action under Plaintiff's oversight.

148.     On or about July 1, 2016, Plaintiff submitted a request for additional Over Time (OT) funds.    However, Plaintiff observed that a few other services did not make Resource Management Board (RMB) requests even though their funds were depleted and had received OT funds without presenting to RMB.

149.    On or about July 6, 2016, Plaintiff presented at a meeting before the Resource Management Board (RMB) an OT request for additional OT funds.   During this meeting, the Executives questioned Plaintiff's intelligence as to why she had not requested reimbursement from Prime Care.   Plaintiff informed them that she had, and Prime Care had informed her that its OT funding was "shot." On July 15, 2016, Plaintiff's OT request was ultimately denied as documented in the RMB minutes.

150.    It should be noted that Mr. Sandles was aware that Mr. Bergeron had depleted Plaintiff's OT funds during her absence to "buy stats." Mr. Sandles approved of Mr. Bergeron's excessive OT usage.

151.    On or about July 1, 2016, Ms. Chambliss sent Plaintiff a Microsoft Lync message asking her whether she had Plaintiff's (FY16) Mid-Year Performance Appraisal.   Plaintiff informed her that she did not and inquired as to why it was being searched at that time.   Ms. Chambliss informed Plaintiff that she was not aware why it was being asked for, but that she had received instructions from Mr. Sandles and Mr. Ryan.

152.    On or about July 6, 2016, Plaintiff inquired with Mr. Ryan as to why her FY16 Mid-Year Review was being searched for at that time. Mr. Ryan informed Plaintiff that he was "familiarizing [himself] with all of the Associate Director's direct report's performance appraisal & performance standards" and inquired whether she had a copy. This was used as a pretense to issue Plaintiff with the "2016 Supervisory Notice of ECF Performance Concerns."

153.    On or about July 18, 2016, Mr. Ryan sent a reminder to all Service Chiefs regarding VA TMS Learning Expiration Notifications.   This reminder inaccurately displayed Plaintiff's

training information to her fellow colleagues.    The notice was inaccurate and was shared with all other Chiefs.

154.    On or about July 20, 2016, Plaintiff received an invite from Pamela Crider (White/Caucasian Female), Secretary to the Medical Center Director, to meet with Mr. Sandles on July 21, 2016.    However, no content for the meeting was provided.    Plaintiff inquired as to what the meeting was regarding but did not receive a response.

155.    On or about July 20, 2016, Mr. Baldwin sent out a solicitation to staff who may be interested in serving in the capacity of the Assistant Chief Health Administration Service (HAS).

156.    On or about July 25, 2016, Plaintiff expressed interest to Mr. Ryan serving in the capacity of the Assistant Chief Health Administration Service. It was her understanding that just an approval or disapproval was needed.

157.    On or about July 21, 2016, Mr. Sandles issued Plaintiff a "2016 Supervisory Notice of ECF Performance Concerns."    The notice included data that was run on June 30, 2016, by Ms. Clay-Jordan, Plaintiff's direct report, who had secretly reported to Mr. Sandles' office on several occasions without Plaintiff's knowledge.    Plaintiff received this notice only a few weeks after she had provided testimony, in a protected EEO activity, where Plaintiff informed the EEO investigator for Ms. Strassner's EEO complaint, Ms. Walkin, that she received direct instructions from Mr. Sandles to terminate Ms. Strassner. Plaintiff also received this notice a little over a week after she contested the proposed removal of Ms. Moni that was based on illegal and discriminatory grounds.

158.    A little over two months after Plaintiff's FY16 Mid-Year Review, she received a "2016 Supervisory Notice of ECF Performance Concerns" that was based on the same data that

Plaintiff received a "fully successful" rating months prior.    Additionally, all the other Chiefs who presented updates at the bi-weekly Strategic Analysis for Improvement and Learning (SAIL) meeting did not receive such a notice even though they did not meet their performance measures. Plaintiff clarified during this meeting whether data for the Telecare-Prime Care rotations was included and Mr. Sandles informed Plaintiff that it was not.

159.    Mr. Sandles was aware that Plaintiff provide support to several areas of the Medical Center with limited resources and staffing shortage.    These other areas were also failing yet, Plaintiff was instructed to provide support to these areas at the expense of her performance – and thus, livelihood. Mr. Sandles exhibited a pattern of intentionally setting Plaintiff up for failure.

160.    Ms. Baldwin, was failing her critical elements. However, Ms. Baldwin was recently promoted to the Chief of Health Administration Service (HAS) as of July 24, 2016 and did not receive a 2016 Supervisory Notice of ECF Performance Concerns. No other Service Chiefs, all of whom were outside of Plaintiff's protected classes, had a second mid-year progress review other than Plaintiff, nor did they receive a 2016 Supervisory Notice of ECF Performance Concerns.

161.    On or about July 22, 2016, VISN Call Center Expansion Point of Contact, Stephanie Seaton, informed VISN 16 that it was doing a "great job," which contradicted the 2016 Supervisory Notice of ECF Performance Concerns that Mr. Sandles issued Plaintiff. Mr. Sandles asked Ms. Seaton to follow up with "data concerns" to VACO.

162.    On or about July 26, 2016, Plaintiff received instructions from Dr. Jagadeesh Kalavar (Southeast Asian Male), Chief of Staff, and Dr. Annapurni Teague (East Asian Female), Associate Chief of Staff to Community-Based Outpatient Clinic Care, to only enter in "scheduling data" into the VHA Support Service Center (VSSC) database as it was a "disadvantage" to

MEDVAMC since it reported on scheduling, clinical, and pharmacy data. However, Plaintiff clarified with VACO and she was informed that all three areas were to be entered. VA Executive Leadership continued to provide Plaintiff with direct instructions and/or pressured her to submit false and/or misleading data.

163.     On or about July 22, 2016, Plaintiff was not selected for the Staff Assistant position to the Deputy Medical Center Director. Another candidate, James Eggers (White/Caucasian Male), was selected. Plaintiff's qualifications for said position were observably superior to Mr. Eggers' qualifications.

164.     Mr. Sandles continued to speak negatively about Plaintiff as her employees informed Plaintiff that she was the topic of conversation on numerous vanpools.    These negative comments have affected the perception that other staff and Executive Leaders have of Plaintiff and has caused her severe reputational harm.

165.     On or about July 27, 2016, Plaintiff missed picking up a call from the front office. There were several instances where Plaintiff's subordinate staff, such as Ms. Davis, were contacted to determine if Plaintiff was present.    Again, Mr. Sandles constantly monitored Plaintiff's presence whereas he did not do so for Marlecia Price (Black/African American Female), who had been reported to disappear from the facility for extended periods of time and still received full pay or Mr. Bergeron (Black/African American Male), who went off-campus during work hours.

166.     On or about August 4, 2016, Plaintiff requested approval to serve in the capacity of the Acting Assistant Chief of HAS.    Mr. Sandles responded, "Judy, the decision of who acts as Assistant Chief HAS is not mine, that will be made at the department level."    However, Mr. Sandles disapproved Plaintiff's request at his level since supervisory approval was needed to move

forward with acting in the role.   Myron Washington (Black/African American Male), Clinical Applications Coordinator, was selected for this acting role even though Plaintiff was in an equivalent grade, and was already under Ms. Baldwin's oversight.   Additionally, Plaintiff already provided support to Ms. Baldwin and it would not "stretch" the organization to approve this request since Plaintiff's service would transition over to HAS anyway.

167.    On or about August 4, 2016, Dr. Laurie Mitchell (Black/African American Female), Education Chief, contacted Plaintiff to submit a best practice write-up to obtain "Gold Status" for MEDVAMC.   Mr. Sandles referred Dr. Mitchell to Plaintiff.   Dr. Mitchell was a direct subordinate of Mr. Sandles. Plaintiff informed Dr. Mitchell that she did not believe it was in the best interest of the facility to submit a write-up at that time. However, Dr. Mitchell continued to pressure Plaintiff to complete the write-up. Plaintiff informed Dr. Mitchell that it was Plaintiff's call and that it was not in the best interest of the facility at that time.   Plaintiff refused to "fudge" information to submit for MEDVAMC to receive "recognition" for its questionable practices.

168.    On or about August 11, 2016, Ms. Davis and Plaintiff met with Mr. Sandles. Plaintiff inquired what Mr. Sandles' expectations were to meet the performance measures if Telecare was short-staffed and had been paying out Over Time (OT) so it could participate in the various projects he had previously tasked Plaintiff to such as the Medical Support Assistant (MSA) Academy, Hepatitis C Project, and Telecare-Prime Care rotations.   Plaintiff informed Mr. Sandles that outcomes of the Telecare-Prime Care project were not as expected.   It was expected that the call volume would follow staff who rotated in the Prime Care rotations; however, it was observed that there was an actual increase in call volumes and that there was now a smaller number of staff responding to calls.   Mr. Sandles claimed that he "was not aware."   However, Plaintiff

had brought staffing concerns to the attention of Mr. Bergeron and Mr. Sandles on several previous occasions.   On or about May 25, 2016, Mr. Sandles inquired with Ms. Crain regarding her concerns about the Telecare-Prime Care rotations.    However, at no time did Mr. Sandles inquire what Plaintiff's concerns were. Instead, Mr. Sandles cancelled his bi-weekly meetings with Ms. Davis and Plaintiff on a consistent-basis.

169.    On or about August 11, 2016, Plaintiff inquired as to why the Assistant Nurse Manager position was no longer approved to recruit even though this position was previously recruited for and there was a need for the position. Mr. Sandles could not provide a reasonable response and stated that he was not in place when these needs had initially been identified. However, Mr. Sandles unfairly and inequitably compared Telecare to Non-VA Care.   For example, Sonja White (Black/African American Female) had the opportunity and support from Mr. Sandles to select her staff. Mr. Sandles even boasted that he had attended the Leadership Development Institute (LDI) graduation of Ms. White.   Of note, Ms. White was one of several thousands of employees Mr. Sandles oversaw, but he had the time to take out of his busy schedule to attend her graduation in a different city utilizing government resources.   It was reported that Mr. Sandles and Ms. White had an inappropriate relationship.

170.    On or about August 19, 2016, Mr. Sandles forwarded Plaintiff an e-mail from an employee, Jisha Tharayil (East Asian/Indian Female), who had reported her concerns to Ms. Irving (Black/African American Female) and informed Plaintiff to review her concern and let him know the outcome.   Plaintiff notified Mr. Sandles that Ms. Tharayil had personal issues outside the workplace and now brought their issues into the workplace with another employee, Ms. Elackatt

(East Asian/Indian Female).    However, Mr. Sandles did not provide Plaintiff with the opportunity to respond to the allegations Ms. Tharayil brought to his attention.

171.    On or about August 26, 2016, Mr. Sandles followed up with Plaintiff on what the outcome was regarding Ms. Tharayil's "concerns" and Plaintiff informed him that the meeting was re-scheduled. Since the topic of disruptive employees were being discussed, Plaintiff further followed up with Mr. Sandles regarding updates on the disciplinary action toward Ms. Danquah, who attempted to physically attack Plaintiff.    Plaintiff reminded Mr. Sandles that he had negotiated a "deal" with former AFGE President, Doris Barnes (Black/African American Female), that Ms. Danquah was to be suspended for 14 days with pay.    Mr. Sandles stated that 14 days without pay since it would cause Ms. Danquah financial harm at the GS-6 level.    However, Mr. Sandles failed to take into account Plaintiff's well-being and safety.

172.    It should be noted that Ms. Barnes was suspended from her position as AFGE President for misappropriation of AFGE funds.    There is a criminal complaint against Ms. Barnes, which demonstrates the "quality" of the corrupt officials that Mr. Sandles engages with and coddles as well as speaks volumes of the conduct he exhibits himself. Mr. Sandles condoned the harm, workplace violence and bullying towards Plaintiff.

173.    On or about August 22, 2016, Mr. Sandles forwarded Plaintiff and Mr. Washington (Black/African American Male) and Ms. Baldwin, an ACHE Early Careerist Newsletter.    This newsletter is geared towards future health care leaders and provides career development resources. However, Mr. Sandles issued Plaintiff a 2016 Supervisory Notice of ECF Performance Concerns to "snuff out" her career trajectory instead.

174.     During the Automatic Call Distribution Strategic Management Board (ACD SMB) meeting on August 23, 2016, Mr. Sandles intentionally embarrassed Plaintiff in front of the new Medical Center Director, Mr. Francisco Vazquez (Hispanic Male), and the Deputy Medical Center Director, Karandeep Sraon (East Asian Male). Mr. Sandles informed Executive Leadership that he was not aware of the issues Plaintiff had reported on even though Ms. Davis and Plaintiff communicated these concerns to him on multiple occasions. Again, Mr. Sandles blamed Plaintiff for moving forward with the Telecare-Prime Care project even though he provided those instructions.

175.     On or about August 23, 2016, Plaintiff contacted Mr. Sandles to provide him with an update related to the Telecare Pharmacy transition and informed him of her concerns as it related to the Health Resource Center (HRC) transition.   Mr. Sandles responded by disregarding Plaintiff's concerns even though they were valid.

176.     On or about August 26, 2016, Mr. Sandles called Plaintiff regarding an e-mail Mr. Vazquez, and he received from Mr. King, Interim AFGE President, regarding the termination of Quiana Fuqua (Black/African American Female).   Mr. Sandles disingenuously alleged that Plaintiff terminated Ms. Fuqua because of her interim reasonable accommodations request. Plaintiff informed Mr. Sandles that Mr. Fuqua was a probationary employee who had attendance, performance, and conduct issues prior to her reasonable accommodation request.   Ms. Fuqua abused leave usage and went on national television to brag about her presence at the circus when she was on leave.   Ms. Fuqua was terminated but was then brought back on board as a federal employee again under the management of Ms. Pam Womack (White/Caucasian Female) to demonstrate that Plaintiff was "incompetent."   However, Mr. Sandles selectively chose not to

address with the AFGE how its steward, Eddie Jones (Black/African American Male), abused government resources and time to drive Ms. Fuqua to an interview at Katy Community-Based Outpatient Clinic (CBOC).

177.    On or about August 26, 2016, Plaintiff received an e-mail from Ms. Arlene Goco (Asian Female), Secretary to the Associate Director.   Ms. Goco stated that Mr. Sandles wanted Plaintiff's contact information even though he already had it on file and called Plaintiff on her personal cellular phone instead of Plaintiff's work phone. Although Mr. Sandles was aware that Plaintiff would no longer be reporting to him in the future as these were his direct instructions; he constantly wanted to know Plaintiff's whereabouts, what Plaintiff was doing, etc.   Mr. Bergeron did not receive the same excessive monitoring treatment even though he and/or his direct subordinates could not be found at times and would be off campus on government time. Plaintiff was informed that Mr. Sandles was "obsessed" with Plaintiff.

178.    Mr. Sandles continued to exhibit a sociopathic pattern where he would deny statements he made and "gaslight" Plaintiff as though she was making up her interactions with him.

179.    On or about September 7, 2016, Ms. Davis informed Plaintiff that Telecare was required to take Prevention and Management of Disruptive Behavior (PMDB) training even though Mr. Sandles provided direct instructions that Plaintiff's staff was not to take the training.

180.    On or about September 12, 2016, Plaintiff requested Mr. Sandles' approval and support of her nomination for board membership on the VISN16 Professional Standards Board (Medical Support Assistants).   Mr. Sandles did not provide a response until September 19, 2016. However, the application was returned by Mr. Sandles the same date it was due and as a result

Plaintiff missed the deadline.    Mr. Sandles purposely delayed his approval for Plaintiff's participation on the Board, even though Plaintiff was a Co-Chair at the facility-level.

181.    On or about September 14, 2016, Plaintiff informed Mr. Sandles that she was interested in applying and participating in the Leadership VA Program**.**    Mr. Sandles only responded on September 19, 2016, after EEO Counselor, Mary Sloan had contacted him to inform him that Plaintiff had filed an EEO complaint.

182.    On or about September 19, 2016, Plaintiff received a forwarded e-mail from Mr. Sandles regarding an action item that was sent out on September 14, 2016, and was due on September 15, 2016.    Plaintiff responded and informed Mr. Sandles that she had notified Operator Leadership prior to the deadline.    The action item did not fall under Plaintiff's purview but had been forwarded to Plaintiff on September 14, 2016, for response.    Mr. Sandles continued to excessively micromanage Plaintiff even though she completed work in a timely manner.

183.    During an Associate Director (AD) Chief Bi-weekly meeting on or about September 1, 2016, Mr. Sandles stated that Mr. Vazquez expected that action items be submitted in a timely manner.    This statement was directed toward Plaintiff.    Plaintiff was blamed for an error that the executive front office made.

184.    On or about September 27, 2016, Plaintiff received an e-mail from Mr. Sandles requesting an update on the removal of Ms. Danquah based upon her Reasonable Accommodations request.    Plaintiff informed Mr. Sandles that the request was vetted again through Regional Counsel and that there had been some process issues within EEO.    Plaintiff further clarified to him that it was not a letter and that it was a package, which Ms. Danquah signed in acknowledgement.    Plaintiff also notified Mr. Sandles of workplace violence concerns,

particularly where an active shooter incident had recently occurred in Houston on September 26, 2016.   Mr. Sandles responded with a mocking comment and used legal terminology inaccurately. Mr. Sandles constantly used legal terms and case law inaccurately in Plaintiff's presence.

185.    On or about September 28, 2016, Mr. Sandles responded to Plaintiff's follow-up e-mail regarding the Proficiency Report of Ms. Elackatt (East/Asian Female).    Mr. Sandles stated, "Judy I consider the tone of this message insubordinate." Plaintiff inquired whether this was a "verbal counseling."    Plaintiff further informed Mr. Sandles that he intentionally continued to misconstrue her statements and/or continued to attempt to take action against her. Plaintiff provided further clarification that her tone was not "insubordinate" as he claimed and informed him, he was inappropriate for including Plaintiff's colleague, Mr. Bergeron, and subordinate, Ms. Davis, in his response wherein he chastised Plaintiff.

186.    On or about September 28, 2016, Plaintiff inquired with Mr. Bergeron whether he was back on campus since his away message stated that he would not be back until October 1, 2016.   Mr. Bergeron informed Plaintiff that he was in Washington, DC on a "project with CITC and their Call Centers." However, Plaintiff was not provided with the same opportunity to work on projects for the Call Center.    Yet, Mr. Bergeron was provided this opportunity as the Staff Assistant to the Associate Director.    Mr. Sandles intentionally blocked Plaintiff's opportunities for professional development and career enhancement while at the same time offering opportunities for professional development and career enhancement to her similarly situated coworkers outside of her protected classes.

187.    On or about September 28, 2016, Mr. Sandles continued to question Plaintiff's integrity. Mr. Sandles offered to resolve Plaintiff's EEO claim by re-assigning her to a GS-12

position, which is a lower grade and pay cut to her salary. However, Mr. Bergeron was not offered a re-assignment to a lower grade that hindered his promotion potential and/or receive a pay cut to his salary when his Prime Care issues were reported in the OIG Report in July 2016.    Mr. Sandles claimed that he had "bent over backwards for Plaintiff," which was not the case as he continued to cause misery and strife for Plaintiff in the workplace.   Mr. Sandles had made it difficult for Plaintiff to complete her work in a timely manner by deliberately undermining and overshadowing Plaintiff's authority as a supervisor.

188.    On or about September 29, 2016, Plaintiff received a solicitation that was brought to her attention regarding her government e-mail and reported this violation in accordance with 5 USC 7102.    However, no action was taken against AFGE Local #1633 even though it was "calling, participating in, or supporting a strike, work stoppage, or slowdown."   The e-mail encouraged staff to contact the Union Office regarding "Sick Building Syndrome."   Mr. Sandles continued to allow these illegal activities to occur on federal grounds on government time, thereby wasting government resources and impacting patient care.

189.    On or about September 29, 2016, Plaintiff requested that Mr. Muhammad, Chief of LMR, to define "insubordination" and/or to direct Plaintiff towards the laws, regulations, and references that could be found as it related to the definition for federal employee manager relations. Plaintiff did not receive a response from Mr. Muhammed.

190.    On September 30, 2016, Plaintiff followed up with Mr. Muhammed regarding her inquiry.    However, Plaintiff did not receive a response from Mr. Muhammed.

191.    On or about September 29, 2016, Ms. Baldwin presented on Insurance Capture Buffer (ICB) rates.   Ms. Baldwin's slide presentation indicated that this performance measure

was "N/A" (Not Applicable) to Telecare.    However, Mr. Sandles had belittled Plaintiff in the past and accused Plaintiff's service of not completing this action and wrote about it in a prior performance appraisal.    This presentation confirmed that Mr. Sandles degraded Plaintiff on the basis of her protected classes, not because there was actual supporting data indicating that Plaintiff's service failed to meet outcomes

192.    On or about September 30, 2016, Plaintiff informed the Office of the Associate Director, including Mr. Sandles, that she recommended again that the VISN take on the new Telecare Record Management Plus (TRM+) contract and informed them that the facility runs the risk of the other VISN 16 facilities failing their Call Center Expansion Initiatives or impacting their patient care if the contract was not in place by December 2016.    As such, Plaintiff would be responsible for their failure even though she did not become aware of their issues and unauthorized access to the program previously.    Plaintiff did not receive a response.

193.    On or about September 30, 2016, Dr. Floyd (White/Caucasian Female) informed Plaintiff that she would set up a Data Day meeting with Mr. Vazquez, her, and Plaintiff the following week.

194.    On or about October 3, 2016, Mr. Sandles sent Plaintiff some information on health law.    Mr. Sandles was aware that Plaintiff did not practice law for the federal government and continued to mock her legal training.    Mr. Sandles continued to insult Plaintiff's intelligence, hard work, and dedication.

195.    On or about October 3, 2016, Mr. Sandles forwarded Plaintiff an e-mail without any content from a subordinate, Ms. Elackatt.    Plaintiff inquired as to what the intent of the e-mail was and inquired whether he was providing Ms. Davis and Plaintiff, as first-line and second-

64

line supervisors with direct instructions to be included in the employee's self-input as their own input.   Plaintiff further informed Mr. Sandles that the employee contacts be credible and verifiable sources.   Mr. Sandles tersely responded, "The intent of the email is to share with the first- and second-line supervisor what I'm receiving from your staff.   I[f] directions weren't included then they shouldn't be inferred."

196.    On or about October 4, 2016, Mr. Sandles met with Ms. Elackatt, Staff RN, who is within Plaintiff's line of supervision and without Plaintiff's knowledge. Again, Mr. Sandles did not provide Plaintiff with the fair and proper opportunity for response and instead instructed Ms. Davis and Plaintiff to meet with the employee and union representative.   Plaintiff had already previously met with the Ms. Elackatt regarding her Annual Proficiency Rating.

197.    On or about October 5, 2016, Mr. Vazquez, inquired what the plan was to address the increasing Average Speed of Answer (ASA) and dropped call rate.   Mr. Sandles was included in this correspondence.   However, Mr. Sandles did not forward this inquiry to Plaintiff, instead, Ms. Wells, Staff Assistant to the Medical Center Director, forwarded Plaintiff this information as a courtesy for a response to Mr. Vazquez by Close of Business (COB) October 6, 2016.   Mr. Sandles continued to intentionally exclude Plaintiff and prohibited her from directly corresponding with the new and current Medical Center Director, as he did with the former Medical Center Director, Mr. Walmus.   Plaintiff provided a response to Mr. Vazquez since no response had been provided to him.

198.    On or about October 6, 2016, Mr. Sandles provided an additional response to Plaintiff's response to Mr. Vazquez.

199.    On or about October 7, 2016, Plaintiff requested clarification on who would report during the weekly Data Day.

200.    On or about October 7, 2016, Dr. Floyd (White/Caucasian Female), falsely and inaccurately responded that the Strategic Analysis for Improvement and Learning (SAIL) metric was assigned to Telecare.    However, Plaintiff was previously assigned to report on Telecare as it relates to this SAIL metric, not to report on the entire facility as Dr. Floyd alleged. Dr. Floyd, who had been submitting false and inaccurate data to Mr. Vazquez regarding Plaintiff's service and facility data, recommended that Ms. Crain (White/Caucasian Female), Medical Care Line Executive, lead a formal project.    However, Telecare submitted accurate data as it related to the service and facility.    Dr. Floyd, who reported to Executive Leadership, continued to submit false and inaccurate data.    However, no administrative or disciplinary action was taken against Dr. Floyd.    It should also be noted that Dr. Floyd oversaw her husband's work as a Patient Advocate at the Texas City/Galveston Community-Based Outpatient Clinics (CBOCs), which clearly demonstrates the corruption and misconduct at MEDVAMC.

201.    On or about October 5, 2016, Mr. Sandles forwarded Plaintiff an alleged concern from employee, Ms. Elackatt, Staff RN. Mr. Sandles did not provide Plaintiff with the fair and proper opportunity to respond to this allegation. Although Mr. Sandles informed Ms. Elackatt to address her concerns with her direct supervisors, he instead met with Ms. Elackatt.

202.    On or about October 6, 2016, Mr. Sandles informed Plaintiff's subordinate, Ms. Davis, that he was concerned with medical record documentation of Ms. Elackatt. However, it was Mr. Sandles who approved the placement of this employee into Telecare in July 2015.    Mr. Sandles also allowed Ms. Elackatt to circumvent the chain-of-command and responded to her

66

alleged concerns, even though he would not meet with Plaintiff or respond to Plaintiff's inquiries as his direct subordinate. Mr. Sandles also met with Ms. Elackatt on several occasions without Ms. Davis' or Plaintiff's knowledge even though she is within their line of supervision.

203.    On or about October 7, 2016, Plaintiff provided Ms. Walkin, EEO Investigator, with additional information regarding the EEO Investigation of Ms. Strassner's EEO Complaint. Plaintiff provided Ms. Walkin with a few correspondences regarding instructions Plaintiff received from Mr. Sandles to terminate Ms. Strassner. On October 28, 2016, Plaintiff responded to Ms. Walkin's additional inquiries regarding this same claim. Plaintiff continued to participate in a protected EEO activity wherein Plaintiff made statements regarding the involvement of Mr. Sandles. As a result, Mr. Sandles continued to retaliate against Plaintiff for her participation in protected EEO activity.

204.    On or about October 12, 2016, during an Administrative Officer Council meeting, Mr. Sandles stated that Dr. Floyd was the Lead for the Call Center Responsiveness measure and that an Executive Leadership meeting regarding this matter had occurred the previous week.    Mr. Sandles deliberately appointed Dr. Floyd even though Plaintiff oversaw Telecare.    Mr. Sandles was aware that Plaintiff would not falsify data for his personal glory and gains. Mr. Sandles deliberately excluded Plaintiff from the Executive Leadership meeting, even though her service submits and reports data to the VHA Support Service Center (VSSC). Mr. Sandles continued to discriminate and retaliate against Plaintiff by intentionally isolating her and undermining her supervisory authority.

205.    On or about October 12, 2016, Plaintiff filed a very detailed formal complaint of discrimination (VA Case No. 2003-0580-2016105116 and EEOC Hearing No. 460-2018-00113X)

with the Agency. Said formal complaint is attached to Plaintiff's First Amended Complaint as Exhibit 3. (Dkt. # 22). In her formal complaint, Plaintiff identified a non-exhaustive list of 147 continuous discriminatory and retaliatory actions the Agency subjected Plaintiff to from on or about April 1, 2014, to on or about October 3, 2016. The incidents of the continuous hostile work environment and discrete acts identified in Exhibit 3 and are incorporated by reference into the facts section of this Amended Complaint.

206.   On or about October 14, 2016, Dr. Floyd recommended that Plaintiff, along with a few other staff, attend the Contact Center Institute Training in November 2016.

207.   On or about October 18, 2016, Plaintiff informed Mr. Sandles that Ms. Davis nor Plaintiff could attend the training and would sign up for the January 2017 training per his request. However, Mr. Sandles continued to "insist" that Plaintiff attend the November 2016 Training and inquired, "Do you both have leave planned in November?"

208.   On or about October 19, 2016, Plaintiff reminded Mr. Sandles that he had previously approved her leave plans in advance and her plans could not be changed.   Plaintiff also asked Mr. Sandles to help her understand the urgency of attending this training as she had previously requested to attend the same training in May 2016 but did not receive a response from Mr. Sandles.   Mr. Sandles did not provide a response. Mr. Sandles continued to provide unfair expectations that Plaintiff change her personal plans through intimidation.

209.   On or about October 18, 2016, Mr. Sandles responded to an inquiry from Tina Pereira (White/Caucasian Female), Pharmacy Outpatient Manager, "Until we move to HRC we will struggle with pharmacy calls.   I'd like to know if they have any suggestions now.   This is our organizational sore spot."   However, Ms. Pereira did not receive a "2016 Supervisory Notice

of ECF Performance Concerns" despite failure to meet performance measures. Plaintiff provided a friendly reminder that VACO advised that any calls that come in for Pharmacy were to be captured and reported onto VSSC.    However, Plaintiff had received previous instructions from Executive Leadership to only enter in "scheduling data" into VSSC as it was a "disadvantage" to MEDVAMC since it reports on scheduling, clinical, and pharmacy data.

210.    On or about October 18, 2016, Plaintiff informed Mr. Sandles of her interest to participate in the Detail Opportunity with the Office of Patient Centered Care & Cultural Transformation. Plaintiff was ultimately denied this opportunity because Mr. Sandles once again intentionally submitted his response after the deadline to effectively deny Plaintiff another career enhancing opportunity. Plaintiff would later be accused on insubordination and forced to apologies to Mr. Sandles regarding her email inquiries to him regarding her concern that, "This is one of several instances in which you have responded after the deadline and thereby have caused me to miss out on career-enhancing opportunities."

211.    On or about October 19, 2016, Plaintiff met with Executive Leadership regarding the Business Value Stream Operations.    Plaintiff was unprepared for the meeting as it was related to the progress of the entire facility and not Telecare as Plaintiff had been informed of by Systems Redesign via Mr. Sandles.    Plaintiff felt humiliated that Mr. Sandles once again intentionally set her up for failure as form of continued discrimination and retaliation.    During this meeting, Plaintiff was also informed that Executive Leadership had sent out a memorandum on October 18, 2016, regarding the appointment of Ms. Crain (White/Caucasian Female) as the Chair of the Taskforce for the Call Responsiveness measure.

212.    On or about October 21, 2016, Mr. Sandles responded to another disruptive employee, Marilyn Shaffer (Black/African American Female), and stated, "The MOU with OKC and Muskogee was dissolved effective October 01, 2016. I apologize that you were not informed." Mr. Sandles did not communicate or confirm this change with Plaintiff and kept her "in the dark" even though it impacted Plaintiff's workload.

213.    On or about October 25, 2016, Mr. Sandles followed up with an allegation that Ms. Elackatt made regarding the Non-VA Emergency Facility Payment Authorization process.    Once again, Mr. Sandles did not provide Plaintiff with the fair and proper opportunity to respond to Ms. Elackatt's allegation.

214.    On or about October 26, 2016, Plaintiff's service became involved in the Rapid Process Improvement Workshop (RPIW) for Inpatient Authorization even though Mr. Sandles alleged that Plaintiff was failing Plaintiff's critical elements. The Office of the Associate Director "recommended" that Plaintiff's service become involved in the process.    Mr. Sandles continued to pile on projects on Plaintiff even though he had alleged she was allegedly "failing" with her current workload and performance measures.

215.    On or about October 28, 2016, Plaintiff received notification that she was not selected for the Medical Administration Officer (Assistant Chief) – Vacancy ID 1789406 position at approximately 10:42 a.m.; this was only less than 24 hours after Plaintiff completed the interview process for that vacancy. Ms. Baldwin had already pre-selected Carolyn Collier for the vacant position. Plaintiff's non-selection was in retaliation for her protected EEO activity.

216.    Ms. Collier had shared with Plaintiff that Mr. Sandles gave her advice about on how to move forward in her career.    Ms. Collier informed Plaintiff that Mr. Sandles told her that

she needed to "step on people's necks" to move forward in her career. Ms. Collier informed Plaintiff that she "did not operate that way."   Plaintiff felt that Mr. Sandles in effect was informing Ms. Collier of how he was treating Plaintiff.

217.   On or about October 27, 2016, Mr. Sandles forwarded Plaintiff a memorandum titled "ACD/ASA Taskforce" regarding the appointment of the Automatic Call Distribution (ACD) Taskforce.   However, Plaintiff was excluded from membership even though her service submitted and reported this data. Ms. Baldwin (White/Caucasian Female) was included despite having no to little knowledge of call center operations.

218.   On or about October 30, 2016, Plaintiff received a copy of "The Source" newsletter. In this newsletter, Mr. Muhammad (Black/African American Male) was congratulated for completing the Leadership Development Institute (LDI).   Mr. Muhammad was offered this career-enhancing opportunity even though he did not meet his performance measures.   However, on the other hand Plaintiff was denied several career-enhancing opportunities, trainings, etc.

219.   Mr. Muhammad also had "stepped down" from his position as the Human Resources Officer in March 2016.   Mr. Muhammad received favorable treatment when he was allowed to change his schedule and pursue educational endeavors unrelated to the federal government.   However, Plaintiff's request to change her schedule temporarily since she was attending law school part-time was denied by Mr. Sandles As a result, Plaintiff was forced to exhaust her Annual Leave to complete her courses.   However, other staff, outside of her protected class including Mr. Muhammed, were allowed to attend their courses while on government time and duty.

220.    On or about November 10, 2016, Mr. Bergeron encouraged Plaintiff to apply to the Leadership Development Institute (LDI) and stated the following, "More than qualified staff, I encourage you to apply." Clearly, the Office of Associate Director acknowledged that Plaintiff was "overly qualified" but continued to discriminate, harass, and retaliate against her.

221.    On or about November 8, 2016, Mr. Sandles sent Plaintiff an e-mail and informed Plaintiff of the following, "Judy, I've completed your FY16 ECF rating.   I have the document with Tegan.   You are welcome to come review the file here at your convenience and we can discuss as you'd like.   Otherwise, once signed your 5-part folder will be provided to Ms. Baldwin once this rating is closed." Upon receiving said e-mail, Plaintiff reported to Ms. Chambliss' office to receive Plaintiff's copy.   Plaintiff received an FY16 annual rating of "Fully Successful" and inappropriate commentary was intentionally included in her appraisal by Mr. Sandles.   Upon Plaintiff's cursory review of her personnel folder, Plaintiff saw that her FY14 Performance Appraisal was missing. Plaintiff's medical documentation was included in her personnel folder – however, those documents should have been excluded as Plaintiff's medical condition(s) should not have had any effect on her performance ratings and/or be uploaded onto Plaintiff's e-OPF.

222.    On or about November 15, 2016, Plaintiff submitted her "FY16 Performance Appraisal Rebuttal" electronically along with a copy of Plaintiff FY16 Mid-Year Review, which the Office of the Associate Director could not locate.

223.    On or about November 16, 2016, Plaintiff submitted a revised hard copy of her "FY16 Performance Appraisal Rebuttal."   In this rebuttal, Plaintiff respectfully rebutted her annual rating of "Full Successful" and the ratings of critical elements, the commentary of "See

attachment labeled 2016 Supervisory Notice of ECF Performance Concerns," and addressed other concerns.

224.     On or about November 28, 2016, Mr. Sandles finally provided a response, 10+ days after Plaintiff's submission.    In this response, Mr. Sandles did not address all of Plaintiff's concerns, presented data that was not shared with Plaintiff throughout the fiscal year, and included other questionable content.

225.     Mr. Breaux (Black/African American Male), Labor Management Specialist, informed Plaintiff that Mr. Sandles had called him into his office on numerous occasions to respond to Plaintiff's concerns.    In regard to these instances, Mr. Breaux informed Plaintiff that Mr. Sandles was clearly "angry" and tried to "portray" himself as if he was "innocent" of any "wrongdoing."    However, Mr. Breaux could not and did not offer any guidance to Mr. Sandles since Plaintiff had not done anything inappropriate.

226.     On or about December 1, 2016, Plaintiff requested clarity from Jennifer Becerra (Hispanic Female), Human Resources Recruitment and Placement Supervisor, and Ms. Kathy Salazar (Hispanic Female), Human Resources Officer, about the Position Management and Organizational Chart Review.    Plaintiff provided correct and accurate information to Human Resources (HR) and was informed to bring this information with her to a meeting.

227.     On or about December 2, 2016, Plaintiff informed HR that she was confused on whether the meetings had been scheduled since Plaintiff was of the understanding that the meetings were to be scheduled for the following week when HAS Leadership was on travel.    Plaintiff also notified HR that she could not tell whether her RN and MSA vacancies were allocated to the Office of the Director or HAS. Ms. Salazar informed Plaintiff that Mr. Sandles was covering HAS during

the VISN 16 Position Management Consultant site-visit even though Plaintiff had direct knowledge of staffing within Telecare.   As usual, Mr. Sandles did not request information directly from Plaintiff and continued to present false and inaccurate information to other parties even though Plaintiff had direct knowledge of staffing within Telecare.

228.   On or about December 1, 2016, Plaintiff requested clarity from Mr. Sandles regarding what effects the change from Houston to Little Rock in the "WHEN Call Center" in FY17 would have on managerial positions in a follow-up e-mail.   Plaintiff also inquired whether this would result in "downgrades to supervisors, removal from supervisory status, etc."

229.   On or about December 2, 2016, Mr. Sandles ignored Plaintiff's inquiry and responded, "Before any announcements are made to staff, I need to review HAS' plan post WHEN."   We can cover this in my next monthly meeting with HAS.   From there we can meet with AFGE, then we discuss with them any impact concerns for non-managerial positions." However, Plaintiff was not invited to and excluded from the HAS monthly meetings.

230.   Mr. Sandles also intentionally excluded Plaintiff from the Executive Leadership Council (ELC) meeting that covered Call Centers, phone tree improvements, and Little Rock as the VISN 16 WHEN Call Center in FY17, etc.   Plaintiff was not invited to this meeting even though she was the subject matter expert.   However, Ms. Baldwin was invited to this meeting.

231.   On or about December 1, 2016, Plaintiff submitted her commentary and concerns to the General Practice Management (GPM) team and Mr. Sandles regarding the latest Scheduling Scenarios draft that was sent out. Plaintiff sought clarification on whether the results were released from the site-visit with the VISN OIG auditors and sought approval to move forward with the Choice Options, among other concerns.

232.    However, on or about December 2, 2016, Mr. Sandles inferred that Plaintiff had lied when he provided her with previous direct instructions to violate the Scheduling Directive and stated that Plaintiff did not need approval to move forward with complying with the Scheduling Directive. Mr. Sandles continued to intentionally undermine Plaintiff's authority and reputation.

233.    On or about December 7, 2016, Judy filed very detailed amendments to her formal complaint of discrimination (VA Case No. 2003-0580-2016105116 and EEOC Hearing No. 460-2018-00113X) with the Agency. The amendments to her formal complaint are attached to Plaintiff's First Amended Complaint as Exhibit 4. (Dkt. #22). In her amendments, Plaintiff identified a non-exhaustive list of 27 continuous discriminatory and retaliatory actions the Agency subjected Judy to from on or about October 1, 2016, to on or about December 1, 2016.

234.    On or about December 14, 2016, Mr. Sandles continued to ignore Plaintiff's concerns of the effects the change regarding the re-alignment to VISN 17 may have on managerial positions and bargaining unit positions. Plaintiff made the original and specific inquiry on December 1, 2016, and followed up again on December 2, 2016, regarding managerial positions.

235.    On or about December 20, 2016, Mr. Sandles provided a condescending response directly toward Plaintiff and once again intentionally included her fellow colleagues, "I know what the action item says. I asked what telecare is doing." Mr. Sandles originally sent an e-mail regarding an action about "Selective Call Monitoring" on December 19, 2016. Plaintiff responded and informed Mr. Sandles that it looks like this action item applies to the entire facility – and not just Telecare. Plaintiff also suggested to include this in the scheduling audits.

236.    On or about December 23, 2016, Mr. Sandles denied that he submitted a different copy of Plaintiff's FY16 Performance Appraisal to Mr. Vazquez than what he provided to her on

November 18, 2016.   Mr. Sandles was aware of the consequences of his dishonest action, which caused injury to Plaintiff's character and reputation.

237.   On or about December 27, 2016, Mr. Sandles sent Plaintiff an e-mail to "memorialize" a discussion they had.  However, Mr. Sandles' "memorialization" only included his selective responses and failed to address Plaintiff's concerns that were posed to him during their meeting.

238.   On or about December 29, 2016, Mr. Sandles failed to confer with Human Resources (HR) regarding Plaintiff's rebuttal and provided Plaintiff with a general response that did not apply to her rebuttal wherein her documents were falsified and submitted to Mr. Vazquez for review.   Plaintiff submitted another rebuttal to her FY16 Performance Appraisal on December 29, 2016.

239.   On or about December 29, 2016, Mr. Sandles negatively portrayed Plaintiff as an "annoyance" to Dr. Amy Smith, VISN 16 Deputy Chief Medical Officer, and Ms. Seaton, VISN 16 Utilization Management Program Manager.   Mr. Sandles stated, "Amy/Stephanie, our call center manager continues to ask for the status of an EDM that the VISN is apparently requesting to officially indicate MEDVAMC will not continue as the V16 WHEN call center."

240.   On or about December 30, 2016, Mr. Sandles deliberately provided contradicting instructions to Plaintiff as he previously instructed her to hand-off the VISN 16 contract to Little Rock but now instructed Plaintiff to retain the Telecare Record Management Plus (TRM+) contract.  These contradicting instructions caused Plaintiff anxiety since she continued to be blamed for the bad decisions Mr. Sandles made.

241.    On or about January 3, 2017, Mr. Sandles stated that he had released Plaintiff's personnel folder to HAS via Mr. Bergeron, Staff Assistant.   However, Mr. Bergeron did not have the authority to accept and receive Plaintiff's personnel folder as he was not her supervisor.  Additionally, Plaintiff did not have the opportunity to review her personnel folder until January 31, 2017.

242.    On or about January 3, 2017, Mr. Sandles responded in a mocking manner when Plaintiff requested a follow-up regarding her concern about a disruptive employee after her initial inquiry on December 19, 2016.   Mr. Sandles stated, "Judy, this is your employee.   You can feel free to contact HR for these questions."   However, Mr. Sandles was aware of Plaintiff's discomfort with this employee since Plaintiff was the subject of an investigation regarding her disciplinary action of this employee.   Mr. Sandles was also directly involved with the negotiation and reduction of the disciplinary action for this employee. Instead of supporting Plaintiff as her supervisor, Mr. Sandles instead reduced the discipline of the problem employee which once again served to undermine Plaintiff's supervisor authority.

243.    On or about January 5, 2017, Mr. Sandles undermined Plaintiff's authority yet again when he directly contacted her subordinate, Ms. Davis.   Mr. Sandles requested that Ms. Davis conduct a fact-finding outside of Telecare, with the knowledge that Ms. Davis had limited knowledge, experience, and lacked training to conduct fair and objective fact-findings as a Nurse Manager without Plaintiff's involvement.  Mr. Sandles stated in a disdainful manner, "It is not appropriate for Judy to be involved in any way." Mr. Sandles did not want Plaintiff to become involved since he wanted to influence the findings so that it would be found that timecard fraud

had not been committed and thus a report would not have to be submitted to for higher-level VA review.

244.     On or about January 11, 2017, Mr. Sandles conducted a Telephone Access Steering Committee (TASC) and informed the group of the two models that the facility would review for implementation.   These models either centralize or decentralize Telecare.   However, Plaintiff was excluded in the development of the models and was not assigned as a voting member of the TASC.  Mr. Sandles directed the Plaintiff's colleagues, who are either lower or equivalent GS-levels, to determine the professional future of the Plaintiff and her subordinates, even though Mr. Sandles could have made a management-directed decision as he had done with the re-alignment of Outpatient Pharmacy.   This was a double-edged approach where Plaintiff would be "removed" from her position with certainty, whether it be from her colleagues' "votes" and/or from being issued 2016 Supervisory Notice of ECF Performance Concerns.

245.     On or about January 11, 2017, Mr. Sandles invited Plaintiff to a TASC meeting to intentionally "bully" her into submitting inaccurate VSSC telephone call center data.     Mr. Sandles encouraged the group members, along with Stacie Henson (White/Caucasian Female), to intimidate Plaintiff into removing Pharmacy data, even though it was a requirement to include this data for reporting.   The removal of Pharmacy data would create the false misperception that MEDVAMC was performing better than it actually was, which could result in additional performance pay for Senior Executive Service leadership.

246.     On or about January 19, 2017, Mr. Sandles ignored Plaintiff's concerns when she brought up data reporting, while continuing to question her competence and integrity.   Mr. Sandles deliberately did not add Plaintiff as a (voting) member of the TASC and documented this in the

updated Charter.   Instead, Mr. Sandles insulted Plaintiff and intentionally assigned her to the role of Telecare Section Chief, Health Administration Service as "Administrative Support," even though Ms. Baldwin had her own administrative program support to take her minutes and complete other administrative duties.   Plaintiff was relegated to this role even though she is a Subject Matter Expert who constantly communicates with VACO and VISN 16 and has been identified as a "thought leader" for Clinical Contact Centers.

247.    On or about January 31, 2017, Mr. Sandles pressured Plaintiff's fellow colleagues to vote on the Memorandum of Understanding (MOU) Pharmacy transition to the Health Resource Center (HRC).  However, Mr. Sandles ignored Plaintiff's concerns when she brought up data reporting and continued to question Plaintiff's competence and integrity.

248.    Mr. Bergeron stopped by Plaintiff's office and told her, "I gave you what you needed" in reference to Plaintiff's EEO complaint against Mr. Sandles. This demonstrates how the Agency's personnel are willing and capable of interfering with the EEO process to "sway" the process and ultimate resolution. This further demonstrates how the Agency's personnel believe they are "above the law" and have the power to "bend the law" as they see fit.    Moreover, this demonstrates the corruptness of the agency whereby its personnel can blatantly and deliberately withhold information from an investigation without any consequences.   Furthermore, it demonstrates that Mr. Bergeron was directed to discriminate, harass, and retaliate against Plaintiff regardless of who encumbered leadership roles since it was the culture to torment Plaintiff.

249.    On or about February 1, 2017, Plaintiff informed Mr. Sandles that she finally received the opportunity to review her personnel folder on January 31, 2017, and provided him with notification of the issues she came across with her personnel folder.

250.    On or about February 1, 2017, Mr. Sandles sent Plaintiff a threatening e-mail stating, "Your continued emails on these topics are considered harassment and intentionally provoking.  Continuing this pattern of behavior will cause me to consider a formal grievance."  Mr. Sandles claimed that Plaintiff "intentionally provoke" him when she inquired about valid concerns. This was a common tactic of "gas lighting" that Mr. Sandles used repeatedly to discriminate and retaliate against Plaintiff.

251.    The VA is well known for its culture of shuffling and promoting bad actors.   Mr. Sandles was no exception as he was shifted to a different job and location, where his destructive behaviors were further encouraged.   Despite Mr. Sandles' transition to another VA medical center, the constant and abusive treatment toward Plaintiff did not stop at the MEDVAMC. Instead, Mr. Sandles handed "the baton" to his successors, Ms. Carolyn Badlwin (White/Caucasian Female) and Mr. Bergeron (Black/African American Male) to continue their fury against the Plaintiff.

252.    From on or about February 19, 2017 forward, Ms. Baldwin continued to discriminate, harass, humiliate, and retaliate against Plaintiff in the stead of Mr. Sandles.   Upon their first meeting, Ms. Baldwin stated that she did not "trust" Plaintiff even though they had no interactions with each other.   It was obvious from the start that Ms. Baldwin had already made up her mind about Plaintiff instead of coming to her own judgment.   Accordingly, Ms. Baldwin deliberately did not provide any managerial support to Plaintiff and intentionally ignored and/or delayed actions in order to place blame on Plaintiff. Ms. Baldwin would constantly mock Plaintiff's legal background, used legal terminology incorrectly, and bragged to Plaintiff that she

80

was a legal clerk. Ms. Baldwin continued to allow and encouraged others, such as AFGE representatives, to berate and disrespect Plaintiff.

253.     Mr. Sandles pre-selected Ms. Baldwin to be the Assistant Chief of Health Administration Service (HAS).   Mr. Sandles then promoted Ms. Baldwin due to their personal relationship, which was a Prohibited Personnel Practice.   Mr. Sandles intentionally re-assigned Plaintiff from under his supervision as the Associate Director to that of Ms. Baldwin's supervision as the Chief of Health Administration Service in order to continue the mistreatment of Plaintiff. Ms. Baldwin continued to use her leverage of having an inappropriate relationship with Mr. Sandles to "beat Plaintiff into submission" and to "hold this abuse of authority over Plaintiff's head."

254.     From on or about February 19, 2017 forward, Mr. Bergeron continued to discriminate, harass, humiliate, and retaliate against Plaintiff in the stead of Mr. Sandles. Mr. Sandles inappropriately re-assigned Mr. Bergeron to a position that did not exist and did not supervise Plaintiff.   However, Mr. Bergeron continued to abuse his authority to "bully" Plaintiff. Mr. Bergeron continued Mr. Sandles' pattern of degrading and demeaning Plaintiff in the presence of her colleagues, subordinates, and superiors in order to "break" and "weaken" Plaintiff's spirit.

255.     On or about February 19, 2017, Plaintiff filed very detailed amendments to her formal complaint of discrimination (VA Case No. 2003-0580-2016105116 and EEOC Hearing No. 460-2018-00113X) with the Agency. The amendments to her formal complaint are attached to Plaintiff's First Amended Complaint as Exhibit 5. (Dkt. #22) In her amendments, Plaintiff identified a non-exhaustive list of 37 continuous discriminatory and retaliatory actions the Agency subjected Plaintiff to from on or about December 14, 2016, to on or about February 7, 2017.

256.    On or about March 10, 2017, Ms. Baldwin chastised Plaintiff for completing a follow-up.

257.    On or about March 22, 2017, Ms. Baldwin did not respond to Plaintiff's concerns regarding the thermostats within Building 122.   This was a consistent pattern wherein Ms. Baldwin purposely ignored Plaintiff's concerns, similar to that of Mr. Sandles' conduct toward Plaintiff.

258.    On or about March 28, 2017, Plaintiff was informed that she was approved for partial funding to attend a VA-sponsored training that had been recommended. However, other staff, outside of Plaintiff's protected classes, such as Sonja White (Black/African American Female), were allowed to attend trainings where the facility paid the travel and training expenses in their entirety. Due to financial concerns of out-of-pocket expenses, Plaintiff did not attend this necessary training.

259.    On or about April 13, 2017, Ms. Baldwin embarrassed Plaintiff in the presence of her colleagues and subordinate and inferred that Plaintiff had submitted untimely work. Ms. Baldwin mocked Plaintiff when she reminded Ms. Baldwin that Plaintiff had been engaged in a federally protected EEO activity.

260.    On or about April 20, 2017, Ms. Baldwin did not respond to Plaintiff's concerns regarding instructions Plaintiff had received to select Supervisory Medical Support Assistants (MSAs).   Plaintiff did not participate in the drafting of the job announcements or interviews but was "pressured" to select candidates.

261.    On or about May 3, 2017, Ms. Baldwin provided Plaintiff instructions to forward the denials Plaintiff referred to when Plaintiff stated that Plaintiff's first choice for a training had

not been granted.    Ms. Baldwin failed to respond to Plaintiff's request regarding the training even though Plaintiff had submitted a timely response on April 26, 2017.    However, Ms. Baldwin was able to sign up for the very training that Plaintiff was excluded from and did not include Plaintiff when she had made this sole request for herself.

262.    On or about May 17, 2017, Kathy Salazar (Hispanic Female), Human Resources Officer, "pressured" Plaintiff to engage in Prohibited Personnel Practices to hire a former employee who had known issues with integrity and professionalism and was not a right fit for the service or Agency.

263.    On or about May 26, 2017, Alisa Cooper (Black/African American Female), Chief of Fiscal Service, did not respond to Plaintiff's inquiries as to why the travel process had changed for Plaintiff and Telecare in a "Do Not Forward" e-mail. On July 26, 2017, Ms. Cooper would change the process yet again when Plaintiff requested clarity regarding the travel process since Plaintiff had been requested to complete a site-visit on short notice.

264.    On or about May 30, 2017, Plaintiff was not selected for the Health Systems Specialist position under the Office of the Deputy Medical Center Director.

265.    On or about June 23, 2017, Ms. Baldwin continually allowed a patient to continue to be abusive toward Plaintiff when Plaintiff had informed her that she "did not feel comfortable."

266.    On or about June 20, 2017, Ms. Baldwin deliberately excluded Plaintiff and directly negotiated with AFGE regarding Plaintiff's service, despite Director Vasquez's statement that Plaintiff would be a part of this negotiation process on April 18, 2017.

267.    On or about June 20, 2017, Plaintiff was not selected for the Health Systems Specialist position under the Clinical Practice Office.

268.     On or about June 23, 2017, Ms. Baldwin contacted Plaintiff regarding an allegation that a photo was taken in Plaintiff's service during an MSA Academy Observations session. Ms. Baldwin would follow up with alleged complaints against Plaintiff and Plaintiff's service in an attempt to "paint the picture" that Plaintiff was incompetent. However, Ms. Baldwin would not follow up regarding important concerns Plaintiff brought to her attention, such as re-alignments, transition of after-hours services, etc.

269.     On or about July 6, 2017, Plaintiff was denied access to meet with Director Vasquez regarding Plaintiff's concerns with the EEO Office, which was under his direct oversight.

270.     On or about July 6, 2017, Mr. Bergeron attempted to block Plaintiff from meeting with the new Associate Director, Anthony Dawson, regarding Plaintiff's concerns about the EEO Office.

271.     On or about July 11, 2017, Mark Muhammad, Chief of Labor Relations, acted threateningly toward Plaintiff during a meeting regarding EEO Office concerns in the presence of Ms. Denise Davis, Telecare Nurse Manager, and Mr. Anthony Dawson.   Ms. Davis had commented on Mr. Muhammad's aggressiveness towards Plaintiff.

272.     On or about July 12, 2017, Mr. Bergeron deliberately took Mr. Dawson, directly to the Plaintiff's service to embarrass Plaintiff in front of new Executive Leadership.

273.     On or about July 12, 2017, Mr. Bergeron "pressured" Plaintiff to participate in the first MSA Hiring Fair that was being held on Saturday, July 15, 2017, in the presence of Mr. Dawson.

274.     On July 12, 2017, Mr. Anthony Dawson (Black/African American Male) made a comment to the effect of, "You write a lot. You're the type that will write everything down.    You

will come back and say, 'No you didn't. You said this."    However, Plaintiff did not take any notes nor did she have a notebook on hand.

275.    Mr. Bergeron continued to defame, slander, and make libelous statements against Plaintiff. Mr. Bergeron continued to suppress her freedom of expression.

276.    On or about July 13, 2017, it was reported that Executive Leadership made a statement that was in reference to the Plaintiff and her job security.    Plaintiff was contacted by EEO Investigator Michael Fulton, regarding her discrimination and retaliation claims against the Agency, that very same day to clarify an event, which involved Executive Leadership.

277.    On or about July 14, 2017, Plaintiff was intentionally excluded from the discussions that Telecare would be re-aligned to report under a different office/Executive Leader.

278.    On or about July 18, 2017, Plaintiff received a meeting request to discuss the Office of Patient Experience/Cultural Transformation but was not provided any additional details other than it was a "possible re-alignment."

279.    On or about July 19, 2017, the Office of the Associate Director held a meeting to inform both non-bargaining and bargaining unit employees that Telecare would be re-aligned under the Office of Patient Experience/Cultural Transformation.    The Office of the Associate Director stated that this decision was "definitive."

280.    On or about July 20, 2017, Plaintiff became aware that Mr. Bergeron transitioned to the Executive Assistant to the Associate Director position.    However, this position was not posted and as a result Plaintiff could not apply, even though her qualifications for the position were observably superior to Mr. Bergeron's qualifications for the position.

281.     On or about July 20, 2017, Mr. Muhammad falsely accused Plaintiff of denying an employee's access to HR.    Plaintiff made several attempts to contact Mr. Muhammad as he recommended but Mr. Muhammad deliberately ignored Plaintiff's calls and Skype messages. Mr. Muhammad failed to inform Plaintiff of the correct laws, regulations, and handbooks that she had clearly requested.    Mr. Muhammad intentionally failed to respond to Plaintiff's several inquiries regarding how such a complaint, that could have been resolved internally within the service, had escalated to him as the Chief of Labor Relations.

282.     On or about July 21, 2017, AFGE Local #1633 deliberately excluded Plaintiff from an alleged complaint. AFGE Local #1633 and HR management were working in collaboration to file meritless formal complaints against Plaintiff in order to move her out of the management position that she encumbered.

283.     On or about July 20, 2017, Mr. Bergeron clarified and confirmed that Mr. Sandles disapproved the hire for the "1.0 Assistant Nurse Manager" position at the time, but that Telecare could now recruit for the position since it had not been removed for the Organizational Chart. This clearly demonstrated that Mr. Sandles wanted to remove the Assistant Nurse Manager position out of his animus toward Plaintiff, not because of the lack of need as new senior leadership recognized that it was a necessary position for the success of the service.    Mr. Bergeron informed Plaintiff that the "1.0 Administrative Officer" position would no longer be reporting to Plaintiff. This just demonstrated that this new leadership was still on the same sheet of music to destroy Plaintiff, whereby her grade level could no longer be justified due to the lack of complex duties and supervision.

284.    On or about July 24, 2017, Mr. Bergeron told Plaintiff to "shut up" when she followed up with an e-mail regarding some inquiries regarding the re-alignment of Telecare to the Office of Patient Experience/Cultural Transformation. Mr. Bergeron continued to do his part to badger, harass and humiliate Plaintiff.

285.    On or about July 25, 2017, Mr. Bergeron arranged a meeting without Plaintiff's knowledge. It was reported that Mr. Bergeron, at said meeting, blamed Plaintiff for not submitting a GS-5 functional statement to HR.   However, Plaintiff was never made aware of this alleged request.

286.    Mr. Bergeron continued to "pressure" Plaintiff to complete questionable, if not illegal acts. Mr. Bergeron also encouraged Mr. Dawson to heavily scrutinize Plaintiff and Telecare even though there were other services that were in dire need of help under HAS.   It is no coincidence that such harsher scrutiny occurred after Plaintiff filed her EEO Complaint.

287.    On July 25, 2017, Mr. Bergeron attempted to deny access to Plaintiff from meeting with Mr. Dawson even though he had previously suggested that Plaintiff be included on Mr. Dawson's calendar.

288.    On or about July 25, 2017, it was reported that Ms. Baldwin openly discussed Plaintiff's EEO case with her subordinates. Ms. Baldwin attempted to seek empathy from the subordinates and encouraged them to collude, testify, and perjure themselves against Plaintiff. Ms. Baldwin continued to engage in spreading false rumors about Plaintiff. Ms. Baldwin deliberately created a hostile work environment wherein she undermined Plaintiff and attempted to "pit" Plaintiff's subordinates and other staff against Plaintiff.   Ms. Baldwin perpetuated such

a tense hostile work environment that one of Plaintiff's staff, Cynthia Mabry-Ezimako, commented that it appeared that Ms. Baldwin was conducting a "witch hunt" for Plaintiff.

289.   On or about July 25, 2017, Plaintiff received a request from Ricardo Wilson (Hispanic Male), Chief of Office of Group Practice Management, to submit documentation regarding the Telephone Taskforce as it was requested from the Office of Medical Inspector (OMI). This was related to a federal investigation and thus, a federally protected activity.

290.   On or about July 26, 2017, Plaintiff submitted documentation, as requested by Mr. Wilson, at approximately 8:47 a.m. At approximately 8:48 a.m., Ms. Baldwin immediately sent Plaintiff a Skype message and stated in an irritated tone, "I responded at 8:16 a.m. that I would provide the info requested."   Plaintiff informed Ms. Baldwin that she was confused as to what the "intent" of Ms. Baldwin's message was since Plaintiff was providing documentation as it related to an investigation.   Shortly thereafter, Ms. Baldwin sent Plaintiff a threatening "Do Not Forward" e-mail and stated, "I am not understanding your motive" and falsely accused Plaintiff of disclosing protected information.   It was reported thereafter that Ms. Baldwin discussed Plaintiff and her alleged "motives" with other staff.   Ms. Baldwin, like Mr. Sandles before her, continued to cause significant harm to Plaintiff's reputation and undermined Plaintiff's authority as a supervisor.

291.   On or about July 26, 2017, Ms. Baldwin did not inform Plaintiff's subordinates that she was transitioning out of her position as the Chief of Health Administration Service.   Plaintiff had to inform them in order to provide transparency. This demonstrated the lack of respect that Ms. Baldwin had for Plaintiff and Plaintiff's subordinates.   Coincidentally, Ms. Baldwin transitioned out of MEDVAMC shortly after her affair partner, Mr. Sandles, was no longer present

to shield her from her own incompetence.   It was reported that Ms. Baldwin even took a "downgrade" in her new position since she knew she could not sustain the false perception that she had knowledge, skills, and abilities as a manager.

292.    On or about July 26, 2017, Plaintiff received a message from the Assistant Chief of HAS, Carolyn Collier, regarding an alleged complaint from Mr. Bergeron that Plaintiff's staff had "IPADs streaming videos" within the Telecare Prime Care Call Center. Mr. Bergeron continued to constantly badger, harass and humiliate Plaintiff which caused harm her to her reputation and mental health.

293.    On or about July 27, 2017, Plaintiff filed very detailed amendments to her formal complaint of discrimination (VA Case No. 2003-0580-2016105116 and EEOC Hearing No. 460-2018-00113X) with the Agency. The amendments to her formal complaint are attached to Plaintiff's First Amended Complaint as Exhibit 6. (Dkt. #22). In her amendments, Plaintiff identified a non-exhaustive list of 21 continuous discriminatory and retaliatory actions the Agency subjected Plaintiff to from on or about February 19, 2017, to on or about July 26, 2017.

294.    From on or about February 2017 to November 2017, Mr. Bergeron and Ms. Baldwin continued the pattern of harassment, discrimination, and reprisal against Plaintiff.   These two agency officials continued the mental, physical (isolation), emotional torture and torment of Plaintiff.   Ms. Baldwin transitioned from the facility after Mr. Sandles was no longer present to "protect" her.   Ms. Baldwin even commented they were on the same "team."

295.    From on or about November 20, 2017 to on or about February 14, 2019, Agency management officials, including but not limited to Ava "Pam" Womack (White/Caucasian Female), Chief of the Health Administrative Service, Anthony L. Dawson (Black/African

American Male), Associate Director, Alisa P. Cooper (Black/African American Female), Chief Financial Officer, Curtis Bergeron (Black/African American Male), Staff Assistant to the Associate Director, Kathy Salazar (Hispanic Female), HR Manager, Karandeep Sraon (East Asian/Indian Male), Deputy Director and Francisco Vazquez (Hispanic Male), Medical Center Director, badgered, harassed and humiliated Plaintiff on almost a daily basis, motivated by and/or because of her race, color, sex and in retaliation for her prior protected EEO activity. This continuous hostile work environment included but not limited to setting Plaintiff up for failure; excessively monitoring Plaintiff; talking down to Plaintiff; mocking Plaintiff's education; giving Plaintiff demeaning work duties; trying to turn Plaintiff's coworkers against her; attempting to create strife between Plaintiff and her subordinate employees; intentionally giving Plaintiff inconsistent instructions; sending Plaintiff harassing emails; humiliating Plaintiff in front of her coworkers; defaming Plaintiff; repeatedly questioning Plaintiff's intelligence; excluding and isolating Plaintiff from her coworkers. The incidents comprising this hostile work environment are identified in very specific detail in Exhibit 1 and Exhibit 2 attached to Plaintiff's First Amended Complaint and also identified in the facts section of this Second Amended Complaint. (Dkt. #22).

296.    In addition to the hostile work environment described above, the Agency subjected Plaintiff to several discrete adverse actions from on or about November 20, 2017 to on or about February 14, 2019, including but not limited to denying Plaintiff a higher rating on her performance appraisal; eliminating Plaintiff's position; denying Plaintiff career enhancing opportunities on multiple occasions; denying Plaintiff "detail" opportunities; deliberately isolating Plaintiff physically, emotionally, and mentally; transferring Plaintiff on multiple occasions and not promoting Plaintiff. These discrete adverse acts were motivated by and/or because of Plaintiff's

race, color and sex, as well as being in retaliation for Plaintiff's opposition to such unlawful conduct. The discrete acts of discrimination are identified in very specific detail in Exhibit 1 and Exhibit 2 attached to Plaintiffs First Amended Complaint and also identified in the facts section of this Second Amended Complaint. (Dkt. #22).

297.    On or about November 20, 2017, Ms. Pam Womack (White/Caucasian Female) was selected to encumber the position of Chief of Health Administration Service for the purposes of continuing to the harassment, discrimination, and retaliation against Plaintiff.  Ms. Womack was past retirement age and continued to boast that she had 38 years of federal service and had been to 13 different VA facilities.   Thus, should any allegations be found against her, Ms. Womack could easily retire without any repercussions and the Agency could deny any wrongdoing or claim she had retired and no action could be taken.

298.    On or about December 1, 2017, Ms. Womack sent an unnecessary e-mail regarding food restrictions, thereby, "forbidding" Plaintiff from eating cultural foods with these ingredients.

299.    On or about December 6, 2017, Plaintiff's log-in ID code was used without her knowledge or permission.   Ms. Womack stated that "changes to Telecare" were forthcoming even though Ms. Womack was not aware of the operation of Telecare, nor did she seek input from Plaintiff and Ms. Davis even though they were identified as subject matter experts.

300.    On or about December 8, 2017, Ms. Womack made changes to the Telecare Strength Report in Plaintiff's absence.  Ms. Womack eliminated positions, added new staff, and changed tours-of-duty of staff without requesting any feedback from Plaintiff.  Ms. Womack even added an employee, Ms. Ullanda Berry, that was previously removed from the Emergency Department, who had reported concerns against Ms. Womack and Ms. Collier, to Plaintiff's

service in Plaintiff's absence.   Ms. Womack undermined Plaintiff's authority by not consulting Plaintiff prior to making significant changes to the Telecare department.

301.    On or about December 8, 2017, Ms. Womack sent an e-mail regarding Microsoft Skype log-in, which she used to closely monitor Plaintiff. Ms. Womack did not excessively monitor other VA employees outside of Plaintiff's protected classes compared to her Plaintiff.

302.    On or about December 14, 2017, Ms. Womack chastised Ms. Davis when she responded to a disruptive employee. Ms. Womack made disparaging comments about Plaintiff and Ms. Davis in the presence of the AFGE even though Plaintiff had not yet returned from leave.   Ms. Womack belittled Plaintiff and Ms. Davis's management experiences and "spoke down" to them as if they were "stupid."

303.    On or about December 20, 2017, Plaintiff's medical documentation was requested when she informed HAS management that Plaintiff's provider had excused her from returning to work.   HAS management had not requested medical documentation from Plaintiff previously and it was not until Ms. Womack came on board that Plaintiff's medical documents were requested.

304.    On or about December 27, 2017, Ms. Womack was aggressive and hostile toward Plaintiff even though they had not yet met face-to-face.   Ms. Womack refused to acknowledge Plaintiff's presence.   Ms. Womack had already decided upon changes with Telecare even though she had not discussed any changes with Plaintiff.   Ms. Womack completely ignored Plaintiff's presence and assigned Telecare Medical Support Assistant (MSA) recruitment and posting to Ms. Collier.   Ms. Womack refused to speak with Plaintiff directly about Telecare and directed Ms. Collier to complete assignments related to Telecare even though Plaintiff managed Telecare. Plaintiff inquired what these "changes" meant for Telecare management and Ms. Womack stated

92

that Plaintiff's position description would need to be reviewed and that it may stay the same or be downgraded.   At no time did Ms. Womack mention that Plaintiff's job would be abolished.

305.    On or about December 28, 2017, Ms. Collier informed Plaintiff that Plaintiff was qualified to be either an Assistant Chief or Deputy Chief of HAS.    However, Ms. Womack spoke negatively of Plaintiff and claimed that Plaintiff was incompetent and lacked knowledge, skills, and abilities to her other staff.   Ms. Womack continued that pattern of Agency management officials intentionally humiliating Plaintiff and besmirching Plaintiff's reputation.

306.    On or about December 29, 2017, HAS management complained that Plaintiff's subordinate, Ms. Clay-Jordan, Administrative Officer, should be able to correct incomplete encounter codes even though they were both aware that Ms. Henson corrected these codes for the entire facility.   Ms. Womack later acknowledged this arrangement on March 6, 2018, even though Ms. Womack pressured Plaintiff to further discuss this alleged issue with Ms. Clay-Jordan.   Ms. Womack intentionally attempted to cause "strife" between Ms. Clay-Jordan and Plaintiff.

307.    On or about January 2, 2018, Ms. Womack sent an offensive e-mail to Health Administration Service (HAS) supervisors targeting Plaintiff and stated that her focus was on the call center. However, there were several departments under HAS that were performing poorly. Yet, Ms. Womack honed in on Plaintiff and her service.   Ms. Womack attempted to restrict free speech rights of HAS supervisors when she provided instructions "not to copy anyone outside of HAS that is above me without my knowledge . . ."

308.    On or about January 11, 2018, Plaintiff submitted Call Center Supervisory and Lead Medical Support Assistant (MSA) functional statements for Ms. Womack to review.  Ms.

Womack responded derisively and questioned Plaintiff's competence, "Did you get these from a web site or some other facility?"

309.    On or about January 11, 2018, Ms. Womack completely ignored a request from Plaintiff and placed blame on Plaintiff when Plaintiff followed up with a suggestion from Ms. Collier.

310.    On or about January 12, 2018, Ms. Womack "boasted" to Plaintiff that she sat on several committees and spoke of her "vast" experiences.   Ms. Womack was purposely disrespectful toward Plaintiff when she asked, "Do you have a degree I don't know about?"   Ms. Womack boasted about only having a high school diploma, thereby engraving into Plaintiff's memory that she had power over Plaintiff as a high school graduate.   Ms. Womack continued to showboat about how she was able to advance to her position without any college degrees but yet had authority over those who did.   Ms. Womack then attempted to persuade Plaintiff that it would be an "advantage" if Plaintiff took a downgrade.   Ms. Womack tried to convince Plaintiff to take a downgrade voluntarily and pointed to her GS pay scale sheet and stated that it would only be "$50 less per pay period and it wouldn't make a difference."

311.    On or about January 17, 2018, Ms. Womack forwarded a memorandum regarding the Proper Use of Email and Other Messaging Services even though she did not follow the policy. This communication was intentionally directed toward Plaintiff as Ms. Womack made snide remarks.

312.    On or about January 17, 2018, Ms. Collier complained to Plaintiff that there was a high call volume in the scheduling queue.   However, Plaintiff did not log on to answer calls because she worked on completing another duty for Ms. Collier.   Shortly thereafter, Ms. Womack

sent an e-mail to Health Administration Service (HAS) supervisors that was directed toward Plaintiff and coldly stated, "When we have staff shortages in HAS, I expect supervisors to pitch in and help with the workload no matter what the job is even down to the clerk level."

313.    On or about January 17, 2018, Ms. Womack scornfully asked Plaintiff, "Why would you ask her for a functional statement?    I would be the one to provide you with those or if you feel our is not correct, we can rewrite." Ms. Womack then continued to "drill into Plaintiff's brain" that she was accomplished when she stated, "Ok but you forgot that I am on the national committee for MSA staffing and I write all the original functional statements for all MSA positions."

314.    On or about January 17, 2018, Plaintiff sought Compensatory Time in advance in the event that no staff were able to come in during inclement weather.    Ms. Womack denied this request even though Plaintiff was required to be present in the past during after-hours and was denied a career-enhancing and development opportunity previously.

315.    On or about January 18, 2018, Plaintiff apologized to Karen Reynard (Black/African American Female), Human Resources Staffing Specialist, when Ms. Womack miscommunicated, what Plaintiff stated.    Ms. Womack deliberately misconstrued what Plaintiff stated to Human Resources to make Plaintiff appear unknowledgeable and incompetent.

316.    On or about January 22, 2018, Ms. Womack sent a threatening e-mail to Health Administration Service (HAS) supervisors regarding timecards.

317.    On or about January 23, 2018, Ms. Womack sent Plaintiff a "private" e-mail regarding the rebuttal memorandum Plaintiff had submitted to Ms. Collier regarding Plaintiff's Fiscal Year 2017 Performance Appraisal.    Ms. Womack asked in an offensive manner and

intentionally provided Plaintiff with incorrect information, "Also, who told you that a performance evaluation is grievable as I believe it is not and especially if you got an excellent as that is above and beyond what most staff get and is not going to impact negatively on you as far as advancement etc., and in fact, neither would a fully successful."   Ms. Womack also accused Plaintiff of failing to follow the chain-of-command.   Ms. Womack continued to "shove it down" Plaintiff's throat that Plaintiff's rebuttal was not about performance. Ms. Womack attempted to coerce Plaintiff into "mediating;" however, Ms. Womack did not contact Human Resources like she stated she would but instead contacted the Agency EEO office.

318.    On or about January 25, 2018, Ms. Womack provided Plaintiff conflicting instructions and information about Telecare position recruitment when she had previously provided Plaintiff with other instructions.

319.    On or about January 26, 2018, Ms. Womack intentionally set Plaintiff up for failure and to have grievances filed against Plaintiff since Ms. Womack insisted on just meeting and discussing administrative Telecare staff and not discussing Telecare clinical staff.   Plaintiff oversaw both administrative and clinical staff, so it was not reasonable to discuss only one type of employee and ignore the other.

320.    On January 26, 2018, Ms. Womack blamed Health Administration Service (HAS) supervisors for Union and EEO complaints even though Ms. Womack was the source of the negativity.

321.    On or about January 26, 2018, Ms. Womack provided contradictory instructions from prior meetings.   Ms. Womack instructed Plaintiff to move forward with her directions despite Plaintiff's concerns.

322.    On January 26, 2018, Ms. Womack stated she would assist with follow-up with Reasonable Accommodations placements of Telecare staff, but Ms. Womack had not provided any support to Plaintiff.

323.    On or about January 29, 2018, Ms. Womack sent a "notification" to Health Administration Service (HAS) supervisors to inform them to not speak with staff about changes she was implementing.   However, Ms. Womack had discussed these changes with several staff members and blamed the changes on the HAS supervisors.

324.    On or about January 29, 2018, Ms. Womack refused to acknowledge the help that Plaintiff provided to Ms. Collier with the correction of Fiscal Year 2017 Performance Appraisals.

325.    On or about January 30, 2018, Ms. Womack finally responded to Plaintiff regarding her request for Ms. Womack to share performance standards for call center staff.   Ms. Womack "picks and chooses" what and when to respond to Plaintiff, which had an adverse effect on Plaintiff's workload.

326.    On or about January 30, 2018, Ms. Womack completely disregarded Plaintiff's request for Beneficiary Travel information but Ms. Womack shared this information with the Administrative Officer mail group.

327.    On or about January 30, 2018, Ms. Womack turned a "blind eye" and allowed Nancy Saunier-Howes (White/Caucasian Female), to fall asleep during the HAS Management meeting without any consequences.

328.    On or about February 1, 2018, Ms. Womack made non-verbal and hostile gestures and facial expressions toward Plaintiff during a Telephone Access Steering Committee (TASC) meeting.

329.    On or about February 2, 2018, Ms. Womack expressed her raging anger toward Plaintiff in a "private" e-mail.

330.    On or about February 2, 2018, Ms. Womack sent Plaintiff and Ms. Davis an inappropriate, if not condescending e-mail.    This was the second time Ms. Womack referenced a "breakdown" as it related to Plaintiff's comprehension.    Plaintiff clearly understands English as she was educated in the United States. Ms. Womack refused to communicate with Plaintiff directly and avoided interactions with Plaintiff.    Ms. Collier stated that she was the "middleman again" since she observed that Ms. Womack refused to communicate with Plaintiff.

331.    On or about February 2, 2018, Ms. Womack and Ms. Collier met with Plaintiff and Ms. Davis and explained the "chain-of-command" to them as if they were incompetent. Ms. Womack continued to insist that Plaintiff and Ms. Davis were "confused."    Ms. Womack accused Plaintiff of "imagining" nonverbal gestures she made toward Plaintiff. Ms. Womack warned Plaintiff that Plaintiff needed to "stick with Carolyn and me."    Ms. Womack further stated, "You should be supporting Carolyn and me."    Ms. Womack further insulted Plaintiff when she stated that Plaintiff was "almost our [Ms. Collier and her] level."    Ms. Womack was well aware that Plaintiff was the same grade as Ms. Collier.    Plaintiff had also acted in the capacity of Chief and Assistant Chief of Heath Administration Service previously.

332.    On or about February 8, 2018, Ms. Womack refused to sign off on Plaintiff's work and deferred it to Ms. Collier even though Plaintiff had completed it in accordance with Ms. Womack's instructions.

333.    On or about February 12, 2018, Ms. Collier requested clarity as to why Ms. Clay-Jordan was a bargaining unit employee with an Administrative Officer title.    Plaintiff followed

up as Ms. Collier requested.    Ms. Salazar, Human Resources Officer, intentionally included Ms. Womack in a response to attack Plaintiff.    Plaintiff had identified Ms. Salazar in prior protected EEO activity. Ms. Womack continued to insist that Plaintiff's other subordinate violated the Hatch Act even though Ms. Womack did not specialize in labor management.

334.    On or about February 12, 2018, Ms. Collier informed Plaintiff that Ms. Womack "was not happy" regarding a final decision that Mr. Vazquez made regarding a disciplinary action even though it was not under the purview of the Plaintiff.    Ms. Collier was aware of fits of anger that Ms. Womack had toward Plaintiff and gave this as a "warning" to Plaintiff to steer clear of Ms. Womack.

335.    On or about February 16, 2018, Ms. Womack sent a "notification" about planned leave, which was directed toward Plaintiff.    Plaintiff was on approved leave and did not include information that Ms. Womack wanted in Plaintiff's out-of-office message.

336.    On or about February 16, 2018, Ms. Womack refused to sign Family Medical Leave Act (FMLA) memorandum requests for Plaintiff's subordinate staff even though Ms. Collier directed Plaintiff to retrieve Ms. Womack's signature.    Ms. Womack turned "bright red" when Plaintiff knocked on her door and Ms. Womack refused to sign the requests even though it required her approval.    Ms. Womack wasted Plaintiff's time since Plaintiff had to wait for approximately 20 minutes until Ms. Collier physically came down to the office to sign in lieu of Ms. Womack.

337.    On or about February 20, 2018, Ms. Womack sent another "reminder" about putting on an out-of-office e-mail message when staff were out, which was again directed toward Plaintiff.

338.    On or about February 21, 2018, Ms. Collier sent updates to Jeremiah Jackson (Black/African American Male), Health Systems Specialist, regarding the Telephone Access

Steering Committee (TASC) meeting that was to be held on February 22, 2018.    Plaintiff inquired whether any of the proposed changes would be discussed at the Health Administration Service (HAS) Townhall meeting and Ms. Womack provided instructions that it was not to be discussed. However, Ms. Womack had already informed Plaintiff's subordinate staff of the changes and caused uncertainty, confusion, and dissatisfaction among Plaintiff's staff.

339.    On or about February 22, 2018, Ms. Womack refused to speak with Plaintiff on the phone until Plaintiff made several requests about an employee issue.    Ms. Womack then mockingly stated, "Obviously, reference checks do not work as we were told that she may have been let go from another gov't job due to poor performance and then she got a job here."    Plaintiff stated it was not obvious since managers would not have been aware of prior actions since they do not have access to the employee's electronic personnel file.

340.    On or about February 26, 2018, Ms. Womack "threatened" that Health Administration Service (HAS) supervisors would be "written up" for allowing staff's computer access to lapse even though staff are responsible for their own computer access.

341.    On or about February 26, 2018, Ms. Womack "nitpicked" Plaintiff's response to Human Resources, inferring that Plaintiff did not properly provide standards for the rating of outstanding for Plaintiff's staff.    Plaintiff continually defended herself to Ms. Womack since she continued to attack Plaintiff's competence.

342.    On or about February 26, 2018, Ms. Womack sent a "blind" e-mail about a Health Administration Service (HAS) Townhall meeting and did not inform Plaintiff that she had sent it to Plaintiff's subordinates, thereby causing confusion.

100

343.    On or about February 27, 2018, Ms. Womack commented on the history related to Telecare staffing, even though Ms. Womack did not seek feedback from Plaintiff and Ms. Womack then provided inaccurate information to Human Resources.

344.    On or about February 28, 2018, Ms. Womack abused her authority and purposely used Plaintiff as a "secretary."

345.    On or about February 28, 2018, HAS management made a condescending remark toward Plaintiff.

346.    On or about March 1, 2018, Plaintiff requested clarification on the Telecare restructure since the details had not been discussed with and/or disclosed to Plaintiff.   Ms. Womack ignored Plaintiff's request.

347.    On or about March 1, 2018, Ms. Womack instructed Plaintiff not to address Telecare nursing staff even though Plaintiff was a Chief who oversaw both administrative and clinical staff and all of her subordinates had a right to be aware of changes to their work conditions.

348.    On or about March 2, 2018, Plaintiff inquired whether the HAS Organizational Chart was finalized and could be shared.   Ms. Womack then re-directed the spotlight to be on Plaintiff and inquired whether incomplete encounters had been completed.

349.    On or about March 2, 2018, Ms. Womack blatantly disregarded Plaintiff's request to receive a copy of the local union agreement.

350.    On or about March 2, 2018, Ms. Collier was aware of how poorly Ms. Womack treated Plaintiff.   During a Telecare staff meeting, Plaintiff and her staff noticed that Ms. Collier was distraught and "teary-eyed."   Staff had commented on her facial expressions and appearance. Ms. Collier confided to Plaintiff that Ms. Womack had treated her poorly and yelled at her.

However, Ms. Collier refused to report any complaints against Ms. Womack since she feared "getting into trouble" or "being retaliated against." Prior to a meeting with the American Federation of Government Employees (AFGE), Ms. Collier informed Plaintiff that Ms. Womack had yelled at her and James Herrera (Asian Male) for allegedly being loud and discussing work in the common area.

351.    On or about March 5, 2018, Plaintiff again requested a copy of the Health Administration Service (HAS) Organizational Chart but did not receive a response.

352.    On or about March 5, 2018, Ms. Womack sent an update of the HAS Townhall meeting that supervisors were excluded from. Ms. Womack informed Plaintiff's subordinates of upcoming changes but had instructed Plaintiff not to discuss any changes with staff, thereby creating distrust between Plaintiff and her subordinates.   Ms. Womack then alleged that Telecare was non-compliant with national guidelines, which was false and misleading.

353.    On or about March 6, 2018, Ms. Womack knowingly and purposely withheld information from Plaintiff and did not share any information that impacted the workload of the Plaintiff.

354.    On or about March 8, 2018, Ms. Collier stated that the Telephone Access Steering Committee (TASC) would be disbanded after the call center changes were implemented, which demonstrated that Ms. Womack's intent was to disrupt Plaintiff's work.

355.    On or about March 9, 2018, Ms. Womack sat on a call with Contracting to "babysit" Plaintiff even though Plaintiff was responsible for the Telecare Record Management Plus (TRM+) contract for years. Ms. Womack continued the Agency's discriminatory and retaliatory pattern of excessively monitoring Plaintiff

356.    On or about March 9, 2018, Ms. Womack and Ms. Collier were aware that Ms. Mabry-Ezimako was selected as the Assistant Nurse Manager.    However, Ms. Womack questioned Plaintiff's selection of Ms. Mabry-Ezimako. Ms. Womack continued the Agency's pattern of undermining Plaintiff's authority and reputation.

357.    On or about March 13, 2018, Ms. Womack did not attend a meeting with Ms. Collier and Plaintiff to negotiate with the American Federation of Government Employees (AFGE) the changes Ms. Womack wanted even though these were the changes Ms. Womack was insistent upon being implemented. However, Ms. Womack did not provide any justification as to why these changes were being made.

358.    On or about March 14, 2018, Ms. Womack did not provide any justification as to why she proposed changes in operating hours for the Centralized Scheduling Unit (CSU) but expected Ms. Collier and Plaintiff to rationalize this proposal during negotiations with AFGE. Ms. Womack continually set Plaintiff up to fail and/or to act in bad faith in furtherance of the Agency's discriminatory and retaliatory actions against Plaintiff.

359.    On or about March 15, 2018, Ms. Womack appointed Roxanne Pierce (White/Caucasian Female) as the Acting Chief. Ms. Womack had removed Plaintiff from acting in the Assistant Chief and Chief roles. Similar to Ms. Womack, Ms. Pierce only had a high school diploma and was a White/Caucasian Female.

360.    On or about March 18, 2018, Ms. Womack, continuing to excessively monitor Plaintiff, required Ms. Collier to review and monitor the work of Plaintiff even though Plaintiff had completed her duties independently.

361.    On or about March 20, 2018, Ms. Womack failed to attend a Joint Health Administration Service (HAS) and American Federation of Government Employees (AFGE) meeting to speak of the changes Ms. Womack wanted to implement.    Plaintiff's subordinate staff even stated that they felt that they were being "strong armed" into the changes.

362.    On or about March 20, 2018, Ms. Womack made a patronizing remark to Plaintiff as if Plaintiff were a secretary.

363.    On or about March 20, 2018, Daphne Jackson, (Black/African American Female) Vice President of American Federation of Government Employees (AFGE), stated to Plaintiff, Ms. Davis, and Ms. Mabry-Ezimako that it was "inappropriate" for Ms. Womack to respond to Plaintiff's subordinate staff at her level as the Chief of Health Administration Service as there were several layers of supervision between Ms. Womack and Plaintiff's subordinate staff.    It was apparent to staff and the union that Ms. Womack continued to intentionally disrespect and undermine Plaintiff.    Ms. Womack continued her hostile and harassing discriminatory/retaliatory behavior towards Plaintiff.

364.    On or about March 21, 2018, Ms. Womack only attended a meeting at the request of the American Federation of Government Employees, not in support of Plaintiff even though this meeting was at her direction to carry out her plans.    During this meeting, Ms. Womack refused to sit down and hovered over Plaintiff's staff.    Ms. Womack rolled her eyes, twirled her glasses, and played with her hair to show disinterest in the meeting Plaintiff arranged. Ms. Womack specifically rolled her eyes when a comment was made that Plaintiff was a "subject matter expert."

365.    On or about March 22, 2018, Ms. Womack embarrassed Plaintiff in front of the American Federation of Government Employees (AFGE), Ms. Carolyn Collier, and Plaintiff's

subordinates regarding the Medical Support Assistant (MSA) functional statements that Ms. Womack had previously reviewed and approved.   Ms. Womack deliberately caused confusion and refused to directly speak with Plaintiff, which Ms. Collier also observed and acknowledged.

366.    On or about March 26, 2018, Ms. Womack sent a "patronizing" and "private" e-mail about "coverage" to Plaintiff when Plaintiff had previously been approved for sick leave. Ms. Womack threatened, "We can discuss when you return."

367.    On or about March 28, 2018, Ms. Womack exclaimed several times, "I wasn't aware" that Plaintiff and supervisory subordinates were on a call with the VISN 16 Operations Manager, Mr. Embra. Jackson.   Ms. Womack sent Plaintiff a "Do Not Forward" e-mail that it was "totally not unnecessary" that the Plaintiff included Ms. Womack's statements in the meeting minutes.   Ms. Womack then created new "restrictions" that all communications to the VISN must go through her even though staff could communicate with VISN staff as a previous practice.   Ms. Womack intentionally placed restrictions on who Plaintiff could or could not speak to.   Ms. Womack also stated during the same call, "I don't understand her" when Plaintiff spoke.   On several occasions, Ms. Womack commented that she did not understand Plaintiff even though English is Plaintiff's native language. Ms. Womack constantly attacked Plaintiff's Asian heritage.

368.    On or about March 28, 2018, Ms. Womack "bragged" about the new townhouse she just purchased to showcase that she was "above" her subordinates.   Ms. Womack deliberately made condescending remarks as though Plaintiff and her subordinates could not afford such a residence since they were "below" her level.

369.    On or about April 2, 2018, Ms. Womack "threatened" to meet upon Ms. Collier's return to the office, but Ms. Womack did not send an invite to Plaintiff.   Ms. Womack sent

Plaintiff "Do Not Forward" e-mails.   Ms. Womack instilled the fear in Plaintiff that any meeting

with her would be a meeting where Plaintiff would be in "trouble."

370.   On or about April 4, 2018, Ms. Collier stated that she needed to meet with Plaintiff

and that she felt "conflicted" and had sought advice from her husband.   Ms. Collier further stated

that she did not want to get "into trouble" for "not doing the right thing."   Ms. Collier felt that it

was "not fair or right" where an employee's livelihood was impacted and that no arrangements

were being sought to minimally impact the employee.   Ms. Womack informed Ms. Collier that

Plaintiff would have to "figure it out" even though Ms. Womack was implementing the elimination

of the position Plaintiff encumbered.   Ms. Womack had no regard for what would happen to

Plaintiff if her position were eliminated, particularly where Plaintiff had relocated across the

country for her position and even received a recruitment incentive. Ms. Collier stated that it was

"not right," and that she had even questioned Ms. Womack as to why Plaintiff's job was being

eliminated and did not receive a rational response.   Ms. Womack stated to Ms. Collier that

Plaintiff was "unqualified" for the position that Plaintiff encumbered.   Ms. Collier further

informed Plaintiff that Ms. Womack felt "uncomfortable" that Plaintiff took notes and wrote

minutes.   However, Ms. Womack had not authorized Ms. Collier to inform Plaintiff that her job

was being eliminated.   Ms. Collier had informed Plaintiff out of her moral obligation and

conscience since she knew Plaintiff's livelihood would be impacted.

371.   On or about April 5, 2018, Ms. Womack did not attend a meeting with the American

Federation of Government Employees (AFGE) even though she was the mastermind of the

changes that were being discussed at the meeting.   Ms. Womack deliberately avoided Plaintiff

even though the meeting was held in the HAS administrative office.   Ms. Womack remained in her office and did not provide any support.

372.    On or about April 5, 2018, Plaintiff requested approval to apply to be detailed to the Office of Internal Audit & Risk Assessment to be able to work in a productive, healthy, and safe work environment.  Plaintiff also stated in writing that it would allow sufficient time for appropriate officials to address the hostile work environment found within HAS management, alleviate work-related stress, and improve morale.   The Agency failed to take any concrete action to address the issues that Plaintiff brought to the attention of HAS management and Executive Leadership.

373.    On or about April 6, 2018, Ms. Womack continued to send Plaintiff "Do Not Forward" e-mails even though Plaintiff requested that Ms. Womack kindly refrain.   Ms. Womack refused to relinquish her control over the e-mails as Plaintiff requested.

374.    Ms. Womack made false and misleading statements that she had informed Plaintiff that she was eliminating the position Plaintiff encumbered.   Ms. Womack continued to "gaslight" Plaintiff as if an actual discussion occurred between Ms. Womack and Plaintiff where Plaintiff had been informed that her position would be eliminated.   Ms. Womack spoke of Plaintiff's qualifications even though Ms. Womack was not aware of Plaintiff's work experiences and background and attempted to defame Plaintiff's character and reputation.

375.    On or about April 9, 2018, Anthony Dawson (Black/African American Male) claimed that he was not aware of the harassment issues that Plaintiff spoke of even though it was brought to his attention.

107

376.     On or about April 10, 2018, Mr. Dawson asked Plaintiff about her thoughts on the elimination of the position that she encumbered. Mr. Dawson alleged that Plaintiff's interpretation was "off-track" when she wrote a follow-up e-mail of their meeting.   Plaintiff provided clarification and recommended that meetings could be recorded if agreed upon in the future. Management officials continued to "gaslight" Plaintiff and alleged discussions did not occur even though they did (or vice-versa), especially when she sent follow-up summaries in writing. However, they did not respond to Plaintiff's suggestion of recording meetings if the follow-up summaries were, indeed, inaccurate as they had alleged.

377.     On or about April 10, 2018, Plaintiff provided notification to the Agency management officials that a hostile work environment, discrimination, and retaliation (due to prior protected EEO activity) was occurring against Plaintiff by Ms. Womack.

378.     On or about April 11, 2018, Plaintiff requested a "Stay Away Letter" against Ms. Womack.   However, no clarity was provided nor was a "Stay Away Letter" issued to Ms. Womack.   Also, on this day Plaintiff requested that the HAS Organizational Chart be shared, but Ms. Womack refused to share it even though Plaintiff had access to it previously.    Ms. Womack sent Plaintiff a "private" e-mail regarding the proposed Organizational Chart, only after Plaintiff notified Ms. Collier and Mr. Dawson, Associate Director, of the ongoing hostile work environment, discrimination, and retaliation.

379.     On or about April 17, 2018, Plaintiff requested clarity regarding the position she encumbered because she was confused with the latest Strength Report, which included details regarding staffing, that Ms. Womack sent out.

380.     On or about April 17, 2018, Plaintiff informed Ms. Collier that Plaintiff's staff felt uncomfortable when Mr. Bergeron reported to Building 122 after-hours on April 9, 2018.  Mr. Bergeron continued to harass Plaintiff and her staff since he was identified in Plaintiff's federally protected EEO activity.

381.     Mr. Bergeron sent Ms. Collier a private e-mail wherein he stated that Plaintiff was "mental" when Plaintiff reported her concerns and questioned the realignment of Telecare to Systems Redesign, specifically under the oversight of Dr. Floyd (White/Caucasian Male).   Ms. Collier shared Mr. Bergeron's comment with Plaintiff and showed her the email thread.   On several occasions, Mr. Bergeron and other Agency management officials "gaslighted" Plaintiff when she brought forth valid concerns.   To refrain from responding to these merited concerns, the Agency management officials ruthlessly attacked Plaintiff's character and reputation.

382.     On or about April 24, 2018, Kimberly Landry (Black/African American Female), Staffing Specialist, included Plaintiff in an e-mail regarding the approval of Medical Support Assistant (MSA) staff.   Plaintiff inquired whether the HAS Organizational Chart had been approved and what the effective date of the changes were.   Plaintiff did not receive a clear response despite several correspondences.

383.     On or about April 24, 2018, Ms. Womack continued to refuse to share the HAS Organizational Chart with Plaintiff.   However, Ms. Womack intentionally humiliated Plaintiff as she shared HAS Organizational Chart with other VA staff whose livelihoods would not be impacted.   Yet, Ms. Womack refused to share it with Plaintiff even though Plaintiff's livelihood would be directly impacted.

109

384.    On or about April 26, 2018, Plaintiff sent an inquiry as to whether any additional action needed to be taken as it related to her travel request.    Alisa Cooper (Black/African American Female) sent a message targeting Plaintiff to several VA employees that (ePAS) travel requests would be rejected if not submitted without sufficient lead time.    Ms. Cooper continued to harass Plaintiff because she was identified in Plaintiff's federally protected EEO activity.

385.    On or about April 27, 2018, Ms. Womack refused to acknowledge Plaintiff's hard work and dedication.    Yet, Ms. Womack was fully capable of praising others who were outside of Plaintiff's protected classes.    VISN 16 Operations Manager, Mr. Embra Jackson, commented that Plaintiff and Ms. Davis were on the "national map" for chart audits.

386.    On or about May 1, 2018, Plaintiff sought clarity from Mr. Dawson as to who Plaintiff should report to.    Mr. Dawson did not provide a response.

387.    On or about May 2, 2018, Plaintiff informed Ms. Collier that Ms. Womack continued to contact Plaintiff directly.    Plaintiff stated that she was confused as to why contact would continue since this was not the case where other employees brought forth concerns of discrimination, harassment, and retaliation and requested the related rules, regulations, and policies.    Plaintiff further stated that she wanted to ensure that her concerns "would not fall through the cracks."

388.    On or about May 3, 2018, Ms. Womack sent a message, directed toward Plaintiff, to all Health Administration Service (HAS) supervisors. Ms. Womack removed Plaintiff's authority for final approval of a Lead position or Supervisor position within Telecare, thereby stripping Plaintiff of her management duties.    Also on this day, Ms. Womack sent a "reminder" about Over Time (OT) even though Plaintiff maintained records for Telecare.

389.    On  or about April 19, 2018, Plaintiff requested approval to serve as a Special Assistant United States Attorney (SAUSA) as a part of an interagency loan arrangement.   On April 26, 2018, Plaintiff received approval after providing a friendly reminder to Ms. Collier.   Ms. Womack approved the arrangement as well.

390.    On or about May 3, 2018, Ms. Womack congratulated Plaintiff on the approval for the Department of Justice (DOJ) interagency loan arrangement and requested that Plaintiff provide the paperwork to Human Resources. However, on July 2, 2018, Plaintiff became aware that the Agency did not approve Plaintiff's interagency loan arrangement. On August 1, 2018, the Department of Justice rescinded Plaintiff's offer because the Agency reneged on its original agreement.   The Agency did not provide clarity as to why there was a reversal with the decision since it had previously approved Plaintiff's interagency loan request nor did it inform Plaintiff that her request was disapproved.

391.    On or about May 3, 2018, Ms. Womack sent an e-mail to Ms. Davis without Plaintiff's knowledge regarding the placement of an employee from the Lake Jackson Community-Based Outpatient Clinic (CBOC) into Telecare, even though this affected Plaintiff's staffing and service morale.

392.    On or about May 11, 2018, Ms. Davis reported that Mr. Dawson entered Plaintiff's office while she was on leave.   Mr. Dawson had no valid reason to enter a secured and locked administrative office, nor had it been the practice of the Agency to enter secured and locked administrative offices.

393.    On or about May 14, 2018, Plaintiff inquired with Ms. Collier on whether she received any clarity as to who Plaintiff should report to among other concerns since Ms. Collier would be transitioning to her new job.

394.    On or about May 15, 2018, Plaintiff followed up with Mr. Dawson regarding who Plaintiff's first-line supervisor was.   Mr. Dawson did not provide Plaintiff with a response. On June 19, 2018, Plaintiff followed up again with Mr. Dawson.   Plaintiff was not aware that she was to continue to report to Ms. Womack even though Plaintiff reported concerns of hostile work environment, discrimination, and retaliation against Ms. Womack.    Plaintiff again did not receive a response.

395.    On or about May 16, 2018, Ms. Collier informed Plaintiff that the position she had previously encumbered was posted.   Ms. Collier was aware that Plaintiff was qualified for the Assistant Chief of HAS position, especially since Plaintiff had acted in Ms. Collier's absence on multiple occasions.   Plaintiff informed Ms. Collier that if it were under different circumstances and under different HAS Leadership, then Plaintiff would have applied for the position Ms. Collier formerly encumbered.

396.    On or about May 17, 2018, Ms. Womack sent an e-mail, targeting Plaintiff, to all HAS staff regarding the monitoring of customer service.   Plaintiff's subordinate, Marilyn Shaffer (Asian Female), responded to Ms. Womack since the allegations against Telecare management were unfounded.    Plaintiff's subordinate, Thelma Dennis (Black/African American Female), also responded to Ms. Womack since her message did not apply to Telecare management, Plaintiff and Ms. Davis.

397.     On or about May 17, 2018, Plaintiff inquired with Ms. Collier as to who Plaintiff's supervisor was since Ms. Collier was no longer Plaintiff's direct supervisor.   No clarity was provided.

398.     On or about May 25, 2018, Ms. Womack sent a condescending e-mail about Leave Without Pay (LWOP) approval.   Plaintiff had experience with Leave Without Pay (LWOP) requests and had informed Ms. Womack of the correct process.

399.     On or about May 29, 2018, Plaintiff first became aware that she was to serve as an "alternate" for the Inpatient Ward section.   Plaintiff was expected to sign off on legal documents for this section.

400.     On or about May 29, 2018, Plaintiff first became aware that Ms. Clay-Jordan's duties were removed even though she was under Plaintiff's direct oversight.   The removal of Ms. Clay-Jordan's duties would impact Plaintiff's supervisory authority and complexity of duties, which could potentially result in the downgrade of Plaintiff's position.

401.     On or about May 31, 2018, Mr. Bergeron continued to question Plaintiff's integrity and attempted to block Plaintiff's career development.

402.     On or about June 1, 2018, Ricardo Wilson and panel members conducted a "fact-finding" that was intentionally poorly and haphazardly conducted as it related to allegations of a hostile work environment by HAS management.   This was an obvious poor attempt by Agency management to cover its tracks. It should be noted that Mr. Wilson had an improper relationship with his own subordinate, but he did not face any disciplinary action.   Yet, Mr. Wilson was allowed to conduct a fact-finding regarding employee and management relations despite fraternizing with a subordinate.

403.   On or about June 4, 2018, Ms. Womack continued to question Plaintiff's competence when Plaintiff forwarded a subordinate's request.   Ms. Womack then removed Plaintiff from the process altogether, thereby denying Plaintiff of authority to manager her staff.

404.   On or about June 7, 2018, Ms. Womack intentionally excluded Plaintiff from a proposal that Plaintiff's service take on additional duties. Ms. Womack continued her pattern of humiliating Plaintiff by undermining her authority as a supervisor.

405.   On or about June 7, 2018, Ms. Womack attempted to "etch" into Plaintiff's brain that she was on the national Medical Support Assistant (MSA) workgroup even though she had informed Plaintiff of this several times already.   This reminder was unnecessary and condescending as Plaintiff did not inquire nor solicit a request for information from Ms. Womack. Ms. Womack continued her pattern of bullying Plaintiff by unnecessarily imposing her authority on Plaintiff.   Also on this day, Ms. Womack insinuated that Telecare management was not offering Over Time (OT) equally even though Plaintiff had explained the OT process to Ms. Womack.

406.   On or about June 8, 2018, Ms. Womack questioned Plaintiff's competence and inquired, in a mocking tone, why Plaintiff had included certain factors on the Medical Support Assistant (MSA) functional statement.

407.   On or about June 11, 2018, Ms. Womack continued to insist that she was Plaintiff's next line supervisor even though Plaintiff provided the Agency with notification of a hostile work environment, discrimination, retaliation by Ms. Womack.

408.   On or about June 12, 2018, Ms. Womack questioned why Plaintiff needed a laptop when Ms. Womack was aware that Plaintiff would be on VA travel that calendar year. Ms.

114

Womack made it extremely difficult to obtain equipment Plaintiff needed to do her work. Plaintiff had previously been provided with the option to either be issued a Blackberry phone or laptop.

409.    On or about June 13, 2018, Ms. Womack sent an e-mail to Plaintiff's subordinates that alleged that overtime was not being distributed fairly and equitably to embarrass Telecare management.

410.    On or about June 14, 2018, Ms. Womack reached out to Plaintiff to provide written feedback, regarding a particular candidate, even though Ms. Womack was aware that Plaintiff was on detail at that time.

411.    On or about June 18, 2018, Ms. Womack failed to inquire with Telecare management regarding the actions that had already taken place with Not-To-Exceed (NTE) employees.

412.    On or about June 18, 2018, Ms. Womack sent an unsolicited e-mail to Plaintiff about her being on the national team for MSA Boards and that she "hoped" that "they" do what is right and best for all.   Ms. Womack was trying to improperly influence Plaintiff about her inappropriate plans since Plaintiff was the national lead for call centers. Ms. Womack then accused Plaintiff of "misinterpreting" her e-mail.   Plaintiff informed Ms. Womack that she understood English, and that Plaintiff received a law degree from a U.S. accredited institution.

413.    On or about June 20, 2018, Ms. Womack targeted and attempted to embarrass Plaintiff when she sent an e-mail to all HAS supervisors about reference checks.

414.    On or about June 22, 2018, Ms. Womack removed Plaintiff from the Leave Without Pay (LWOP) process when Plaintiff was on detail.

415.   On or about June 25, 2018, Ms. Womack changed practices and removed Plaintiff from the process while Plaintiff was on detail.    Plaintiff forwarded concerns from Ms. Davis, who was also punished for being associated with Plaintiff, to Mr. Dawson to notify him that Ms. Womack was continuing to create a hostile work environment.

416.   On or about June 27, 2018, Ms. Womack appointed Roxanne Pierce (White/Caucasian Female), to act in her absence. However, Ms. Womack did not afford Plaintiff the same opportunity.

417.   On or about July 6, 2018, Ms. Womack was unable to complete Plaintiff's duties in her absence even though she claimed Plaintiff was unqualified on numerous occasions.

418.   On July or about July 11, 2018, Ms. Womack provided inaccurate information as to why silent monitoring audits could not be completed.   However, Ms. Womack still held Plaintiff accountable to these audits.

419.   On or about July 19, 2018, Plaintiff became aware that the position that Plaintiff encumbered had officially been eliminated and that she was no longer "on the rolls" through a request for production against the facility.   Ms. Salazar falsely alleged that Plaintiff was not doing any work and that Plaintiff was wasting taxpayers' resources.   The Agency intentionally approved Plaintiff's detail to the Office of Nursing Services (ONS) effective June 11, 2018, with the knowledge that Plaintiff would be returning to the facility to discover that the Agency eliminated her position.   Plaintiff's position was being eliminated because *she* encumbered the position, not because there was no longer a need for the position. Throughout this timeframe, there was no further discussion with Plaintiff regarding the elimination of the position that she encumbered.   Plaintiff did not receive any formal notifications of the elimination of the position

116

Plaintiff encumbered.   Instead, Plaintiff was surprised attacked while she was on detail; the Agency was deliberate in its actions to "screw" Plaintiff over while she was on a different work assignment.

420.    Plaintiff's position was eliminated. Plaintiff did not receive official notice of the elimination of her position, despite it impacting Plaintiff's livelihood and other career options. However, Medical Support Assistant (MSA) supervisor, Marcus Shade (White/Caucasian Male), failed to report to work for a period of time but did not face any consequences.   Plaintiff received disparate treatment than her similarly situated counterparts outside of her protected classes. Plaintiff's position was eliminated because of discrimination and retaliation.

421.    On or about July 24, 2018, Plaintiff discovered that Ms. Womack had used Plaintiff's service's overtime funds to cover the mismanagement of overtime in other sections within HAS, even though Plaintiff had previously requested overtime funds for just Telecare.

422.    On or about August 8, 2018, Ms. Womack attempted to give Plaintiff a "difficult" time with her Compensatory Time (CT) requests related to VA travel.   Ms. Womack commented that it was Plaintiff's regular tour-of-duty on August 6, 2018.   However, Ms. Womack had approved Plaintiff's leave request for this date.   Ms. Womack attempted to disapprove Plaintiff's alternative pay arrangement even though Plaintiff had completed VA duties on her time off.

423.    On or about August 13, 2018, Plaintiff followed up with a request for approval for a detail to the Office of Compassionate Care.   Ms. Womack gave Plaintiff a "hard time" with the approval even though Ms. Womack had previously approved Plaintiff details. Ms. Womack made the e-mail "private" and notified Plaintiff that the position she encumbered at the facility was eliminated while Plaintiff has been on detail to ONS.   Ms. Womack received a perverse sense of

satisfaction from constantly and continually tormenting Plaintiff even though she wasn't even reporting to facility at the time.

424.    On or about August 13, 2018, Plaintiff notified Director Vazquez, Mr. Dawson, and Ms. Salazar, that she continued to be subject to a hostile work environment, discrimination, and retaliation.   Plaintiff questioned why there were issues with Ms. Womack approving her detail request.   Plaintiff sought clarity as to who approved the elimination of Plaintiff's position, when the approval was made, and why the elimination of the position she encumbered was approved. Plaintiff also requested the rules, regulations, and policies related to the elimination of position.

425.    On or about August 14, 2018, Plaintiff provided feedback via a survey regarding the lack of response from Ms. Salazar.   Plaintiff requested a follow-up regarding concerns.

426.    On or about August 14, 2018, Ms. Salazar sent an e-mail to an employee who had not reported to work for quite some time indicating that Plaintiff was the Designated Management Official for the employee's reasonable accommodations request.   However, Plaintiff was on detail and had not communicated with this employee.   Ms. Salazar changed the Reasonable Accommodations process and completed related documentation on the behalf of the Plaintiff without her knowledge and/or consent while she was on detail.  This change could result in grievances against and other consequences for the Plaintiff, even though she had no knowledge of the request, nor did she provide any input for the request.

427.    On or about August 13, 2018, Plaintiff expressed concerns to Mr. Vazquez, Mr. Dawson, and Ms. Salazar regarding the timing of the elimination of the position that she encumbered at the facility.

428.    On or about August 15, 2018, Ms. Salazar finally provided a response after Plaintiff completed a Human Resources survey regarding the lack of response and sought clarity. Ms. Salazar deliberately included Ms. Womack regarding the concerns Plaintiff brought forth since she knew that Ms. Womack would pounce on Plaintiff.

429.    On or about August 15, 2018, Ms. Womack made false, inaccurate, and misleading statements yet again and tarnished Plaintiff's reputation. Ms. Womack was aware that Plaintiff was disapproved for the interagency loan arrangement at a different level. However, Ms. Womack did not inform this to Plaintiff nor did upper management inform her. Also on this day, Plaintiff stated in writing that she would not continue to engage with Ms. Womack and requested that her concerns be escalated.

430.    On or about August 16, 2018, Ms. Womack sent an e-mail to Plaintiff to disregard the Call Center update since the point of contact had been changed. Ms. Womack removed Plaintiff as the point of contact even though Plaintiff was the subject matter expert. Ms. Womack continued the Agency's pattern of discriminating and retaliating against Plaintiff by intentionally undermining her authority as a supervisor.

431.    On or about August 23, 2018, Plaintiff did not become aware that the new HAS Assistant Chief, Sean Dolen (White/Caucasian Male), had come on board until Plaintiff included Ms. Womack in an e-mail regarding her removal as the point of contact for the Call Center update.

432.    On or about September 4, 2018, Ms. Womack inferred that Plaintiff reversed a problematic employee's leave from Absent Without Official Leave (AWOL) to Leave Without Pay (LWOP).

433.    On or about September 10, 2018, Ms. Womack disregarded Plaintiff's response regarding a problematic employee she planned to take disciplinary action against.   Plaintiff also provided supporting evidence that the employee had failed to report to work.

434.    On or about September 21, 2018, Plaintiff sought clarity as to who would be completing the assessments for the Medical Support Assistant (MSA) staff and administrative staff from June 2018 to September 2018, during Plaintiff's absence.   Ms. Womack attempted to redirect blame upon Plaintiff instead of responding to Plaintiff's questions and asked whether summary ratings were completed.   Ms. Womack tried to coerce Plaintiff into completing the performance assessments even though she would not be present during this time period.   Plaintiff was on detail and thus had no supervision of MSA staff and administrative staff while she was on detail.

435.    On or about September 26, 2018, Ms. Womack provided conflicting information to HAS supervisors.   Ms. Womack informed supervisors to ask questions before acting.   However, when Plaintiff did ask questions, Ms. Womack questioned her competence.

436.    On or about September 28, 2018, Ms. Womack provided conflicting information to supervisors again.   Ms. Womack did not conduct any reference checks for the Telecare Medical Support Assistant (MSA) Leads even though she required that supervisors do so for hires within HAS.   Ms. Womack selected two Telecare MSA Leads without contacting Plaintiff.

437.    On or about September 27, 2018, Ms. Womack updated various mail groups with inaccurate information.   Plaintiff responded and stated that a follow-up would occur with the Office of Nursing Services (ONS).   However, Ms. Womack continued to respond aggressively

toward Plaintiff.   Several other employees commented to Plaintiff that Ms. Womack was "combative" toward her in the e-mail thread in the presence of other mail group members.

438.   On or about October 1, 2018, Plaintiff became aware that two Supervisory MSAs were hired.   Plaintiff was not contacted to discuss these selections even though she may be supervising the staff.   However, Ms. Womack contacted Plaintiff regarding other matters while Plaintiff was on detail.   Ms. Womack deliberately excluded and isolated Plaintiff as she saw fit for her unscrupulous discriminatory and retaliatory purposes.

439.   On or about October 2, 2018, Ms. Womack sent Plaintiff a private e-mail acknowledging that "there were a lot of things being done that should not have been done."   Ms. Womack had admitted that the Agency committed wrongdoing and other questionable acts.

440.   On or about October 7, 2018, Plaintiff filed a very detailed formal complaint of discrimination (VA Case No. 2003-0580-2018106006) with the Agency. Said formal complaint is attached to Plaintiff's First Amended Complaint as Exhibit 1. (Dkt. #22). In her formal complaint, Plaintiff identified a non-exhaustive list of 146 continuous discriminatory and retaliatory actions the Agency subjected Plaintiff to from on or about November 20, 2017, to on or about September 27, 2018

441.   On or about October 18, 2018, Ms. Womack entered in another request for an employee's Family and Medical Leave Act (FMLA) paperwork.   Ms. Womack deliberately ignored Plaintiff when she inquired whether employee's other time was accounted for, even though Plaintiff had provided this information to Ms. Womack during Plaintiff's detail.

442.   On or about October 17, 2018, Plaintiff invoked the Freedom of Information Act (FOIA) with the Privacy Office since Human Resources, Health Administration Service, and

Executive Leadership had refused to provide her with details regarding the elimination of her position.

443.    On or about October 24, 2018, Ms. Womack informed Plaintiff, who was on leave, that she consulted with Human Resources regarding the close-out of Fiscal Year 2018 (FY18) Performance Appraisals for Telecare staff. Ms. Womack refused to close out the performance appraisals and shifted the workload to Plaintiff for completion even though Plaintiff was on detail during this time.    Plaintiff informed Ms. Womack that she would not falsify, backdate, or provide any misleading data since she could not speak on Telecare staff performance while she was on detail.    Plaintiff also included a written disclaimer on each of the Telecare staff's performance appraisals that she was on detail for period of their performance cycle.

444.    On or about October 31, 2018, Plaintiff made several inquiries because she was being singled out in the alleged HAS re-organization upon her return to the office from a detail.

445.    On or about November 5, 2018, Ms. Salazar deflected the responses to Plaintiff's inquiries toward HAS and violated Plaintiff's privacy when she included Mr. Dolen, HAS Deputy Chief in these inquiries.    However, it was Ms. Salazar and Executive Leadership that signed off on the HAS re-organization changes.    Plaintiff made additional inquiries and requested further clarity.

446.    On or about November 20, 2018, Plaintiff followed up, yet again, regarding her inquiries regarding the HAS re-organization changes. Ms. Salazar intentionally did not provide her with information in its entirety, nor did she respond to all of her inquiries.    Ms. Salazar tried to bait Plaintiff into taking a lower-graded position as a Labor Management Relations Specialist without informing her that pay retention would only last for two years with the voluntary

122

acceptance of a downgrade.   Ms. Salazar did not want Plaintiff in her service and mentioned that the position description for the position that Plaintiff was interested in would most likely be downgraded to dissuade her from accepting the position.   However, Plaintiff refused to have her legal background misused and/or abused and would not take a voluntary downgrade as a Labor Management Relations Specialist.

447.   On or about November 5, 2018, Ms. Womack questioned Plaintiff's right to vote in Mid-Term Elections and attempted to block Plaintiff's 19th Amendment right to vote.   Plaintiff further inquired whether she was a bargaining unit employee now that the HAS re-organization changes had occurred.

448.   On or about November 5, 2018, Ms. Womack stated that Mr. Dolen (White/Caucasian Male) would now oversee Ms. Davis.   However, Ms. Womack previously stated that administrative staff could not oversee clinical staff and thus this was the reason why Plaintiff's job would be eliminated.   Yet, Mr. Dolen was administrative staff who could now oversee clinical staff without possessing a clinical background himself.

449.   On or about November 7, 2018, Plaintiff requested an extension to complete the FY18 Performance Appraisals of Telecare staff.   Ms. Womack disrespected Plaintiff yet again when she mentioned that the Telecare MSA supervisor was Absent Without Official Leave (AWOL) for a year even though Ms. Womack was aware that Plaintiff was supervising the Telecare staff and that there had been no lower-level supervisory support for some time.   Ms. Womack intentionally ignored and did not address Plaintiff's request for Compensatory Time (CT), where Ms. Womack shifted workload to Plaintiff.

450.    On or about November 14, 2018, Ms. Womack attempted to coerce Plaintiff into meeting with her face-to-face even though Plaintiff had notified Ms. Womack and the chain-of-command directly of concerns of discomfort and safety. Ms. Womack again tried to compel Plaintiff to meet with her and slighted Plaintiff when she stated, "You need to put your personal feelings aside and still maintain an appropriate working relationship."   Plaintiff recommended that Ms. Womack follow-up with Human Resources instead of abusing her authority and continuing to pressure Plaintiff to meet with her and stated that another witness or Plaintiff's attorney would need to be present at the meeting.

451.    On or about November 16, 2018, Plaintiff inquired as to when Ms. Womack would notify Plaintiff's former subordinate staff that her job was eliminated.   Ms. Womack stated that she did not think that the terms of Plaintiff's job being eliminated should be used.   Plaintiff informed Ms. Womack that there was "gossip" and "rumors" going around that Plaintiff was "fired," which Ms. Womack had directly spread herself to humiliate Plaintiff.   Ms. Womack falsely accused Plaintiff of making assumptions and circulating rumors regarding the elimination of her job.   Ms. Womack continued to demean Plaintiff and alleged that she made up stories to defame her character and reputation.   Ms. Womack disingenuously alleged that Plaintiff had no work to do and was wasting government resources.   However, it was Ms. Womack that did not plan the "re-organization" properly but instead had done it in a hostile, discriminatory, and retaliatory manner.

452.    On or about November 16, 2018, Ms. Womack sent Plaintiff yet another nasty e-mail and further questioned her competence and the guidance she received.   Plaintiff originally stated that the guidance was from Human Resources (HR). Ms. Womack humiliated Plaintiff in

124

front of her former staff and stated that Plaintiff was moving to "our Clinical Application Coordinator Section for reassignment . . ."   Ms. Womack selectively and purposefully used the term "re-assignment" as a negative connotation for staff to make a damaging inference, which staff equated to the demotion of Plaintiff.   Yet, Ms. Womack did not address that Ms. Clay-Jordan, Administrative Officer, had also been re-assigned.   Ms. Womack deliberately spread rumors and gossip that Plaintiff was "fired."   Ms. Womack also openly spoke to staff about Plaintiff's EEO case and bragged to other staff that Plaintiff would not be successful.

453.    On or about November 20, 2018, Plaintiff was denied a detail opportunity with the Office for Health for Policy and Planning. This denial was motivated by Plaintiff's race, color, sex and in retaliation for Plaintiff's EEO activities.

454.    On or about November 20, 2018, Paula Kinsel (White/Caucasian Female) reached out to Plaintiff and stopped by Plaintiff's office.   Ms. Kinsel stated that she wanted to "eyeball" Plaintiff prior to conducting an informal fact-finding that she was conducting with Dedrick Robinson (Black/African American Male), Compliance Officer, as it related to a "hostile work environment."   Ms. Kinsel singled out Plaintiff based upon comments that Ms. Womack shared with her.   Plaintiff had never met Ms. Kinsel prior to this "meeting" nor was there any valid reason for Ms. Kinsel to reach out to Plaintiff prior to the "informal" fact-finding as it was not VA policy or procedure to meet Plaintiff beforehand to "eyeball" her.   Ms. Womack continued to defame and slander Plaintiff when she continuously cultivated a hostile work environment, discriminated, and retaliated against Plaintiff.   Ms. Womack falsely alleged that Plaintiff created a "hostile work environment" when Ms. Womack knowingly created a working hell for Plaintiff. This "informal" fact-finding was yet another attempt to "fish" for information and to use Plaintiff's

125

valid concerns against her in a "counter-investigation."   It should be noted that Ms. Kinsel was Ms. Carolyn Baldwin's former supervisor at another VA medical center and they had a good relationship.   It should also be noted that Mr. Dedrick Robinson did not receive any disciplinary action for treating his government office space as a residence.

455.   On or about November 26, 2018, Plaintiff was purposefully assigned demeaning "grunt work" to keep her "busy," rather than to utilize her knowledge, skills, and abilities.   Ms. Womack and the Agency continued to intentionally isolate Plaintiff from her fellow colleagues and tried to suppress Plaintiff's freedom of speech and minimize Plaintiff's skillset.   Ms. Womack and the Agency intentionally mistreated Plaintiff to ensure her physical and mental decline.

456.   On or about November 28, 2018, Plaintiff made a request to Ms. Womack that she not be used in a "secretarial manner" since her former subordinate staff still contacted Plaintiff even though she was no longer in their supervisory chain-of-command.   Ms. Womack stated that staff ignore her e-mails. However, Ms. Womack accused Plaintiff of "lying" on her FY17 Performance Appraisal Rebuttal when Plaintiff brought up similar concerns about staff.

457.   On November 30, 2018, Ms. Womack intentionally had an impromptu meeting regarding the demolition of Building 122 and did not notify impacted staff.   Ms. Womack purposefully held this impromptu meeting to avoid notifying Plaintiff of the building demolition. However, Plaintiff had cancelled leave for this date and was present even though she was originally scheduled for leave this date.   Ms. Womack was "visibly angry" when Plaintiff brought concerns regarding the transparency of the rationale for the building demolition, access to the outside

126

assessment report and meeting minutes, and avenues for staff to report their concerns if they felt the outside assessment impacted them in this open forum.

458.     On or about November 30, 2018, Ms. Womack harassed Plaintiff and attempted to engage Plaintiff to speak with her even though Ms. Womack and the Agency were aware that Plaintiff was not comfortable with Ms. Womack.   Ms. Womack tried to interact with Plaintiff in a "public forum" to discredit her hostile work environment, discrimination, and retaliation concerns.

459.     On or about November 30, 2018, Mr. Sraon and other personnel completely ignored and refused to respond to Plaintiff's inquiries and re-directed Plaintiff to other personnel who could not respond regarding the demolition of Building 122.   The Agency intentionally and knowingly "ping-ponged" Plaintiff back and forth to provide confusion to refuse liability for subjecting employees to unsafe working conditions.   Similar claims of unsanitary conditions were found at the Loma Linda VA Healthcare System where Mr. Sraon became the Medical Center Director. The Department of Veterans Affairs endorses a "management merry go-round" that shifts poor performers and problem employees to different locations instead of holding these dishonest officials accountable.

460.     From on or about November 30, 2018 to on or about May 6, 2020, Agency management officials, including but not limited to Ms. Womack, Chief of the Health Administrative Service, , Ms. Cooper, Chief Financial Officer, Ms. Salazar, HR Manager, Mr. Sraon, Deputy Director and Mr. Vazquez, Medical Center Director, badgered, harassed and humiliated Plaintiff on almost a daily basis, motivated by and/or because of Plaintiff's race, color, sex and in retaliation for her prior protected EEO activity. This continuous hostile work

environment included but not limited to setting Plaintiff up for failure; excessively monitoring Plaintiff; talking down to Plaintiff; mocking Plaintiff's education; giving Plaintiff demeaning work dutie; trying to turn Plaintiff's coworkers against her; attempting to create strife between Plaintiff and her subordinate employees; intentionally giving Plaintiff inconsistent instructions; sending Plaintiff harassing emails; humiliating Plaintiff in front of her coworkers; defaming Plaintiff; repeatedly questioning Plaintiff's intelligence; excluding and isolating Plaintiff from her coworkers. The incidents comprising this hostile work environment are identified in very specific detail in Exhibit 7 and Exhibit 8 attached to Plaintiff's First Amended Complaint and also identified in the facts section of this Second Amended Complaint. (Dkt. #22).

461.    In addition to the hostile work environment described above, the Agency subjected Plaintiff to several discrete adverse actions from on or about November 30, 2018 to on or about May 6, 2020, including but not limited to the Agency disapproving of Plaintiff's request for a temporary promotion detail on or about November 20, 2018; on or about October 23, 2019, Ms. Salazar failed to assign Plaintiff to a similar and permanent position within 360 days of Plaintiff's previously eliminated position; on or about November 4, 2019, Plaintiff received notification that she was not selected for the Health Systems Specialist position; Plaintiff was also not selected for the Chief of Health Administration Service position and Plaintiff was not selected for the Assistant Chief of Health Administration Service position. These discrete adverse acts were motivated by and/or because of Plaintiff's race, color and sex, as well as being in retaliation for Plaintiff's opposition to such unlawful conduct. The discrete acts of discrimination are identified in very specific detail in Exhibit 7 and Exhibit 8 attached to Plaintiff's First Amended Complaint and also identified in the facts section of this Second Amended Complaint. (Dkt. #22).

128

462.    On or about December 19, 2018, Plaintiff informed Mr. Dolen that she would be reporting to the Office of Workers Compensation Program (OWCP) office due to breathing and other symptomatic issues she had since coming on board and working in Building 122.   Plaintiff stated that this continued to be a "distressful" experience.

463.    On or about December 6, 2018, Plaintiff finally received a response from Ms. Salazar regarding Plaintiff's inquiry regarding whether Plaintiff could be reassigned to another facility.   Ms. Salazar claimed she did not know the status of Plaintiff's interagency loan agreement even though Ms. Salazar was involved in the process.

464.    On or about February 5, 2019, Plaintiff inquired whether there were any updates regarding her reassignment to another facility and/or her permanent reassignment within the facility.   Plaintiff informed Ms. Salazar that she was now completing work that she did when she first started out as an intern with the Agency.   Plaintiff questioned the alleged positive outcomes of this arrangement and its intent especially where she had contacted the appropriate officials regarding her concerns.   Plaintiff notified that Agency that the temporary assignment was isolating Plaintiff physically, mentally and emotionally.   Plaintiff stated that the temporary assignment impacted her qualifications for other positions and leadership programs and thus there were tangible negative effects to her career and livelihood. Plaintiff stated that this was causing her more distress than necessary, particularly where elimination of Plaintiff's position was a management-directed action that was signed off and approved by Executive Leadership and Human Resources previously.

465.    On or about December 7, 2018, Plaintiff followed up on inquiries regarding whether a Standard Form-50 (SF-50) would be submitted to reflect her temporary reassignment.

Ms. Womack informed Plaintiff that she was not asked to do any other type of paperwork and stated she would follow up with Human Resources.   However, this was not what Plaintiff was informed of as it related to accounting for an employee's personnel work history.   Management and Human Resources continued to play the game where they deflect blame and ping-pong employees back and forth to deny liability.

466.   On or about December 11, 2018, Plaintiff inquired when incentive awards would be processed because she had not received an incentive award.   This was not the first time that she did not receive an incentive award, thereby impacting Plaintiff financially.

467.   On or about December 20, 2018, Plaintiff inquired whether the results of the "informal" fact-finding would be shared.   On January 7, 2019, Plaintiff finally received a response from Mr. Eggers who accused Plaintiff of not communicating with the chain-of-command and that she did not maintain a respectful and professional working environment. Plaintiff's concerns were twisted to be about her instead of Ms. Womack's egregious misconduct. On January 10, 2019, Mr. Eggers stated that he was only provided with the results and shared it with the Plaintiff as a summary.   Mr. Eggers confirmed that the fact-finding was to evaluate both parties even though Plaintiff had brought up concerns regarding Ms. Womack.   On January 18, 2019, Mr. Eggers informed Plaintiff there was no evidence file.   Clearly, Plaintiff's concerns were not taken seriously since there was no evidence file to support the results. This was a sham attempt to shut Plaintiff up and a means to take disciplinary action against Plaintiff for expressing her valid concerns.   The Agency preferred to gaslight Plaintiff instead of addressing her concerns.

468.   On or about December 28, 2018, Plaintiff requested that HAS management follow-up with Plaintiff's approval to be appointed as a Controlled Substance Inspector.   HAS

management stated that it had been consumed with the relocation of staff.   However, at no time did HAS management inquire about Plaintiff's experience with the relocation of staff even though Plaintiff had experience with relocations.   Instead, Plaintiff was subjected to demeaning and menial "grunt work."

469.    On or about January 2, 2019, Plaintiff forwarded Talent Management System (TMS) Learning Expiration Notifications of former employees to Ms. Womack as she previously requested.   Ms. Womack then stated that Plaintiff did not need to forward the messages unless it was for someone different.   Plaintiff acknowledged that she would do so. On January 10, 2019, Plaintiff forwarded Talent Management System (TMS) Learning Expiration Notifications to Ms. Womack based on the most recent instructions Ms. Womack provided. On February 4, 2019, Ms. Womack became "annoyed" that Plaintiff followed her most recent instructions.

470.    On or about January 2, 2019, Plaintiff requested clarity regarding a Freedom of Information Act (FOIA) response she received from Mary Reid (White/Caucasian Female), FOIA Officer.   Ms. Reid stated that there was a delay in responding to Plaintiff's request. Ms. Reid ignored Plaintiff's response when Plaintiff inquired how long it would be delayed. On January 7, 2019, Ms. Reid responded in a different e-mail to the same thread.   Ms. Reid had a pattern of responding to different e-mail threads to cause confusion and to ensure that responses cannot be traced back to the original thread.

471.    On or about January 4, 2019, Ms. Womack mockingly sent Plaintiff a job posting. However, Plaintiff had not spoken to Ms. Womack of any of Plaintiff's (legal) interests. Ms. Womack further mocked Plaintiff with the statement, "I just want you to find something you like." However, Ms. Womack was the key player who deliberately eliminated the former position

Plaintiff encumbered and intentionally forced Plaintiff into the temporary reassignment for 10+ weeks without any further planning. Ms. Womack's intentional sarcastic behavior was humiliating to Plaintiff.

472.    On or about January 4, 2019, Plaintiff became aware that changes had been made to Time & Leave since it indicated that Janet Byrd (Black/African American Female) was her supervisor.   However, Ms. Byrd previously reported to Plaintiff via the chain-of-command when Plaintiff served as the Acting Assistant Chief and Chief roles of HAS.   Plaintiff was "demoted" where her former staff now oversaw her team and attendance.

473.    On or about January 7, 2019, Plaintiff requested an update as it relates to the installation of her phone.   Plaintiff was originally moved from Building 122 on December 19, 2018, but still did not have a phone installed.   Plaintiff needed a phone to function in her role. The Agency purposely cut off Plaintiff's modes of communication to intentionally isolate to badger, harass and humiliate her.

474.    On or about January 16, 2019, Plaintiff requested an update on the installation of Plaintiff's phone.   Plaintiff had to find a vacant workstation and/or use her own (personal) cell phone for work-related business. The poor moving arrangements by management impacted Plaintiff's work since Plaintiff's working conditions were ignored with the move from Building 122.

475.    On January 22, 2019, Ms. Salazar disingenuously claimed that she researched Plaintiff's question regarding a possible detail to the Department of Justice and did not find anything.

476.    On February 1, 2019, Plaintiff followed up with Ms. Reid, Freedom of Information Act (FOIA) Officer, regarding the four FOIA requests she previously submitted as they were past overdue. Plaintiff received a "rude" and "defensive" response from Ms. Reid, who reported to Executive Leadership, when Plaintiff made a few inquiries.

477.    On February 4, 2019, Plaintiff contacted Mr. Eggers regarding the defensive, if not rude, response from Ms. Reid and stated that Plaintiff was confused regarding how the FOIA Officer can provide regulations regarding exemptions on the disclosure of information but cannot provide any regulations as it relates to dissemination of information. Mr. Eggers "covered" up for Ms. Reid, who is a White/Caucasian female.

478.    On or about February 18, 2019, Plaintiff filed very detailed amendments to her formal complaint of discrimination (VA Case No. 2003-0580-2018106006) with the Agency. The amendments to her formal complaint are attached to Plaintiff's First Amended Complaint as Exhibit 2. (Dkt. #22). In her amendments, Plaintiff identified a non-exhaustive list of 18 continuous discriminatory and retaliatory actions the Agency subjected Plaintiff to from on or about November 20, 2018, to on or about February 14, 2019.

479.    On or about February 14, 2019, Plaintiff received meeting minutes from the bi-weekly VISN 16 Call Center meeting.   The meeting minutes indicated that Mr. Dolen was present even though he has no clinical background despite Ms. Womack removing these related duties from Plaintiff.

480.    On or about February 15, 2019, Plaintiff further followed up with Ms. Salazar regarding the regulations related to a temporary reassignment and made other additional inquiries.

133

On March 1, 2019, Ms. Salazar intentionally provided unclear and confusing information to Plaintiff in response to Plaintiff's inquiries.

481.    On or about February 26, 2019, Plaintiff was deliberately removed from the VHA HOU Administrative Council mail group, even though she was a member of this work group for a number of years. Plaintiff continued to be excluded from the operations of the facility.

482.    On or about March 4, 2019, Plaintiff requested challenging work, particularly because Plaintiff was completing demeaning and mind-numbing intern-like duties during the temporary reassignment.

483.    On or about March 5, 2019, Plaintiff became aware that she was not selected for the Executive Assistant position at the VA Loma Linda Health Care System.   This position reports to the Medical Center Director. Mr. Sraon was chosen as the new Medical Center Director of this facility.    Mr. Sraon continued to retaliate against Plaintiff for her involvement in federally protected activities.

484.    On or about March 28, 2019, Plaintiff's new computer hard drive was replaced. This replacement "coincidentally" occurred after Plaintiff submitted amendments to an EEO complaint and had recently returned to the office from approved leave. Plaintiff lost most of the Plaintiff's work and documents as a result of the hard drive replacement. The Agency is acutely aware that it must keep records for litigation purposes.   The agency knowingly removed Plaintiff's hard drive so that she would no longer have access to evidence regarding her claims of discrimination and retaliation.

485.     On or about March 29, 2019, Plaintiff requested work since she had completed the assignments that she was tasked.   The Agency continued to assign Plaintiff menial and demeaning tasks which contributed to the discriminatory and retaliatory hostile work environment.

486.     On or about March 29, 2019, Plaintiff continued to follow up regarding her Fiscal Year 2018 (FY2018) Performance Appraisal award since there were issues with Plaintiff's award in previous years.

487.     On or about March 29, 2019, the Office of Consumer Affairs, specifically Mr. Sylvester James (Black/African American Male), contacted Plaintiff regarding a letter she wrote to the Honorable Secretary Robert Wilkie dated July 24, 2018.   Plaintiff responded to the inquiries the office made, including whether she had contacted the chain-of-command.   The Agency continued to try to take disciplinary action against Plaintiff for exercising her free speech rights.

488.     On or about April 2, 2019, Plaintiff continued to receive VA TMS learning expiration notification alerts for former employees that she previously oversaw. Plaintiff was informed that Ms. Womack spoke of Plaintiff negatively to others and questioned her supervisory skills. However, Plaintiff had previously submitted and handed off disciplinary actions related to these former employees.

489.     On or about April 10, 2019, Office of Information and Technology (OI&T), specifically Darnell Daniels (Black/African American Male) and Tony Brown (Black/African American Male), purposely threatened to remove Plaintiff's original workstation "coincidentally" right before Plaintiff went on leave and temporary detail.   (The agency was aware that Plaintiff would not be reporting to Plaintiff's home station for approximately 120 days.)   OI&T attempted

135

to "force" Plaintiff to reveal details regarding her engagement in federally protected EEO activities.    However, the Agency was aware of and agreed to the arrangements where Plaintiff would keep her original workstation. OI&T then "pressured" Plaintiff into completing an "exemption," which she completed.    However, Plaintiff was aware that this process did not apply to other staff. OI&T knowingly created a hostile work environment and pressured Plaintiff into completing the exemption but then refused to sign off on it.

490.    On or about April 16, 2019, Plaintiff had to follow up with Office of Consumer Affairs, specifically Mr. James Sylvester (Black/African American Male) and Mr. Robert Kempker (White/Caucasian Male)), regarding her original inquiries and updates request. The Office of Consumer Affairs deliberately delayed a response to Plaintiff to deny her the opportunity to submit a rebuttal. The Agency continued to defame, slander, and make libelous statements against Plaintiff. The Agency further continued to paint the false picture that Plaintiff was "disruptive" even though Plaintiff was just exercising her First Amendment rights.

491.    On or about April 25, 2019, Ms. Alisa Cooper (Black/African American Female) became "irritated" when Plaintiff requested assistance with her travel scheduled for April 26, 2019. Ms. Cooper continued to treat Plaintiff differentially and disparately, thereby creating a "trickle down" effect to Ms. Cooper's subordinates. The VA Travel Office continued to "pressure" Plaintiff to find lower cost lodging even though her lodging was within the government rate.

492.    On or about April 22, 2019, the Office of Consumers Affairs, specifically Mr. James and Mr. Kempker, intentionally ignored Plaintiff's inquiries related to her Department of Justice Interagency Loan Request. On June 7, 2019, the Office of Consumer Affairs, specifically, Mr. James and Mr. Kempker, refused to provide a response to Plaintiff's follow-up inquiries.

493.    On or about May 14, 2019, Plaintiff received an e-mail indicating that the exemption that IT coerced Plaintiff into completing was rejected because IT did not complete its actions related to the exemption process.    The Agency continued to harass Plaintiff and threaten to destroy evidence and refused to fulfill its obligation preserving and maintaining evidence.

494.    On or about June 10, 2019, Plaintiff was informed that Ms. Womack refused to pay Plaintiff Holiday Pay even though she was on government travel on a federal holiday.

495.    On or about June 14, 2019, Ms. Cooper wrongly accused Plaintiff of not using the government-issued travel card even though Plaintiff had explained to Ms. Cooper's staff why Plaintiff did not use the card. Plaintiff questioned why it was an issue now even though she had traveled before. Ms. Cooper did not provide a response.

496.    Executive Leadership made multiple unsuccessful attempts to "get rid of" Plaintiff. However, there were no valid grounds to terminate Plaintiff despite their numerous attempts and constant harassment. Plaintiff still had not received a permanent assignment despite the elimination of the job Plaintiff encumbered.

497.    On or about November 20, 2018, Mr. Eggers, Acting Associate Director, and Francisco Vazquez, Medical Center Director, disapproved Plaintiff's request for a temporary *promotion* detail as a GS-13/14 Policy Program Specialist with the Office of the ADUSH for Health for Policy and Planning even though Plaintiff had been selected and offered the temporary detail. Other staff, outside of Plaintiff's protected classes, were provided with the opportunity to complete details elsewhere without any issues. The Agency and its management officials were well aware that Plaintiff's knowledge, skills, and abilities were not being fully utilized.

137

Additionally, the Plaintiff still did not receive a permanent assignment; however, Agency officials deliberately disapproved this request to further discriminate and retaliate against Plaintiff.

498.     On or about August 4, 2019, Mr. Bergeron harassed Plaintiff to meet with the new Associate Director, Mr. Chris Myhaver (White/Caucasian Male), even though Plaintiff was temporarily and physically detailed elsewhere. Mr. Bergeron continued to spread false "rumors" and "gossip" about Plaintiff to destroy her reputation and to prevent career-enhancing opportunities. Even though Plaintiff was on detail, the Agency's "tentacles" reached far and distant wherein Plaintiff continued to be subjected to harassment, discrimination, and a hostile work environment.

499.     On or about August 6, 2019, Plaintiff was informed that her belongings had been rummaged through and notes had been torn from her notebooks. The Agency and its management personnel were the only officials who had access to and knew of the location of Plaintiff's belongings.

500.     On or about August 9, 2019, Plaintiff received a message from the Information Security Officer, indicating that Plaintiff had been "separated" from the agency. However, Plaintiff was not separated from MEDVAMC or VA.  At no time did Plaintiff state that she was not returning to MEDVAMC upon the completion of her detail. Plaintiff continually received "subliminal messages" and "hints" from the agency that Plaintiff should "separate" due to her participation in protected EEO activity.

501.     On or about August 15, 2019, there were issues with Plaintiff's timecard where her pay would have been impacted had it not been for her continued follow-up regarding this issue.

502.    On or about August 20, 2019, Mr. Bergeron reached out to Plaintiff to set up a meeting to speak with the Associate Director, Mr. Myhaver but he was unable to provide any details.   Despite overseeing multiple departments and thousands of employees, Mr. Myhaver took time out of his busy schedule to verify "rumors" he heard about Plaintiff.

503.    On or about August 29, 2019, Ms. Cooper asked Plaintiff why Plaintiff continued to have the same lodging arrangements. Plaintiff was aware that other staff who were on detail to other stations did not receive the treatment that she did nor where they "pressured" to change to a different type of lodging despite the extension of such opportunities.

504.    On or about September 24, 2019, Plaintiff was contacted as the Point of Contact (POC) for the Telecare Manager contract despite providing notifications on several occasions that she was no longer the POC.   This duty had been removed from Plaintiff for quite some time. The Agency intentionally continued to insult and spite Plaintiff when it is aware that it had eliminated the job that she formerly encumbered.   The Agency continued to "add salt" into her "wound."

505.    On or about October 15, 2019, Plaintiff was informed that MEDVAMC staff attempted to use the workstation and related equipment that was assigned to her. However, the Agency and its management were aware that her workstation and its equipment were not to be in use as they related to on-going federally protected EEO activity. The Agency ultimately removed the computer despite Plaintiff's attorney notification to the Agency and management officials of a litigation hold.

506.    On or about October 23, 2019, Ms. Salazar failed to adhere to statutory authority to have Plaintiff assigned to a similar and permanent position within 365 days of the Plaintiff's previously eliminated position.

507.     On or about October 31, 2019, Mr. Bergeron reported Plaintiff as non-compliant with the submission of Fiscal Year 2019 (FY19) Performance Plans.   This non-compliance alert included Executive Leadership, thereby creating a false impression that Plaintiff did not follow instructions.

508.     On or about November 4, 2019, Plaintiff received notification that she was not selected for the Health Systems Specialist position. Plaintiff's non-selection was motivated by her race, color, sex and in retaliation for her protected EEO activity.

509.     On or about December 16, 2019, Plaintiff followed up with receiving e-Performance training for the new performance year even though employees at the facility had received the training. Plaintiff was not issued Plaintiff's Fiscal Year 2020 (FY20) Performance Standards. This was yet another instance where the Agency demonstrated its lack of regard for Plaintiff, particularly where it "hints" that the Plaintiff does not "belong" to and is not an employee of the facility.

510.     On or about December 31, 2019, Plaintiff became aware of Executive Leadership's approval of Ms. Cooper's request to transfer Plaintiff's travel profile to the detail station.  Ms. Crain, Deputy Associate Medical Center Director, approved this request in retaliation for Plaintiff identifying her in a prior EEO case.   Plaintiff had reported Ms. Crain's staff on prior occasions for "blind scheduling."  This was yet another retaliatory action against Plaintiff, particularly where Ms. Crain abused her another authority in her new position as an Executive Leader. Ms. Cooper's staff had been assisting Plaintiff with travel authorizations for approximately 8 months until this request was made. During this timeframe, Plaintiff was contacted regarding Plaintiff's participation in a hearing that may involve Ms. Cooper. Plaintiff also did not receive any training to complete

travel authorizations. Ms. Cooper had sufficient staff to complete travel authorizations for all facility employees. At no point in time did Plaintiff state that she was not returning to MEDVAMC. Ultimately, Executive Leadership still did not respond to Plaintiff's request for clarity and instead reversed the decision upon Ms. Cooper's request since Plaintiff's concerns were valid. The Agency continued to harass Plaintiff into "quitting" and purposely created difficult situations for her to create a constant state of mental anguish for Plaintiff.

511.    On or about February 7, 2020, Plaintiff filed a very detailed formal complaint of discrimination (VA Case No. 2003-0580-2020101147) with the Agency. Said formal complaint is attached to Plaintiff's First Amended Complaint as Exhibit 7. (Dkt. #22). In her formal complaint, Plaintiff identified a non-exhaustive list of 48 continuous discriminatory and retaliatory actions the Agency subjected Plaintiff to from on or about November 30, 2018, to on or about December 31, 2019.

512.    On or about March 4, 2020, Plaintiff was approved to apply for and participate in the Partnership for Public Service Excellence in Government (PPS-EIG).   However, The Office of the Associate Director did not approve Plaintiff's name to move forward.

513.    On or about May 15, 2020, Judy filed very detailed amendments to her formal complaint of discrimination (VA Case No. 2003-0580-2020101147) with the Agency. The amendments to her formal complaint are attached to Plaintiff's First Amended Complaint as Exhibit 8. (Dkt. #22). In her amendments, Plaintiff identified a non-exhaustive list of 18 continuous discriminatory and retaliatory actions the Agency subjected Plaintiff to from on or about February 14, 2020, to on or about May 6, 2020.

514.    On or about July 20, 2020, Plaintiff received notification regarding the extension of a Telecare contract option period.   Plaintiff requested to be removed as the point of contact since supervisory duties were removed along with duties related to Telecare.   Plaintiff provided notification that the contract would be invalid and/or fraudulent if exercised under Plaintiff's name as Plaintiff did not authorize any other staff to take action.

515.    On or about August 5, 2020, Plaintiff was identified as "deficient" for not completing training.   Plaintiff inquired about the timeliness of the report and requested to be removed from supervisory trainings as deficient trainings can result in loss of access and/or disciplinary action.

516.    On August 18, 2020, Plaintiff inquired about the Executive Management Fellowship program.   A MEDVAMC employee had been selected for this program previously. However, Mr. Bergeron deliberately ignored Plaintiff's request.

517.    Mr. Dolen informed Plaintiff that Mr. Myhaver was detailed to the Department of Human & Health Services.   However, Plaintiff was denied a similar opportunity to detail with the Department of Justice even though Plaintiff had followed the same steps.   Clearly, the Agency intentionally "cherry picks" who it wants to advance and retaliates against those they don't.

518.    On or about January 15, 2021, Plaintiff followed up with Mr. Dolen regarding her permanent placement since Plaintiff's position was eliminated.   Plaintiff was not provided with any clarity despite consistent follow-up.

519.    On or about March 8, 2021, the Chief of Staff's staff deliberately re-scheduled an interview for the Health System Specialist for the Chief of Staff Office detail.   In purposefully

scheduling meetings last minute, Plaintiff was unable to participate.   This was done purposely to exclude Plaintiff from process to deny her career enhancing opportunities.

520.   On or about March 25, 2021, the Agency sent a message regarding its support for Asian Americans against crimes and racial discrimination.   However, the Agency encourages as well as enables the perpetuation of discrimination, harassment, retaliation against Plaintiff and continues to fail to commit to being a diverse and inclusive workplace.

521.   On or about May 12, 2021, Plaintiff requested assistance to reinstate her access to Plaintiff's account so that Plaintiff could perform work.   Employee Education Service (EES), specifically Valerie Williams (Black/African American Female), did not contact Plaintiff regarding mandatory trainings.   However, Plaintiff's access was removed. On several other occasions, Plaintiff was "reported" and threatened with disciplinary action for not completing non-applicable trainings.

522.   On or about July 2, 2021, Plaintiff continued to receive reminders of "deficiency" despite several notifications that she no longer served in a supervisory capacity.   Plaintiff's supervisory duties were removed yet she continued to be reported for not completing trainings that were non-applicable to her.

523.   On or about September 1, 2021, Plaintiff received a restricted message from Sherin Tiji regarding COVID-19 vaccination.    Plaintiff requested clarity on why a vaccination card was needed if attestation was already provided and particularly if this was protected health information. Ms. Tiji deliberately ignored Plaintiff's questions.

524.     On or about November 24, 2021, Plaintiff submitted her Fiscal Year 2021 (FY2021) Performance Appraisal package to Mr. Dolen.    Plaintiff was not provided with any updates regarding her permanent placement.

525.     Plaintiff was not selected for the Chief of Health Administration Service position. Plaintiff did not receive a non-selection notice.

526.     Plaintiff was not selected for the Assistant Chief of Health Administration Service. Position. Plaintiff did not receive a non-selection notice.

527.     On or about February 11, 2022, Plaintiff thanked Mr. Dolen for enabling Plaintiff to complete a detail, which ultimately resulted in Plaintiff's transition to a work environment free of discrimination and harassment and promotes diversity and inclusion.

528.     On or about February 13, 2022, Plaintiff transitioned from the MEDVAMC to a different Program Office. Shortly, thereafter, Plaintiff was informed that another staff (African American Female) encumbered the same exact position, title, and grade for Plaintiff's position that was allegedly "eliminated." Clearly, the agency wanted to remove Plaintiff from that position unlawfully and succeeded in doing so to Plaintiff's detriment.

529.     On or about June 28, 2021, the Agency issued its Final Agency Decision (FAD) on VA Case No. 2003-0580-2016105116.

530.     On or about July 26, 2021, Plaintiff timely appealed the FAD for VA Case No. 2003-0580-2016105116 to the Office of Federal Operations (OFO). As of the date of the filing of this Amended Complaint, the OFO has not made a decision on Plaintiff's appeal.

531.     On or about July 29, 2021, the Agency issued its Final Agency Decision (FAD) on VA Case No. 2003-0580-2020101147.

144

532.     On or about August 25, 2021, Plaintiff timely appealed the FAD for VA Case No.

2003-0580-2003-0580-2020101147 to the Office of Federal Operations (OFO). As of the date of

the filing of this Amended Complaint, the OFO has not made a decision on Plaintiff's appeal.

533.     On information and belief, Plaintiff asserts that the Agency acted willfully and with

malice and in reckless disregard of Plaintiff's rights and welfare.

## COUNT 1

## TITLE VII -SEX DISCRIMINATION

534.     Plaintiff, JUDY VUONG, realleges and adopts, as if fully set forth herein, the

allegations stated in Paragraphs one (1) through five hundred thirty-three (533).

535.     Plaintiff is a member of a protected class under Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII").

536.     By the conduct describe above, the Agency engaged in unlawful employment

practices and discriminated against Plaintiff on account of her sex including but not limited to the

adverse actions identified in paragraphs 11, 12, 295, 296, 460 and 461 of this Second Amended

Complaint.

537.     The Agency's adverse employment decisions toward Plaintiff were motivated by

and/or because of sex-based considerations.

538.     The Agency's unlawful and discriminatory practices toward Plaintiff were

intentional.

539.     The Agency's unlawful and discriminatory practices were done with malice or with

reckless indifference for the federal protected rights of Plaintiff.

WHEREFORE, Plaintiff prays the following damages against the Agency:

    a.  Back pay and benefits;

    b.  Lost wages;

    c.  Prejudgment interest on back pay and benefits;

    d.  Front pay and benefits;

    e.  Compensatory damages for emotional pain and suffering, inconvenience, reputational harm, emotional distress, physical pain and suffering, loss of enjoyment of life and humiliation;

    f.  Attorney's fees and costs;

    g.  Injunctive relief; and

    h.  For any other relief this Court deems just and equitable.

## COUNT II

## TITLE VII-RACE DISCRIMINATION

540.    Plaintiff, JUDY VUONG, realleges and adopts, as if fully set forth herein, the allegations stated in Paragraphs one (1) through five hundred thirty-three (533).

541.    Plaintiff is a member of a protected class under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII").

542.    By the conduct describe above, the Agency engaged in unlawful employment practices and discriminated against Plaintiff on account of her race including but not limited to the adverse actions identified in paragraphs 11, 12, 295, 296, 460 and 461 of this Second Amended Complaint.

543.    The Agency's adverse employment decisions toward Plaintiff were motivated by and/or because of race-based considerations.

544.    The Agency's unlawful and discriminatory practices toward Plaintiff were intentional.

545.    The Agency's unlawful and discriminatory practices were done with malice or with reckless indifference for the federal protected rights of Plaintiff.

WHEREFORE, Plaintiff prays the following damages against the Agency:

    a.   Back pay and benefits;

    b.   Lost wages;

    c.   Prejudgment interest on back pay and benefits;

    d.   Front pay and benefits;

    e.   Compensatory damages for emotional pain and suffering, inconvenience, reputational harm, emotional distress, physical pain and suffering, loss of enjoyment of life and humiliation;

    f.   Attorney's fees and costs;

    g.   Injunctive relief; and

    h.   For any other relief this Court deems just and equitable.

## COUNT III

## TITLE VII-COLOR DISCRIMINATION

546.    Plaintiff, JUDY VUONG, realleges and adopts, as if fully set forth herein, the allegations stated in Paragraphs one (1) through five hundred thirty-three (533).

547.    Plaintiff is a member of a protected class under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII").

548.    By the conduct describe above, the Agency engaged in unlawful employment practices and discriminated against Plaintiff on account of her color including but not limited to the adverse actions identified in paragraphs 11, 12, 295, 296, 460 and 461 of this Second Amended Complaint.

549.    The Agency's adverse employment decisions toward Plaintiff were motivated by and/or because of color-based considerations.

550.    The Agency's unlawful and discriminatory practices toward Plaintiff were intentional.

551.    The Agency's unlawful and discriminatory practices were done with malice or with reckless indifference for the federal protected rights of Plaintiff.

WHEREFORE, Plaintiff prays the following damages against the Agency:

       a.   Back pay and benefits;

       b.   Lost wages;

       c.   Prejudgment interest on back pay and benefits;

       d.   Front pay and benefits;

    e.   Compensatory damages for emotional pain and suffering, inconvenience, reputational harm, emotional distress, physical pain and suffering, loss of enjoyment of life and humiliation;

    f.   Attorney's fees and costs;

    g.   Injunctive relief; and

    h.   For any other relief this Court deems just and equitable.

## COUNT IV

## TITLE VII-RETALIATION

552.    Plaintiff, JUDY VUONG, realleges and adopts, as if fully set forth herein, the allegations stated in Paragraphs one (1) through five hundred thirty-three (533).

553.    The Agency retaliated against Plaintiff in violation of Title VII in that Plaintiff's complaints of sex discrimination, race discrimination, color discrimination and participation in other protected EEO activity was a reason for the Agency taking adverse actions against Plaintiff including but not limited to the adverse actions identified in paragraphs 11, 12, 295, 296, 460 and 461 of this Second Amended Complaint.

WHEREFORE, Plaintiff prays the following damages against the Agency:

    a.   Back pay and benefits;

    b.   Lost wages;

    c.   Prejudgment interest on back pay and benefits;

    d.   Front pay and benefits;

e. Compensatory damages for emotional pain and suffering, inconvenience, reputational harm, emotional distress, physical pain and suffering, loss of enjoyment of life and humiliation;

f. Attorney's fees and costs;

g. Injunctive relief; and

h. For any other relief this Court deems just and equitable.

Dated this 1ST day of June 2023.

Respectfully submitted,

/S/ Ashok Bail

_____

Ashok Bail
Attorney for Plaintiff
3120 Southwest Freeway, Suite 450
Houston, TX 77098
Tel. No. (832) 216-6693
Fax. No. (832) 263-0616
E-mail: ashok@baillawfirm.com
Attorney for Plaintiff
The Bail Law Firm, PLLC

**CERTIFICATE OF SERVICE**

I hereby certify that on June 1, 2023 I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/Ashok Bail_____
Ashok Bail